**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

_____

|  |  |
|---|---|
| JUICE CREATIVE GROUP, LLC, | ) |
| | ) |
| Plaintiff, | )   Civ. No. |
| | ) |
| | )   **COMPLAINT** |
| v. | )   **AND DEMAND FOR JURY TRIAL** |
| | ) |
| UNCOMMONGOOD, INC., | )   September 16, 2022 |
| | ) |
| Defendant. | ) |

_____

## PRELIMINARY STATEMENT

1.     This is an action seeking an injunction and damages for unlawful copyright infringement and other wrongful acts by Defendant UncommonGood, Inc. ("UG") concerning the valuable source code created and owned entirely by Plaintiff Juice Creative Group, LLC ("Juice"). Juice is the owner of six copyrights registered with the United States Copyright Office in Juice's name as well as additional intellectual property rights, including additional unregistered copyrights, all of which UG is currently exploiting, infringing and profiting from to Juice's detriment.

2.     UG entered into a master services agreement with Juice effective as of August 10, 2021 (the "Master Services Agreement" or "MSA"), for Juice to design, code and build out a series of robust web-based features for the basic UG web application that Juice had already created for use by UG. As is often the case with startups like UG with whom Juice partners, UG was at an early stage of capital development and its ability to raise more capital was dependent upon its ability to put a working business model and operation into place. As it typically does in partnerships like these, Juice agreed to design and build a robust and feature-rich web application

at close to cost while UG worked on getting its team and operations up and running. Juice maintained ownership of the source code as the Master Services Agreement makes unambiguously clear. Juice would then recoup its losses and begin to make a profit later in the relationship either by continuing to host and maintain the site for UG at market rates, or by later selling and transferring the code to UG when it has the resources to run and maintain the site itself. Juice refers to these relationships as partnerships in part because it is assuming some risk of the startup's success.

3.      UG decided not only that it liked having a robust and feature-rich web application built for it at close to cost, but that it also wanted to own the code and have Juice continue building for UG indefinitely without having to pay. Through a pattern of deceptive and fraudulent conduct, UG made false and misleading representations to Juice to circumvent the ownership provisions of the Master Services Agreement and to induce Juice to enter into the March 7, 2022 Transfer Agreement whereby Juice would transfer possession and ownership of the source code to UG (the "Transfer Agreement").

4.      The intent and heart of the Transfer Agreement was that Juice would transfer possession and ownership of all that it had built uniquely for UG, UG would pay some portion of the outstanding invoices that it had been wrongfully withholding, the parties would terminate their relationship cleanly and permanently, and the litigation that UG had threatened would be averted.

5.      But having represented that it would accept the existing source code built by Juice uniquely for UG's web application as fulfillment of the Juice's obligation to UG, UG immediately alleged a breach of the Transfer Agreement just hours after UG took possession of the code. That very evening UG demanded that Juice provide four additional coded features that all parties knew did not exist – i.e., demanding that Juice continue to work for UG for free.

6.      As set forth in detail below, UG never intended to abide by the terms of the Transfer Agreement. UG falsely represented to Juice that all it wanted was "existing" UG specific material and falsely acknowledged that the list of such existing UG specific material, agreed to by both parties and clearly referenced in the Transfer Agreement itself, was the comprehensive and complete universe of what was to be transferred. UG also misrepresented that transfer of the existing source code would constitute full and final termination of the parties' relationship and that it would seek no further development from Juice. Importantly, UG represented that if Juice entered into the Transfer Agreement, UG would drop its (baseless) threats to litigate over fees previously paid by UG to Juice. Because it had no intention of fulfilling these promises made as part of the Transfer Agreement, UG procured the existing source code by fraud.

7.      Now, UG continues to utilize protected, valuable source code for profit, to the detriment of the copyright holder, Juice.  UG's use of non-UG specific material, the rights to which Juice never transferred, is infringing. UG's use of the copyrighted UG-specific material, which right was procured by fraud, is infringing. UG's continued demands that Juice develop more features for free or pay an arbitrary, large sum of money to UG, are wrongful and unlawful.

8.      The Transfer Agreement at issue must be rescinded because it was procured by fraud, and UG must be enjoined from infringing all of Juice's copyrighted material.  Juice is also entitled to damages arising out of UG's wrongful use of Juice's source code and its other wrongful conduct as detailed below.

## PARTIES

9.      Plaintiff Juice Creative Group, LLC is a Delaware limited liability company, having its principal place of business in Norwalk, Connecticut. Juice provides digital media services including web design, branding, and other advertising and marketing services.

10.     Defendant UncommonGood, Inc. is a Delaware corporation, having its principal place of business in Greenwich, Connecticut. UG describes itself as a financial technology company that facilitates internet-based funding and promotes awareness for non-profit organizations.

## JURISDICTION

11.     The Court has jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338, as this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*

12.     The Court has supplemental jurisdiction over additional claims asserted in this Complaint pursuant to 28 U.S.C. § 1367.

## VENUE

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant is found within this district and a substantial part of the events giving rise to the claim occurred within this district.

14.     Furthermore, the parties designated this Court to have jurisdiction over this dispute in a forum selection clause in one of the alleged contracts at issue in this action.

## FACTS COMMON TO ALL COUNTS

### A.     Background

15.     Juice is a full-service digital agency and business consultant.  Juice works with companies at all stages of growth but has a focus of working with startups. When partnering with a startup, Juice's business model is to help the startup founder to design, refine and launch the new products, services and experiences as the startup works to raise money and build its own internal

team.  Juice's model is designed to help the startup get off the ground even if it has limited capital and resources, even before the startup's operating model has come into focus.

16.      UG is one such for-profit startup.  UG provides charitable organizations with a one-stop suite of tools and organizational products to help run their charities for a fee. UG also functions as a marketplace for philanthropically minded people to find, learn about, and hopefully donate to charities that focus on causes in which they are interested.

17.       In March 2020, UG solicited Juice to provide digital media solutions, focusing primarily on branding, marketing, business development, and website initiation and building services to help it develop a suite of products/marketplace site.

18.      Juice submitted to UG a Proposal for Services outlining its proposed strategy, along with proposed deliverables, time estimates, and cost estimates (the "March 2020 Proposal").  The parties began to work together in general accordance with the March 2020 Proposal without any signed contract.  Juice provided consulting services with respect to branding, market research, initial business model and design services and built a basic web application in beta model as set forth in the March 2020 Proposal. The beta model went live on April 21, 2021. The March 2020 Proposal capped fees at $95,592.50 and actual payments thereunder totaled $89,224.

19.      From March 2021 to September 6, 2021, Juice provided additional services, including development of additional features to be added on to the web-based application, building out a demo server for a presentation to UG's board of directors in September, and beta partner marketing and outreach, which were neither in the March 2020 Proposal nor covered by any other agreement. In fact, of the approximately twenty partner charities that signed up to use the UG platform, more than ten had been obtained through the connections and efforts of Juice.

20.     In planning for its new capital raise in September 2021, UG wanted to continue to add features to the web application.  Thus, UG asked Juice to formalize the process for developing these important new features in or around August 2021.  The parties followed the model that Juice employs with most startups – charging deeply discounted prices at close to cost in the short term to enable a capital raise, with the understanding that the short-term relationship would change to a more equitable, and commercially standard model if the startup was able to raise capital.

> **B.**     **The Parties Enter Into the Master Services Agreement and the Initial Statement of Work for Design and Development of the UG Web-Based Application**

21.     The parties executed the Master Services Agreement to govern the web application and feature development work to be performed by Juice.  *A true and correct copy of the fully executed MSA is attached hereto as Exhibit A.*  The MSA provides that from time to time, the parties would specify the work to be performed and fees to be paid in Statements of Work that would become part of the MSA. *MSA, Art. II.*

22.     The parties worked together pursuant to the MSA and an initial Statement of Work (the "Initial SOW"), which contemplated three phases of work to be performed during August, September and October 2021, respectively, building out the web application and certain enumerated features.  *A true and correct copy of the Initial SOW is attached hereto as Exhibit B.*

23.     Consistent with Juice's business model for working with emerging startups, the costs set forth in the Initial SOW were "reflective of cost of labor for this project, with no upcharge to [UG]." *Initial SOW.*

24.     Also consistent with Juice's model for working with emerging startups, the MSA clearly and unambiguously provides that ownership of all intellectual property rights to anything

created by Juice pursuant to the MSA remains with Juice.  Specifically, section 14.1 of the MSA provides:

> **Section 14.1** Except as otherwise specifically provided below or in a Statement of Work, *each party shall retain all right, title, and interest in and to such party's Intellectual Property and all improvements, modifications, enhancements and derivative works and any Intellectual Property developed or created by such party in connection with performing its obligations hereunder*, and all copies and embodiments thereof, including all rights in know-how, copyrights, trademarks, patents, patent applications (including reissues, renewals, continuations, continuations-in-part, or divisions of any patent or patent application), trade secrets, instructions, improvements, modifications and all proprietary information relating to such party's products and services (collectively, all of the foregoing, "Intellectual Property"). *Without limiting the generality of the foregoing, Client shall not (i) decompile, reverse engineer, disassemble, or otherwise attempt to discover the source code of any deliverable or other product or software of JUICE, (ii) reduce any deliverable, or other product or software of JUICE to a human-perceivable form, or (iii) adapt, modify, sublicense, rent, lease, resell for profit, distribute (except as may be otherwise provided in a Statement of Work) or create derivative works based on any deliverable or any component software code*. Each party agrees that it shall not at any time apply for any registration of any patent, copyright or trademark, or other designation, which would affect the other party's exclusive ownership of such other party's Intellectual Property, or file any document with any government authority or take any action, which would adversely affect such other party's exclusive ownership thereof.

*MSA §14.1* (emphasis added).

25.     The development process was multi-stepped. First, Juice's development team would formulate a design and architecture to accomplish a feature desired by UG. UG would be asked to review and approve the design.  Only when the design was approved by the client would Juice move to development and begin writing the unique source code.  The Initial SOW provides, for every phase, the following language: "* All features will be built in accordance to the specifications and design approved by the client in advance of each feature being developed. Any changes after approval is **[sic]** not part of this deliverable phase." *Initial SOW, p.1, p.2, p.3 and p.4.*

26.     Once the client approved a design, Juice would proceed to write source code for the approved feature.  When Juice has completed the source code for a particular feature, UG then has another opportunity to review and approve the functionality, user experience and user interface. Once UG approved at this stage, Juice would translate the source code into read-only code to publish on the site that contain the UG web application. Once the feature is published, it has been delivered to UG pursuant to the MSA.

27.     The Initial SOW lists a total of fourteen features contemplated by the parties to be bult out by Juice for the UG web application and sets forth a work plan to begin that development covering the three-month period of August-October 2021.

28.     The MSA by its terms was in effect for three months, or until thirty (30) days after the work under latest statement of work was complete, whichever was shorter. *MSA, Section 1.1.*

29.     Consistent with the terms and structure of the MSA, in February 2022, Juice filed for registrations of the copyrighted material for six features it built for UG's web application. Juice has obtained registrations of the copyrighted material for six features it built for UG's web application: (1) Non-profit Sweepstakes Tool; (2) Non-Profit CRM; (3) Non-Profit Fundraiser Tool; (4) Non-Profit Media Library Tool; (5) Non-Profit Donation Tools; and (6) Non-Profit Email, (collectively the "Copyright Registrations").[1]

---

[1] Six filings were made in February; two required refiling in August 2022.  All six registrations have been confirmed by the Copyright Office by e-mail, but only two certificates have yet been mailed – TX 9-118-495 for the Sweepstakes Tool and TXu 2-329-948 for the Nonprofit Media Library Tool. The other certificates have not yet been received.  The request numbers for the registrations for which certificates have not been received are: 1-11625830171, 1-11625866850, 1-11212755481, 1-11212760109, respectively.

C.   **UG Halts Work on the Four Features and Juice Produces the Revised October Statement of Work to Govern through December 31, 2021**

30.   Included in the list of fourteen features to be developed for UG's web-based application pursuant to the Initial SOW, the following four were subsequently taken out of scope by UG: (1) Stories was to have been a part of Phase II to begin in September, and (2) Chat, (3) Auctions, and (4) Analytics were part of Phase III to begin in October (collectively, the "Four Features").

31.   However, on September 28, 2021, Carolyn Driscoll, President of UG and signatory of the MSA on behalf of UG, sent a message to Carter Grotta, Managing Partner and Creative Director of Juice, via Slack, informing Mr. Grotta that she wanted Juice to halt work on certain features and to focus on the features that were currently in development and allow for user testing.

32.   Specifically, Ms. Driscoll stated that:

> And I think we need to discuss hitting the pause button on further functionality for a while. I know we have Email, Media Library and Project Management tools in Dev. I think we should let it breath and do some user testing before adding additional functions. So lets [sic] pause any UX/UI, project management work etc [sic] that Juice is doing and focus solely on the tech development.
>
> …
>
> [S]o to be clear, I would like to finish email, project management tools, and media library[.]
>
> [T]hen let it exist in the wild so we can actually do user testing before building any more functionality.

33.   Ms. Driscoll reiterated the instruction to Juice to pause certain work including but not limited to the Four Features during an October 1, 2021 meeting between Juice and UG team members. During the meeting, Juice provided UG links to all the work that had been done on the

Four Features through September 28, 2021 when work was halted, including initial storyboards, designs, wireframes, and other documentation.

34.     Also, on or about October 1, 2021, it became publicly known that UG was successful in its capital raise and had received a round of investment of approximately $2.5 million. This capital raise was successful in large part because of the technical capabilities of the web-based application created by Juice.

35.     Thereafter, Ms. Driscoll demanded an updated Statement of Work to reflect these changes to scope and the revised timeline.

36.     On or about October 13, 2021, Juice sent UG the requested revised statement of work (the "October SOW").  *A true and correct copy of the October SOW is attached hereto as Exhibit C.*

37.     In accordance with UG's explicit instruction, the October SOW removed the Four Features (i.e., removed the Stories feature from Phase II, and the Chat, Auctions, and Analytics features from Phase III), and instead focused on the Project Management Tools, Media Library, and Email Integration features.  The October SOW provides that: "An updated status of each features' progress and changes to original scope requested by client are provided in Appendix II." *October SOW, Appendix I, p.1.*  Appendix II then expressly states that each of the Four Features was "Removed from scope by the Client as of September 28." *October SOW, Appendix II.* Appendix II also reflects that other changes were made to the original project scope by the client, *e.g.,* adding in a new feature "CRM V2" which was already complete as of October 13, 2021.  *Id.* CRM V2 was not a feature that was listed in the Initial SOW, but UG had provided instructions to add it.  Other similar changes that added changes post-design approval had been made to scope at UG's direction.

38.     The October SOW, just like the Initial SOW, also required that all features be approved by UG before their development.  Having explicitly taken the Four Features out of scope on September 28, UG clearly never approved the Four Features for development.

39.     Based on UG's instructions in September and October 2021, and the requirements of the October SOW, Juice did not continue development of any of the Four Features after September 28th, 2021.

40.     Ms. Driscoll provided feedback and articulated specific concerns about the October SOW.  But neither Ms. Driscoll nor anyone at or on behalf of UG ever objected to the removal of the Four Features from scope. Upon information and belief, UG simply did not want to revert to the commercial standard pricing that the parties contemplated would apply once UG received funding and the MSA expired.

41.     Although UG never executed the October SOW, UG continued to direct and pay for work (still at the deeply discounted prices) to be done by Juice, and Juice performed services pursuant to the October SOW between October and December 2021.

42.     Neither Ms. Driscoll nor anyone at UG ever sought to restart work on the Four Features after September 28.  Nor did anyone from or on behalf of UG ever inquire as to why no work was being done on the Four Features.

43.     On December 10, 2021, Juice sent UG a User Manual, prepared at UG's request, that described all the features built for the UG website. These manuals made no reference to the Four Features, which all parties knew were not built pursuant to UG's instructions.

44.     On December 16, 2021, also at UG's request, Juice set forth in an email precisely what was being worked on currently and would be worked on through the end of December – unsurprisingly, with no mention of the Four Features.

45.     And in January – February 2022 as set forth more completely below, UG actually had view access to what the parties agreed constituted everything that had been built by Juice for UG. No code for the Four Features appeared in the view access material and UG did not raise an issue.

### D.     UG Seeks to Terminate the Relationship Early and the Parties Negotiate the Transfer Agreement

46.     In or about October 2021, and further detailed in December 2021, understanding that not all the work that had been originally imagined by the parties had been completed, and having already received the sizeable investment that Juice's web-based application helped to procure two months prior, UG informed Juice that it wished to wind down the parties' relationship. Juice agreed. Because Juice would not be continuing to work and commercially standard fees for UG, Juice simply sought payment of outstanding invoices and fair terms for the transfer of ownership and possession of the source code from Juice to UG.

47.     Having received its $2.5 million investment in or about October 2021, UG immediately began the process to transition Juice out.  UG took advantage of Juice's business model to obtain a robust and feature-rich web site at deeply discounted rates to show to investors, while never intending to make Juice whole either with a continued market-based relationship or by purchasing back the source code at a price that reflected its value.

48.     Beginning in December 2021, UG and Juice began to negotiate the March 7, 2022 Transfer Agreement that would govern the termination of their relationship (the "Transfer Agreement").  *A true and correct copy of the Transfer Agreement is attached hereto as Exhibit D.* UG made clear that it wanted to take all aspects of the UG website and web-based application,

underlying source code, software, and all other functionality and means to access and operate the website and application into its own exclusive control.

49.     But UG refused to pay for any of it.

50.     What is more, UG sought to increase its negotiating leverage by making threats of litigation based on unfounded complaints about fees and allegations regarding Juice's work constructed out of whole cloth.  In December 2021, UG's counsel incorrectly took the position that, despite the clear and unambiguous language of the MSA that governed, UG owned the source code and Juice was wrongfully withholding it. UG, through its counsel, repeatedly threatened litigation if the source code were not turned over immediately for free.

51.     Eventually, UG's strong-arm tactics prevailed, and Juice decided that it did not have the energy or resources to fight with UG and its counsel and made many compromises to achieve the peace that the termination of the relationship would afford.

52.     Accordingly, at the heart of the Transfer Agreement was the fundamental understanding that Juice would turn over source code only to the extent that such source code existed, and that such code would be provided "as is." The consideration for obtaining the source code (to which UG had no rights whatsoever under the MSA or by any other means) was that UG would receive what Juice had built, receive a 50% discount on outstanding invoices to Juice, and UG would make no further financial or service demands of Juice.

53.     Prior to executing the Transfer Agreement, the parties followed a series of procedures to ensure that UG understood exactly what existed and could be transferred so as to avoid any disputes. By e-mail dated, January 15, 2022, Juice proposed a View Access period to show UG:

"all computer code and information in Juice's possession that Juice has **ever built,** drafted, installed or implemented, and any element it otherwise now uses or may use during the Term to operate the UG Website in its most up-to-date form, whether for live, public use and/or administrator use in a pre-live, testing or "sandbox" firm, or administrator use for live form including all features or elements, whether or not entirely or partially completed."  (emphasis added).

54.     The proposal would also make Juice developers available to UG for whatever questions or concerns UG might have with respect to "all computer code and information in Juice's possession."  On January 17, UG responded:

*"Your procedure in your email below is agreeable for the View Access Period."*

55.     From January 19 through February 3, 2022, Juice *in fact* provided UG with View Access to all existing materials, including source code, with no exceptions or reservations.

56.     By telephone conversation on February 22, 2022, counsel for UG verbally represented to Juice board member Rhonda Brown that "[The Transfer Agreement] was meant to resolve the entire matter." UG's counsel specifically told Ms. Brown that he left the words "As Is" in the Transfer Agreement and told UG's CEO (Ms. Driscoll) specifically that what they saw in the View Access was precisely what would be transferred under the Transfer Agreement – no more, no less.

57.     Juice executed and entered into the Transfer Agreement in reliance on UG's several representations that Juice would meet its obligations if Juice provided everything shown during the View Access Period and complied with the specific process set forth in the Inventory and Mechanics of Transfer List to be incorporated as Exhibit B to the Transfer Agreement.

58.     These representations are in fact reiterated in the Transfer Agreement itself. The Transfer Agreement acknowledges that the View Access Period took place precisely as planned, and the computer code and information shown to UG during that period represents the totality of the code and information existing in Juice's possession:

WHEREAS, to facilitate said transfer, from January 19, 2022 to February 3, 2022, Juice provided UG with read only, or "view access," entry to *all computer code and information in Juice's possession* that is used to operate the UG website in its most up-to-date form…

(emphasis added).

59.     Section 1 of the Transfer Agreement defines the Web Site Technical Deliverables and the Web Site Content Deliverables to be transferred.  The definition mirrors the language from Ms. Brown's January e-mail describing the View Access period materials and the Whereas clause quoted above which acknowledges that View Access Period took place. Specifically, the Transfer Agreement called for the transfer of "all existing computer and physical files…whether or not entirely or partially completed or in a pre-live 'sandbox' form and whether or not accessible to the public…" necessary or convenient to UG alone to operate the UG web site. *Transfer Agreement §1.*

60.     In accordance with the Transfer Agreement and the process of Exhibit B attached thereto, Juice transferred all existing computer code, files, and information in its possession to UG.

61.     Juice transferred possession not only of the Web Site Technical Deliverables and Web Site Content Deliverables, but also transferred additional proprietary, copyrighted material that is owned by Juice and as to which the Transfer Agreement *did not* assign ownership rights from Juice to UG. The Transfer Agreement specifically excluded from the definition of Web Site Technical Deliverables and reserved Juice's ownership rights in certain elements that Juice developed and used more generally for other clients, though in some cases, these additional elements may be embedded in UG's web-based application. *See Transfer Agreement, Section 1(c).* The Transfer Agreement – even if it were not procured by fraud – has no provision granting UG ownership of or license to use and exploit these additional Juice proprietary tools which are "a

component of the UG web site that, in [their] generic form may have usefulness and in other software programs or programming applications." *Id.* There is currently no basis whatsoever for UG to exploit that material.

62.     Juice completed the transfer of existing materials to UG in compliance with the four-day procedure laid out in the Transfer Agreement at or about 5:00 p.m. on Friday, March 11.

> ### E.   UG Made Multiple Misrepresentations to Induce Juice to Enter into the Transfer Agreement and Surrender the Source Code that UG Had Neither Bargained For Nor Paid For

63.     But just as UG never intended to abide by the provisions of the MSA, UG never intended to abide by the Transfer Agreement or allow the Transfer Agreement to end the parties' relationship. UG never intended to accept the materials it saw in the View Access Period as the fulfillment of Juice's obligations despite its multiple representations in negotiating – and in executing – the Transfer Agreement.

64.     *A mere five hours after UG obtained possession of the source code from Juice*, UG demanded for the first time that Juice turn over the Four Features. On March 11, 2022, at 10:20pm, UG's counsel emailed to Ms. Brown:

> However, as of close of business today, UG is still not in possession of all the UG Website Technical Deliverables as you suggest. Specifically, UG does not have in its possession those expressly listed and included by Exhibit A – i.e., … (ii) any code whatsoever related to (a) stories (see Phase II: September at p. 3), (b) chat (see Phase III: October at p. 4), (c) auctions (id) and (d) analytics (id); (iii) any design documentation for 9 additional features (Summary see p. 1)…

65.     This claim of UG counsel can only have been made in bad faith, in light of the fact that UG itself halted development of the Four Features and acknowledged, tacitly or expressly, on multiple occasions that the Four Features were never built or paid for.  Juice responded to UG's counsel by reiterating that it provided everything in its possession, and everything it was obligated

to provide under the Transfer Agreement. Because no code for the Four Features existed, and never existed, there was no code for Juice to transfer to UG in connection therewith.

66.     Notably, Juice did once again transfer to UG links to the relevant files and information that existed concerning the Four Features, such as initial storyboards, designs, wireframes, and other documentation, that it had already transferred on October 1, 2021.

### F.     Juice's Cease and Desist Letter

67.     Though UG, through counsel, made threats and spurious claims through the end of March and beginning of April 2022, Juice believed the relationship to be fully terminated.  On April 19, 2022, Juice wrote that it believed the matter resolved and received no reply from UG for four months.

68.     On August 4, 2022, UG's counsel forwarded Ms. Brown a draft complaint based on Juice's alleged breach of the Transfer Agreement. UG's counsel stated that he would file the complaint unless Juice "complete[d] its performance" under the Transfer Agreement, or "remit[ted] a refund of $200,000 for the undelivered items."

69.     Both the email from UG's counsel and the attached draft complaint are riddled with misrepresentations, including but not limited to: (a) an allegation that Juice invoiced UG for the development of the Four Features; and (b) the implicit denial that the MSA (which shockingly is not even mentioned in the draft complaint) is a valid and binding agreement of the parties.

70.     UG never intended to honor the Transfer Agreement that it induced by fraud and continued its threats of litigation. On August 22, 2022, counsel for Juice responded to UG's allegations by sending a Cease-and-Desist Letter to UG's counsel. Because UG procured the Transfer Agreement through fraudulent means, UG had no right to utilize Juice's source code.

71.     UG never responded to Juice's Cease and Desist Letter and has not ceased or desisted its infringement. As of the filing of this Complaint, UG has manipulated Juice's copyrighted source code to add several new features to the web application, including, among other things, a cookie policy widget and subscription tiers, and it has taken the media library live, which required UG to access Juice's source code and reduce it to human perceivable form. Altering Juice's copyrighted source code is precisely what the MSA sought to protect against, and UG would not have been able to do so without inducing Juice to enter into the Transfer Agreement.

## FIRST CAUSE OF ACTION
## COPYRIGHT INFRINGEMENT

72.     Juice repeats the allegations of the preceding paragraphs as though fully set forth herein.

73.     Juice's source code is an original work containing copyrightable subject matter for which copyright protection exists under 17 U.S.C. § 101, *et seq.*

74.     Absent a writing to the contrary, copyright ownership vests automatically in the author of the work, i.e., the party which translates a work into a fixed, tangible medium of expression entitled to copyright protection. Here, Juice created the source code and retained its ownership rights in all the web application materials and source code throughout the parties' relationship.

75.     For the avoidance of doubt, the parties further agreed in the MSA, Juice would remain the exclusive owner of rights under copyright in and to the protected source code.

76.     Juice is the owner of the six Copyright Registrations and of additional intellectual property, including additional unregistered copyrighted material embodied in the UG web-based application.

77.     UG has obtained possession of this copyrighted source code through fraudulent means, and is exploiting the copyrighted source code without authorization in violation under 17 U.S.C. § 101, *et seq.*

78.     UG's infringing conduct alleged herein was and continues to be willful and with full knowledge of Juice's rights in the source code and has enabled UG illegally to obtain profit therefrom.

79.     As a direct and proximate result of UG's infringing conduct alleged herein, Juice has been harmed and is entitled to damages in an amount to be proven at trial.

80.     Pursuant to 17 U.S.C. § 504(b), Juice is also entitled to recovery of UG's profits attributable to UG's infringing conduct alleged herein, including from any and all profits obtained utilizing the source code, and an accounting of and a constructive trust with respect to such profits.

81.     Alternatively, Juice is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), for UG's infringing conduct and for each line of source code that UG has infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

82.     Juice further is entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

83.     As a direct and proximate result of the UG's infringing conduct alleged herein, Juice has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless UG's infringing conduct is enjoined by this Court, Defendant will continue to infringe Juice's copyright-protected source code. Juice therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining UG's ongoing infringing conduct.

## SECOND CAUSE OF ACTION
## <u>FRAUD IN THE INDUCEMENT</u>

84.    Juice repeats the allegations of the preceding paragraphs as though fully set forth herein.

85.    Juice entered into the Transfer Agreement based on UG's representations that the Transfer Agreement would fully terminate their relationship; that the Inventory and Mechanics of Transfer List contained the universe of documents and information to be transferred; and that the items made available to UG during the View Access Period established the full and complete set of items and documents or information would be required to be transferred for Juice to fulfill its obligations under the Transfer Agreement.

86.    Juice relied on these representations to its detriment by executing the Transfer Agreement, surrendering its possession of the source code, and reducing its receivables by approximately 50%.

87.    Contrary to UG's representations, UG had no intention of terminating its relationship with Juice.

88.    UG knew at the time its counsel represented to Juice that the documents and information provided during the View Access Period were the complete universe of material to be transferred, that it intended to demand more – including the Four Features, or a disproportionately large sum in their stead.

89.    UG made such representations for the purpose of obtaining the valuable source code to the web application, circumventing the provisions of the MSA, and to coerce Juice into providing additional source code for UG (i.e., the Four Features which UG knows full well do not exist) and/or coerce Juice into paying sums to UG under the threat of litigation it had agreed to forego.

90.     UG's conduct after inducing Juice to sign the Transfer Agreement directly contradicted the promises and representations made to induce Juice to sign the Transfer Agreement.

91.     Had Juice known that just hours after the transfer of the documents and ownership of the source code was completed, UG would demand additional deliverables from Juice, and use that demand to reinstitute its threat to sue Juice for monetary damages, it never would have executed the Transfer Agreement and surrendered ownership of the source code.

92.     UG's actions as detailed herein were willful, malicious and without legal justification.

93.     As a direct and proximate result of UG's fraudulent conduct, Juice has suffered damages.

94.     As a direct and proximate result of UG's fraudulent conduct, Juice is entitled to rescission of the Transfer Agreement.

**THIRD CAUSE OF ACTION**
**BREACH OF THE MSA**

95.     Juice repeats the allegations of the preceding paragraphs as though fully set forth herein.

96.     The MSA is a valid and enforceable contract.

97.     Under the MSA, UG is responsible for making payment of all Juice invoices within 30 days of receipt thereof.

98.     Juice fully performed all of its obligations pursuant to the MSA.

99.     Pursuant to the MSA, Juice would send monthly invoices to UG for work performed.

100.    As of the date of the Transfer Agreement, UG had accrued approximately $46,925.95 in unpaid invoices.

101.    Since that time, UG has paid only $23,462, leaving approximately $23,463.95 due and owing.  Juice has made repeated demands for payment, to no avail.

102.    As a direct and proximate result of UG's breach of the MSA, Juice has suffered damages in an amount to be determined at trial, but in any event no less than $23,463.95.

### FOURTH CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – TRANSFER AGREEMENT

103.    Juice repeats the allegations of the preceding paragraphs as though fully set forth herein.

104.    By demanding the Four Features and threatening litigation mere hours after receiving ownership of the documents and source code from Juice, UG has evaded the spirit of the Transfer Agreement.

105.    In doing so, UG has deprived Juice of the benefits of the bargain – *i.e.,* a full and complete termination of the relationship between the parties.

106.    As a direct and proximate result of UG's infringing conduct alleged herein, Juice has been harmed and is entitled to damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

107.    Juice repeats the allegations of the preceding paragraphs as though fully set forth herein, excluding those allegations of an express contract between the parties.

108.    Juice has provided UG with valuable source code and other information, to which UG otherwise would have no ownership rights.

109.    Juice has unjustly received no benefit or compensation for the valuable source code and other information provided to UG.

110.    UG also has not paid fair value for the services provided by Juice.

111.    UG has been enriched by utilizing the source code for the benefit of its website and application, from which it has been able to obtain valuable benefit, and by failing to pay Juice for the source code it created and services it provided.

112.    The failure of UG to pay Juice fair value for the source code and for its services was to Juice's detriment.

113.    As a direct and proximate result of UG's infringing conduct alleged herein, Juice has been harmed and is entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## QUANTUM MERUIT

114.    Juice repeats the allegations of the preceding paragraphs as though fully set forth herein, excluding those allegations of an express contract between the parties.

115.    Juice has conferred a benefit upon UG by providing UG with valuable source code and other information, to which UG otherwise would have no ownership rights.

116.    Juice has unjustly received no benefit or compensation for the valuable source code and other information provided to UG.

117.    Juice is entitled to reasonable value for the services rendered to UG.

118.    UG is aware of the benefit conferred upon it by Juice.

119.    UG accepted and retained the benefits conferred upon it by Juice and has been enriched by utilizing the source code for the benefit of its website and application, from which it has been able to obtain valuable financial benefits, and by failing to pay Juice for the source code it created and services it provided.

120.     The failure of UG to pay Juice fair value for the source code and for its services was to Juice's detriment.

121.     As a direct and proximate result of UG's infringing conduct alleged herein, Juice has been harmed and is entitled to damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT

122.     Juice repeats the allegations of the preceding paragraphs as though fully set forth herein.

123.     There is an actual and bona fide substantial question in dispute as to whether Juice has "completed its performance" under the Transfer Agreement.

124.     As set forth above, Juice has fully complied with its obligations under the Transfer Agreement.

125.     Juice is entitled to a declaration and judgment that it has not breached the Transfer Agreement.

**WHEREFORE**, Plaintiff demands judgment on all Counts of the Complaint and requests that the Court enter judgment in Plaintiff's favor and against Defendant in the Complaint as follows:

1.     On the First Cause of Action, awarding Plaintiff a preliminary and permanent injunction against further exploitation of Juice's copyrighted materials as well as actual or statutory damages in an amount to be determined at trial, and costs and attorneys' fees;

2.     On the Second Cause of Action, declaring the Transfer Agreement be rescinded and awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial;

3.      On the Third Cause of Action, awarding Plaintiff damages in an amount to be determined at trial, but in any event no less than $23,463.95;

4.      On the Fourth Cause of Action, awarding Plaintiff damages in an amount to be determined at trial;

5.      On the Fifth Cause of Action, awarding Plaintiff damages in an amount to be determined at trial;

6.      On the Sixth Cause of Action, awarding Plaintiff damages in an amount to be determined at trial;

7.      On the Seventh Cause of Action, declaring that Plaintiff has not breached the Transfer Agreement; and

8.      Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  September 16, 2022

McCARTER AND ENGLISH

By
Joseph J. Cherico (CT 24869)

One Canterbury Green
201 Broad Street
Stamford, CT 06901
Tel.:  (203) 399-5940
Fax:  (203) 399-5840
Email:  jcherico@mccarter.com

-and-

KIRSCH & NIEHAUS, PLLC
(pro hac vice motions to be filed)

Emily B. Kirsch
Craig S. Tarasoff
950 Third Avenue, Suite 1900
New York, New York 10022
(646) 415-7530
emily.kirsch@kirschniehaus.com
craig.tarasoff@kirschniehaus.com

*Attorneys for Plaintiff*
  *Juice Creative Group, LLC*