**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| JUICE CREATIVE GROUP, LLC, | ) ) ) | Civ. No. 3:22-cv-01175-JCH-MEG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNCOMMONGOOD, INC., | ) ) | April 11, 2023 |
| Defendant. | ) ) ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

Spencer Dreier (*pro hac vice*)
Phillips Nizer, LLP
485 Lexington Avenue, 14th Fl.
New York, New York 10017
Tel.: (212) 841-1344
Email: sdreier@phillipsnizer.com

Robert M. Fleischer (CT 11960)
Green & Sklarz, LLC
One Audubon Street, Third Floor
New Haven, CT  06511
Tel.: (203) 285-8545
Email: rfleischer@gs-lawfirm.com

*Attorneys for Defendant*
*UncommonGood, Inc.*

Defendant UncommonGood, Inc. ("UG") respectfully submits this Memorandum, together with the Declaration of Carolyn Driscoll, dated April 11, 2023 ("Driscoll Dec."), and the Declaration of Spencer Dreier, Esq., dated April 11, 2023 ("Dreier Dec."), in opposition to the Motion to Compel by Plaintiff Juice Creative Group, LLC ("Juice").

## THE NATURE OF THE CASE

This dispute arises out of a simple breach of contract – by Plaintiff. The parties entered into a certain Transfer Agreement in March 2022 (the "Agreement"), by which Juice was obligated to transfer to UG's possession certain computer code and related items that Juice had produced for UG's website, and, when Juice failed and refused to deliver several of those items, leaving UG without approximately $200,000 of deliverables, UG brought suit against Juice for that breach in Connecticut Superior Court, on August 26, 2022. Three weeks later, Juice retaliated by bringing this action in this Court, frivolously claiming that UG's filing its State court action breached and voided the parties' Agreement and that, thus, UG's use of those other items that Juice *did* transfer and that UG has been using since violates Juice's copyrights, despite the Agreement expressly and indisputably confirming UG's ownership of those items and despite UG paying in full for them.

This case is nothing other than an attempt by Juice to recapture the intellectual property that it sold to UG, while keeping the approximately $600,000 that UG paid for it, including both the $400,000 in deliverables it transferred (which is the subject of Juice's efforts to claw back in this action) and the $200,000 of deliverables it failed to transfer (which is the subject of UG's State court action to force Juice to deliver or refund). Juice wishes to use this Motion to weaponize the discovery process under the pretext of a copyright claim to force UG to disclose how it has used that intellectual property and how it has benefited from it, so that Juice can gain the commercial advantage of exploiting it, even without actually prevailing on the merits of its meritless claim.

1

Indeed, this Motion is Juice's *whole purpose* in bringing this action. It is the vehicle that allows Juice to conjure the need for the sort of broad and invasive discovery in a bogus copyright claim that goes far beyond the discovery it would otherwise be permitted in defending UG's State breach of contract claim. Once Juice knows all the improvements UG has made to the code that UG initially acquired from Juice and all the ways in which UG has used those improvements, that knowledge in the hands of Juice cannot be unwound (see Driscoll Dec. ¶ 3). Thus, this Court should not just routinely grant that knowledge to Juice through its abuse of the discovery process.

In sum: Even if, contrary to all the facts, Juice is proven correct in the State action that it was not obligated to deliver to UG under the Transfer Agreement anything more than it did deliver, the result will simply be a finding by the State court that neither UG nor Juice owes each other anything more under the Agreement. There is no circumstance under which that results in UG having to return to Juice the intellectual property that Juice did deliver to UG – and that UG fully paid for. Accordingly, there is no basis whatsoever for a copyright claim that could entitle Juice to the discovery UG is challenging here, even if there were no other grounds for UG's Objections to that discovery. Nevertheless, as shown below, there are *numerous* other grounds which fully justify UG's Responses and Objections to this discovery and warrant a denial of Juice's Motion.

## **THE RELEVANT (AND ACTUAL) FACTS**

UG will address the relevant facts in its Argument hereinbelow regarding each of Juice's misguided contentions as to the purported deficiencies in UG's discovery Responses – but Juice's presentation of the facts (Juice Mem. at 1-4) upon which it bases this Motion is so stunningly false that various key misstatements must be pointed out at the outset to give this Motion proper context.

1. Juice states (at 2) that UG's "Objections to the subpoenas [ostensibly issued to the UG directors] were served late." This is false. In fact, the Objections were served on the very day Juice designated for Objections on the face of its subpoenas – March 29, 2023. (See Point II, *infra).*

2. Juice states (at 2) that "no documents [called for by the subpoenas] have been produced, though the deadline has passed." This is false. In fact, the deadline for production of documents that Juice designated on the face of its subpoenas has not even arrived yet. (See (Point II, *infra*).

3. Juice states (at 1) that "UG has failed to meaningfully engage in the discovery process." Clearly, this is false. In fact, Juice itself concedes (at 2) that UG produced "1995 pages of documents responsive to Juice's Document Requests" on February 3, 2023, after UG responded in timely fashion to those Requests on January 23, 2023. As Juice further concedes (at 3), UG then produced "approximately 100 pages of additional responsive documents and the last known addresses of individuals identified in UG's initial disclosures" – even while, to this date, Juice has failed to provide any addresses for the individuals identified in its own initial disclosures. UG also responded in timely, on January 23, 2023, to each Interrogatory that Juice had served upon it. UG has also provided a detailed five-page privilege log of each document withheld on the basis of the attorney-client privilege, identifying the date, sender, recipients, and subject matter. UG engaged in a nearly one hour "meet and confer" requested by Juice with respect to UG's Responses to the Document Requests and Interrogatories. And UG has served on Juice its own set of 57 Document Requests, 25 Interrogatories and 4 Notices of Deposition – all entirely in conformity with the Scheduling Order. UG has thus engaged "meaningfully" and extensively in the discovery process.

4. Juice states (at 4) that "UG's counsel would have Juice and this Court believe that not one member of the entire company ever put a single word in writing internally about the building, development, or acquisition of their Website or Web-Based Application." This is entirely false. In fact, UG has never taken that position, either with Juice or now with this Court. As shown in detail (in Section IV, *infra*), UG painstakingly explained to Juice, in what UG chooses to dismiss (at 3) as mere "rhetoric," that, as is the case with many tech start-ups that have just a handful of

3

employees, all of whom work remotely, UG team members typically communicate internally by Zoom calls that remain open through the day rather than in writing. Insofar as they communicated internally in writing about subjects related to this action, they did so – like Juice – primarily over a messaging program called Slack, which allows for the creation of chat rooms that were dedicated to various topics as they came up in the production of UG's website with Juice. These chat rooms were later mostly deactivated – both by Juice and UG – before or when the Juice consultancy ended, and UG has produced the messages from those chats where it had copies. Insofar as UG communicated internally by email or text, (a) two of the main UG team members who worked on the UG website with Juice no longer work with UG, and UG does not have access to their email accounts, and (b) the remaining UG team members reviewed their emails and texts and either never had any messages or no longer have any, because it is not their practice to retain all of their old emails and texts or did not have their old computers or phones. UG does not provide "company computers" or "company phones" and does not manage personal devices. (Driscoll Dec. ¶ 2).

5. Juice states (at 1) that it "holds six copyrights to source code that UG is currently utilizing for its Website and Web-based Application, without authorization from Juice." This is false. In fact, the ownership of the source code was expressly confirmed in the Transfer Agreement as belonging to UG – which clearly resolves UG's complete authorization to utilize the code.

6. Juice contends (at 1) that UG's ownership of the code was nevertheless somehow abrogated, because "Juice has rescinded the Transfer Agreement." This is false. In fact, Juice has never rescinded the Transfer Agreement, because it has never returned to UG the money that UG paid to Juice under the Agreement (and never even offered to do so).

7. Juice states (at 5) that "UG appears intent on employing dilatory tactics to thwart the progress of this Federal Action." This is obviously false, as demonstrated by this very Motion. In fact, the only dilatory tactic has been Juice's delay in bringing this Motion until 71 days after UG

asserted its Objections – more than 40 days after the deadline set forth in the Scheduling Order – while insisting on suspending all of its depositions until disposition of the Motion. Juice states (at n.7) that UG "delayed until April 3, 2023, before serving a single document demand or interrogatory," but, unlike this Motion, that was entirely within the permissible timeframe under the Scheduling Order. Juice states that "the parties joint status report contemplated a deposition deadline of May 1, 2023" (Id.), suggesting that UG has somehow acted to frustrate that deadline, but, in fact, the Joint Status Report, dated February 24, 2023, like the Scheduling Order itself, makes no mention of a May 1 deposition deadline but merely provides that fact discovery shall be completed by May 24 – and UG has noticed all of its depositions within that timeframe. In fact, Juice has now confirmed that May 24 *is* the deadline for depositions.

Juice has simply invented a set of facts that are belied by the self-evident actual facts and cannot be a basis for any relief here.

## ARGUMENT

### I. Juice's Motion Must Be Denied, Because It is Untimely And Has Therefore Been Waived

By Juice's own admission (Mem. at n.10), this Motion is untimely under the terms of this Court's Scheduling Order, which plainly required Juice to file any motion to compel "***within 30 days after the due date of the response***" claimed to be inadequate. As Juice acknowledges (at 2), UG served its Responses to the discovery that is the subject of this Motion on January 23, 2023. Juice then filed this Motion on April 4, 2023. The Scheduling Order expressly provides: "Failure to file a timely motion in accordance with this scheduling order constitutes ***a waiver*** of the right to file a motion to compel." (Emphasis added). There are no stated exceptions.

Nevertheless, Juice contends (at n.10) that its untimeliness should be excused, because UG did not serve its privilege log until March 29, 2023. Juice contends that until then it "had no way of knowing the completeness of the UG Production." That explanation is nonsense. Obviously,

Juice had no reason to expect that, upon receiving the privilege log, it would find that UG had claimed no privileged documents. In fact, UG counsel told Juice counsel it certainly would. In any event, based on the deficiencies that Juice attributed to UG's Responses well before receiving the privilege log, there was no prospect that Juice's receipt of the log (no matter how detailed) was going to remedy those purported deficiencies, such that Juice could not proceed with a motion to compel on all its other issues until the log was received. In its letters dated March 1, 26 and 28 (Dreier Exh. A), Juice stated that "The Interrogatory Responses, Document Responses, and UG Production all contain materials deficiencies that must be cured" (March 1 letter); that "UG's discovery responses are woefully inadequate" (March 26 letter); and that there were "egregious discovery deficiencies" (March 28 letter). The absence of a log had nothing to do with any of that.

The only reason Juice failed to meet the Court's deadline for filing a motion to compel within 30 days of receiving UG's Responses is that Juice chose to delay its own follow-up to those Responses. Juice first responded to UG's counsel regarding the Responses *37 days after receiving them* – already beyond the deadline to move for relief. Juice thus made no effort within 30 days to resolve the purported deficiencies with counsel, much less with the Court. The bottom line is that Juice got around to addressing this discovery at its leisure and on its own terms – ignoring the 30-day deadline to make the Motion and then ignoring the 10-page limit to the Motion. The Court should not allow Juice to ignore all the Rules. Its Motion is defective because it was untimely.

**II.  Juice's Motion To Compel Responses to Subpoenas Should Be Denied**

Juice misrepresents to the Court (at 17) that the three deposition subpoenas it issued to persons Juice identified as UG directors required them to produce documents not later than March 29. Conspicuously, Juice failed to include any of the subpoenas among the numerous exhibits to its Motion, but, as seen from the copies annexed as Exhibit B to the Dreier Declaration, the reality is that each of the subpoenas plainly directed the witnesses to "bring with you *to the deposition*

the following documents" set forth in the Schedule A indicated to be attached thereto (emphasis added). The three subpoenas plainly designated the deposition dates as April 12, 19 and 24. Obviously, therefore, none of the subpoenas required the production of any documents by March 29. Furthermore, not insignificantly, one of the three subpoenas (for Marc Jaffe) had no Schedule A attached to it at all, meaning he was thus not required to produce *any* documents at *any* time.

To make matters worse, Juice further misrepresents (at 17) that the deponents "waived all objections to the subpoenas," because, according to Juice, the Objections, which were served on March 29, were due on March 27. Juice points to FRCP 45(d)(2)(B), which, in the normal course, requires objections to the production of subpoenaed documents to be served "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Juice tells the Court that UG counsel accepted service on March 13, and, on this basis, contends that Objections were due on March 27. However, Juice ignores its own Instructions accompanying the subpoenas that, in the very first paragraph, state: "Any objections to the production of documents requested herein shall be made in writing and delivered to the office of Kirsch & Niehaus, PLLC, 950 Third Avenue, Suite 1900, New York, NY 10022, ***on or before March 29, 2023***." (Emphasis added). Thus, when the deponents served their Objections on March 29, they were not late – but right on time.

Even apart from the foregoing, which is dispositive on both issues Juice raises with respect to the subpoenas, the subpoenas are also defective because Juice failed to comply with FRCP 45(b)(1), which provides that: "Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, ***tendering the fees for 1 day's attendance and the mileage allowed by law***." (Emphasis added). Juice did not tender the attendance fee or the mileage for any of the subpoenaed deponents. Counsel's accepting service on their behalf, of course, does not absolve Juice of its obligation to secure the deponent with payment of the fees.

7

Finally, Juice's Motion regarding its subpoenas violates FRCP 37(a), which requires that "the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Juice did not ask to confer about the subpoenas. In fact, the parties' only conferral was on March 10, prior to Juice's even serving them. Thus, Juice's Motion in regard to the subpoenas must fail for this reason too.

### III.  Juice's Motion To Compel "A Proper Privilege Log" Should Be Denied

Juice contends (at 16) that the privilege log UG's counsel has produced "fails to comply with Federal Rule 26(b) and Local Rule 26(e), as it is missing key information that would allow Juice to assess UG's claim of privilege." The argument is disingenuous, at best.

First, Juice complains that UG has failed to disclose "the basis for the claim of privilege." That attorney-client privilege is the basis of the privilege for the documents listed is obvious from the face of the log. It identifies UG's counsel as having sent or received each item listed. But, if it helps, UG hereby confirms the obvious, that the basis for the privilege is attorney-client privilege.

Next, Juice says (at 16-17) that the privilege log is deficient, because it fails to expressly disclose the type of each document withheld. Again, the type of document is entirely evident from the face of the log, but, if it helps, UG hereby confirms that the log is comprised entirely of emails.

Next, Juice contends that for each document it is entitled to "a description sufficient to assess the claim of privilege (*e.g.,* seeking legal advice, giving legal advice)." Of course, giving or seeking legal advice is implicit in asserting attorney-client privilege; it hardly seems necessary to spell that out – or to seek judicial relief. But, if it helps, this is now hereby confirmed.

Next, Juice says it's owed "the name of each author and recipient, including an indication as to which authors and recipients are attorneys." This somehow ignores the fact that the privilege log has a column titled "From," another column titled "To," and another column titled "Cc," which

indicates additional recipients beyond the principal addressee. Juice is, of course, perfectly aware that the undersigned, who is shown as the recipient or sender of each email, is UG's attorney.

Next, Juice says it's owed an explanation as to what the documents are "about." In fact, every document on the log specifies its "subject." Juice's view that it's entitled to know more than that is incorrect and entirely unsubstantiated. Summarizing the content of emails beyond disclosing their subject matters would reveal the very information protected from disclosure by the privilege.

Lastly, UG does not deny that Juice is entitled to see any parts of the emails listed in the privilege log that are not protected by the privilege, such as where the emails included forwarded messages and attachments that had originated from third parties. Accordingly, UG has produced 109 pages of such emails and attachments, with only the privileged parts of the email redacted.

In sum: UG took great care in preparing this privilege log – which consists of 5 pages that itemize 155 emails – to provide all the information necessary to demonstrate the availability of the privilege and to extract from the log the parts of certain items that are not privileged. The law imposes no greater burden on UG than this privilege log reflects.

## IV.   Juice's Motion Should Be Denied Regarding Documents That UG Does Not Have

Juice contends that, despite the ***more than 2,100 pages*** of documents that UG has produced, "UG has failed to meaningfully engage in the discovery process," because UG has not produced certain documents that UG has represented it does not have. Evidently, Juice expected to receive a trove of written communication among UG team members regarding the development of UG's website. The reality is, however, that UG is a small tech start-up whose handful of personnel typically communicates among themselves much less formally. As Juice's counsel was told, internal communication is primarily through Zoom calls that are kept open throughout the day to connect their team of remote workers. UG does not send many internal written messages.

Insofar as there were written communications regarding the UG website, such occurred (whether internally or with Juice) primarily through the messaging platform Slack, via messaging chat rooms. Juice's counsel was told that UG engaged Juice near the beginning of UG's operation, and it was Juice that established virtually every Slack message room that UG's eventual work force used to discuss all matters related to the UG website – both insofar as those discussion were with Juice and among themselves – so that whoever needed to contribute at either UG or Juice could do so as they collaborated on UG's website. However, Juice later deactivated UG's access to those Slacks, either after the subjects of the Slacks were no longer in active discussion or since this litigation. Therefore, UG does not have access to produce those Slacks, which Juice has anyway.

As to the few written communications that Juice did not control that UG had with Juice or UG had only among its own personnel, Juice counsel was told that those were also largely on Slack, and UG had deactivated most of them – just like Juice did – once the subjects of the Slack chats were no longer in active discussion and well before any litigation. The Slacks that UG still has active or has copies of that concern this litigation were used for external communications with Juice, and UG has produced all of the messages it has from those chats. (Driscoll Dec. ¶ 2).

Juice counsel was further told that UG does not regularly use email or text to communicate about subjects relevant to this litigation. Several UG personnel who were part of UG's team at the time that it worked with Juice no longer work with UG, and UG does not have access to their old email accounts or histories. As to the few team members who both worked with UG at that time and still do, they have reported that they reviewed their emails and texts and either never had any relevant messages or no longer have messages at all from that time period, because they did not save messages going back that far or did not save their old computers or phones where they might have previously been saved. UG does not provide "company computers" or "company phones" and does not manage data saved on personal devices. UG also told Juice that, consistent with its

continuing obligation to supplement its production, it would try to find and, if possible, restore any old computers or databases and produce any responsive documents found. (Dreier Dec. ¶ 2).

Finally, since UG engaged counsel in November 2021 to attempt to resolve this dispute between UG and Juice, all UG internal writings regarding Juice and relevant subject matters have been in the context only of UG personnel seeking and receiving legal advice to resolve the dispute.

Notwithstanding all of the foregoing, Juice blithely contends (Mem. at 9): "It is simply not credible that nobody on UG's team texted or emailed one another about Juice or the transferred materials." Juice informs the Court that it can't believe UG "counsel insists that nothing was ever written down, emailed or texted." In fact, however, Juice was never told that nothing was ever written down, emailed or texted, but instead was told (in writing and at the "meet and confer"), just as stated above, that typically things were not written down, emailed or texted and why UG no longer has copies of what may have been written down, emailed or texted. (Dreier Dec. at ¶2). Juice simply chooses to reject the truthfulness of that explanation (which is confirmed in the accompanying Declaration of UG's CEO, Ms. Driscoll), but the simple fact remains that UG cannot produce what it does not have, regardless of Juice's incredulity or theatric characterization.

Accordingly, insofar as Juice moves to compel the production of additional documents responsive to **Juice's Requests for Production No. 9** (concerning any View Access Period), **No. 10** (concerning any Board minutes or related documents), **No. 16** (concerning any Slack communications), or **No. 17** (concerning documents or source code delivered by Juice to UG on or around March 11, 2022), UG has provided all of the responsive documents that it has and has now provided a declaration from its CEO confirming that. There is nothing more UG can do here.

### V.     Juice's Motion Should Be Denied Regarding Documents And Information UG Withheld

UG has objected to various of Juice's Interrogatories and Document Requests as calling for information that is irrelevant, and it has withheld information on grounds that the oppression to

11

UG in producing this information is disproportionate to its relevance, if any. Juice argues (at 5) that: "Whether or not [UG] believes documents to be relevant is not the proper standard for withholding documents under the Federal Rules of Civil Procedure." In fact, however, Fed. R. Civ. P 26(b), titled "Discovery Scope and Limits," expressly limits Juice's discovery to information that is "relevant." It states as follows:

> Parties may obtain discovery regarding any nonprivileged matter ***that is relevant to any party's claim or defense and proportional to the needs of the case***, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. (Emphasis added).

See also Bagley v. Yale University, 315 F.R.D. 131, 144 (D. Conn. 2016) ("Parties may obtain discovery regarding any nonprivileged matter *that is relevant to any party's claim or defense* and *proportional to the needs of the case*.") (emphasis in original); S.C. Johnson & Son, Inc. v. Henkel Corp., 2020 WL 5640528 at * 2 (D. Conn. Sept. 22, 2020) ("Rule 26 defines permissible discovery to consist of information that is, in addition to being relevant 'to any party's claim or defense,' also 'proportional to the needs of the case'").

Moreover, the burden of demonstrating relevance remains on the party seeking discovery" – which, here, is Juice. Bagley, supra at 144. It is only "once the party seeking discovery has demonstrated relevance, [that] the burden then shifts to the party resisting discovery to show why discovery should be denied." Henkel, supra, at * 2.

More particularly, Bagley (at 146) holds that: "In order to be 'relevant' for Civil Rule 26 discovery purposes, information and evidentiary material must be 'relevant' as defined in Rule of Evidence 401," which provides that: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." See also Henkel, supra, at *6 ("The broad standard of relevance [] is

12

not a license for unrestricted discovery"). Here, as shown below, Juice barely attempts to show the relevance of any of its Requests, based on its erroneous view that relevance is a non-factor, but, in any event, the few explanations it does offer as to its supposed need for the information only confirms that the information is *not* relevant. UG shows, on the other hand, that the demands are designed to unduly prejudice UG and will do so if Juice is accommodated.

### A. Completely Irrelevant *And* Unduly Prejudicial Discovery About UG's Investors and Clients

*(i) Juice's Request For Production No. 3 Demanding UG's Investor Documents*

Juice's Request for Production No. 3 demands the following:

> All documents, communications, and records concerning investors, potential investors, lenders and potential lenders in UG, including but not limited to presentations, financial projections, business models, and expected revenues to be generated by UG generally and/or from the Website or the Web-Based Application specifically.

**First**: Juice attempts to justify this Request by telling the Court (at 7): "Such financial projections, business models, expected revenues, and valuations sent to lenders are directly relevant to what profits *could* be generated by the Website and Web-Based Application," and that it needs to know "how much revenue *could* be attributed to Juice's copyrighted code" in order to pursue its claim. (Emphasis added). However, Juice does not explain why speculative and entirely unearned profits are relevant to its claims. The Copyright Act provides (at 17 U.S.C. § 504(a)) only for "the copyright owner's *actual* damages and any additional profits of the infringer" and other "statutory damages." Thus, Juice's requests for projections, models and expectations of profits cannot conceivably be probative of any facts "of consequence in determining the action."

**Second**: It bears emphasis that this Request calls not just for those forward-looking documents but for: "All documents, communications, and records concerning investors, potential investors, lenders and potential lenders in UG, including but not limited to" those forward-looking documents. Juice provides no explanation as to how any documents bearing on any such financial

13

associations are relevant to its copyright claim or any of its other claims. *And Juice has been told that none of those documents reference Juice or any of the subject matter in this action.*

Juice's Request is a transparent attempt to use discovery to obtain all UG's investor, lender and pitch information, under the pretext of relevance, so Juice can pitch them to compete with or replace UG or threaten to do so or resell UG's technology unless UG caves to pay Juice's ransom.

*(ii) Juice's Request For Production No. 6 Demanding UG's Client Documents*

Juice's Request for Production No. 6 demands the following:

> All documents, communications, and records concerning marketing of UG's goods and services related to the Web-Based Application of the Website, including but not limited to prospective client presentations as well as any advertising or marketing materials.

Juice tells the Court (at 7) that: "Juice is entitled to discover the manner in which UG touted its Website and its Web-Based Application, and whether or not it sought to terminate Juice to obtain the source code underlying the Website and Web-Based Application for less than fair value." Why is Juice entitled to that? None of that goes to any element of its copyright claim (or any other claim) or *any* aspect of its damages for those claims. UG's actual use and marketing of the items as to which Juice (falsely) claims copyright ownership is not disputed; only UG's *ownership* of the items is (disingenuously) disputed by Juice, and none of this information bears on that ownership. Nor does any of this information bear on whether UG sought to terminate Juice to obtain the source code for less than fair value — even if that had any conceivable relevance to any of the claims here, which it does not.

It is evident that Juice persists in this irrelevant Request only to gain another piece of UG intel so it can usurp UG's business.

*(iii) Juice's Interrogatory No. 7 Demanding UG's Investor and Client Identities*

Juice's Interrogatory No. 7 demands the following:

> Identify each client, potential client, investor or potential investor of UG with whom UG has discussed Juice, other developers for the Website or the Web-Based Application, or to whom UG has made any statements about the ownership of, or revenues expected to be generated from, the Website or the Web-Based Application.

Here, Juice finally comes out and makes its motivation for these discovery requests crystal clear – to use the information it hopes to obtain from UG to solicit UG's own clients and investors. This information can have no possible relevance to Juice's claims, and Juice offers none.

In any event, UG has informed Juice that UG has not "discussed Juice" or any other matters called for here with any investors or clients, with the exception that UG has communicated with Gregory Gilbert, Esq. about such matters. Therefore, UG identified Mr. Gilbert in response to this Interrogatory, in full compliance with its obligations.

### B. Completely Irrelevant *And* UndulyPrejudicial Discovery About UG's Current Code Development

Juice's Request for Production No. 12 demands the following:

> All documents, communications, and records concerning UG's exploitation, use, copying, downloading, uploading, alteration, modification, or development of any of the source code developed by Juice for UG.

Similarly, Juice's Interrogatory No. 4 demands the following:

> Identify all persons who have had access to or who have worked on the source code developed by Juice for UG and describe in detail all the exploitation, use, copying, downloading, uploading, alteration, modification, or development of that source code by or on behalf of UG.

Juice contends (at 11) that every detail regarding how UG has used the code is properly discoverable, because "Central to Juice's claims in this case is that UG has exploited, modified, and manipulated Juice's source code in UG's further development of its Website and/or Web-Based Application," and, according to Juice, UG does not have the right to [do so]. Again, however, UG does not dispute it has been developing the code. This is an action *not* about whether UG has developed the code or marketed the code – but rather about whether it is UG or Juice that

*owns* the code, so the parties can determine if UG rightfully used and developed the code. There is no element of Juice's claim and no aspect of any damages that are affected by the particulars of *how* UG has developed the code.

UG has already provided Juice (in response to RFP No. 12) all documents that confirm UG has continued to develop the code since the parties entered into the Transfer Agreement, and UG has already identified (in response to RFP No. 4) "all persons who have had access to or who have worked on the source code." UG has withheld only the *actual code* itself that it has developed and the technical details of its improvements – which Juice does not need in any way to prosecute its claims.  Juice's effort to extract this information is intended only to get at one more piece of UG intel that would allow Juice to compete with UG or resell UG's technology.  The harm that the production would cause UG far outweighs any use of this information in this litigation and thereby renders it irrelevant, under Rule 26(b) and the related authorities cited above.

### C. Completely Irrelevant *And* Unduly Prejudicial Discovery About UG's Financials

Juice's Request for Production No. 7 demands the following:

> All audited and unaudited financial statements of UG for the years 2020, 2021 and 2022 and all documents, communications, and records concerning all financial projections and models prepared for any purpose.

Juice's Request for Production No. 8 demands the following:

> All tax records with respect to UG, including without limitation any tax returns, IRS forms 1099 or W-2, or Schedules K-1 related to UG for the years 2020, 2021, and 2022.

**First**: Juice tells the Court (at 8) that it merely "seeks basic financial information so that it can properly evaluate its damages claims under the Copyright Act," and that "Juice is unable to do so without even the most rudimentary financial documents, such as financial statements or tax returns." However, none of these documents Juice seeks identifies anything about any revenues or profits that are specifically attributable to the six items that are the subject of its copyright and

16

other claims. Instead, like all of Juice's requests above, these requests seek to know *everything* about UG, now this time its finances, from all aspects of its operations and going back for years before any of the events giving rise to this suit.   UG objected to these Requests as over broad, and Juice has *never* offered or suggested how it might narrow its requests.   In fact, UG told Juice at the March 10 Meet and Confer and again in UG's March 29 letter: "You continue to demand additional discovery to which UG has already objected – but, for all your letters, you have not attempted to explain how any of UG's objections are actually improper *or to resubmit your requests in a way that addresses or resolves UG's objections*." (Emphasis added).   Instead, Juice has continued to merely repeat its demands, without modifying them at all.

**Second**:   Again, Juice asks for UG's "projections and models prepared for any purpose." Again, as stated above, such documents would only be speculative and could not bear on Juice's actual damages – i.e., actual revenues or profits.

**Third**: Juice states (at 8) that: It "is amenable to designate documents as confidential to protect sensitive information.  But UG is not entitled to withhold all responsive financial documents and deprive Juice of any discovery into its theory of damages."  As already shown, none of what Juice calls for would reveal *any* information about its damages.  And, in any event,
 a confidentiality order governing this or any other confidential information or trade secret here would be of little help — because it is not third parties that UG finds most dangerous, but Juice itself that is the danger.  As should be evident by now, Juice wants to know *everything* about UG so that it has an informational ace in the hole to play against UG, whether or not it can advance past UG's pending Motion to Dismiss.  It can't be stressed enough that irreparable harm will come from Juice getting UG's blueprint.

**Lastly**: Not that Juice has suggested it, but even an "attorney's eyes-only" protective order would raise serious concerns about actually keeping this information out of Juice's hands. Juice's

counsel, Ms. Krisch, is not just Juice's attorney, but is a former colleague and long-time friend of one of its members, Rhonda Brown Grotta, who is actively involved at Juice and the mother of Juice's co-founder and Managing Member, Carter Gortta. Already, there have been several incidents where UG's confidential information was improperly obtained by Juice. Despite her assurances otherwise, UG's former attorney, Elizabeth DiRusso, who is also a friend of Ms. Grotta, surreptitiously represented Juice in transactions contra to UG directly related to this action, without UG's knowledge or consent, while purporting to still represent UG.  A malpractice suit is now proceeding against Ms. DiRusso and her firm, DiRusso Legal Counsel, in Connecticut Superior Court.  Of course, Ms. Kirsch is not Ms. DiRusso, but there is a history here that raises genuine concerns about Juice's willingness to observe boundaries.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Juice's Motion to Compel should be denied in its entirety. Furthermore, by reason of the untimeliness of the Motion, Juice's exceeding the prescribed page-limit of the Motion, Juice's complete disregard or ignorance of its own designated dates for objections to and compliance with subpoenas and other facts it objectively misstates that are fatal to its Motion, and the utter lack of merit and lack of necessity for the Motion, UG asks that it be awarded costs and attorneys' fees under FRCP 37(a)(5)(B).

Dated:  April 11, 2023

| By: /s/ Spencer Dreier | By: /s/ Robert M. Fleischer |
|---|---|
| Spencer Dreier (*Pro hac vice*) | Robert M. Fleischer (CT 11960) |
| Phillips Nizer, LLP | Green & Sklarz, LLC |
| 485 Lexington Avenue, 14th Fl. | One Audubon Street, Third Floor |
| New York, New York 10017 | New Haven, CT  06511 |
| Tel.: (212) 841-1344 | Tel.: (203) 285-8545 |
| Email: sdreier@phillipsnizer.com | Email: rfleischer@gs-lawfirm.com |

*Attorneys for Defendant UncommonGood, Inc.*