UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUICE CREATIVE GROUP, LLC,<br>　　　Plaintiff | : | CIVIL CASE NO.<br>3:22-CV-01175 (JCH) |
| v. | : | |
| UNCOMMONGOOD, INC.,<br>　　　Defendant. | : | DECEMBER 15, 2023 |

**RULING ON DEFENDANT'S PARTIAL MOTION TO DISMISS (DOC. NO. 30) &
ORDER DECLINING EXERCISE OF SUPPLEMENTAL JURISDICTION**

**I.    INTRODUCTION**

Plaintiff Juice Creative Group, LLC ("Juice") brings this action against UncommonGood, Inc. ("UG"), alleging copyright infringement under 17 U.S.C. § 101, et seq., fraud in the inducement, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, and entitlement to a declaratory judgment that Juice has not breached its contract obligations.  See Compl. (Doc. No. 1).  UG moves to dismiss all claims but the claim seeking declaratory judgment.  See Mot. to Dismiss (Doc. No. 30); Mem. of Law in Support of Mot. to Dismiss ("Mem.") (Doc. No. 31); Reply to Opp. to Mot. to Dismiss ("Reply") (Doc. No. 37).  The plaintiff opposes this Motion.  See Mem. of Law in Opp. to Mot. to Dismiss ("Opp.") (Doc. No. 35).

For the reasons discussed below, the court grants the Motion to Dismiss as to Count One and sua sponte declines to exercise supplemental jurisdiction over the remaining state law claims in Counts Two to Seven.

## II.     BACKGROUND

### A.     Factual Background

Juice is a "full-service digital agency and business consultant" located in Norwalk, Connecticut that offers services such as "web design, branding, and other advertising and marketing". Compl. at ¶¶ 9, 15. UG is a start-up financial technology company, operating in Greenwich, Connecticut, "that facilitates internet-based funding and promotes awareness for non-profit organizations". Id. at ¶¶ 10, 16.

#### 1.  Initial Work Relationship and the Master Services Agreement

In March 2020, UG solicited Juice's services "to provide digital media solutions, focusing primarily on branding, marketing, business development, and website initiation and building services to help it develop a suite of products/marketplace site." Id. at ¶ 17. Juice prepared a proposed strategy ("March 2020 Proposal"), outlining deliverables as well time and cost estimates, and capping fees at $95,592.50. Id. at ¶ 18. After submission of the proposal, the parties began working together without a formal contract. Id. at ¶ 18. In accordance with the March 2020 Proposal, "Juice provided consulting services with respect to branding, market research, initial business model and design services and built a basic web application in beta model". Id. Although not covered by the March 2020 Proposal or any other agreement, Juice provided UG with additional services from March to September 2021. Id. at ¶ 19.

In or around August 2021, in preparation "for a new capital raise," UG requested that Juice add new features to UG's web application. Id. at ¶ 20. UG and Juice entered into a Master Services Agreement ("MSA") to govern the execution of this work. Id. at ¶ 2. Effective August 10, 2021, the MSA called "for Juice to design, code and build out a series of robust web-based features for the basic UG web application that Juice had

2

already created for use by UG." Id.  The MSA provides for addendums ("Statements of Work") that would be incorporated into the MSA and would specify the work Juice was to perform and the corresponding fees.  Id. at ¶ 21.

According to its terms, the MSA was to be effective the earlier of three months or thirty days following the completion of work under the latest Statement of Work.  Id. at ¶ 28.  Consistent with its model for working with start-ups, Juice offered these services at deeply discounted prices with the understanding that, if UG were to raise capital, the relationship would become "more equitable."  Id. at ¶ 20; see e.g., id. at ¶ 23.

Critically, the MSA provides that Juice is the owner of all intellectual property rights to works created and developed by Juice.  Id. at ¶ 24.  Beginning in February 2022, Juice filed for copyrights to "six features it built for UG's web application: (1) Non-profit Sweepstakes Tool; (2) Non-Profit CRM; (3) Non-Profit Fundraiser Tool; (4) Non-Profit Media Library Tool; (5) Non-Profit Donation Tools; and (6) Non-Profit Email.  Id. at ¶ 29.  Juice successfully obtained copyright registrations for these features.  Id.

2.  Exclusion of Four Features

The first Statement of Work ("Initial SOW") lists fourteen features to be built by Juice for UG's web application from August to October 2021.  Id. at ¶ 27.  "[O]n September 28, 2021, Carolyn Driscoll, President of UG and signatory of the MSA on behalf of UG, sent a message to Carter Grotta, Managing Partner and Creative Director of Juice, via Slack, informing Mr. Grotta that she wanted Juice to halt work on certain features, and to focus on the features that were currently in development and allow for user testing."  Id. at ¶ 31.  Juice alleges that this message took the following four features out of scope: (1) Stories, (2) Chat, (3) Auctions, and (4) Analytics (collectively, "Four Features").  Id. at ¶ 30.  In an October 1, 2021 meeting between the parties, "Ms.

3

Driscoll reiterated the instruction to Juice to pause certain work including but not limited to the Four Features." Id. at ¶ 33. At this meeting, Juice provided UG with the work it had already completed on these four features. Id.

Consequently, Ms. Driscoll requested "an updated Statement of Work to reflect these changes to scope and the revised timeline." Id. at ¶ 35. On or about October 13, 2021, as requested, Juice sent UG an updated Statement of Work ("October SOW"), which removed the Four Features and included an addendum that provided an updated status as to each of the Four Features ("October SOW Appendix II"). Id. at ¶¶ 36-37; Pl.'s Ex. C, October SOW (Doc. No. 1-3).

UG did not object to the removal of these features, but also never formally executed the October SOW. Id. at ¶¶ 40-41. However, "Juice performed services pursuant to the October SOW between October and December 2021." Id. at ¶ 41. Thus, after September 28, 2021, Juice did not continue development on these Four Features. Id. at ¶ 39. During this period, "UG continued to direct and pay for work" and did not seek to restart work on or inquire about the Four Features. Id. at ¶ 41. On December 10, 2021, in response to a request from UG, Juice sent UG a User Manual that discussed features built for the website. Id. at ¶ 43. On December 16, 2021, in response to another request from UG, Juice sent UG an email specifying what Juice would be working on through the end of the month. Id. at ¶ 44. Neither communication mentioned the Four Features. Id.

        3. Termination of Work Relationship

In or about October 2021, UG and Juice agreed to terminate their relationship. Id. at ¶ 46. Beginning December 2021, the parties began negotiating the contract that would govern the termination of their working relationship, which culminated in the

4

execution of the Transfer Agreement on March 7, 2022.  Id. at ¶ 48.  In exchange for the transfer of ownership of the "website and web-based application, underlying source code, software, and all other functionality" as well the "means to access and operate the website and application", Juice "sought payment of outstanding invoices."  Id. ¶¶ 46, 48.  Such payment also served as "full and final satisfaction of any and all outstanding payments owed to [Juice] . . . ."  Pl.'s Amended Ex. D, Transfer Agreement (Doc. No. 34) at 4, § 4.

On January 15, 2022, Juice sent an e-mail proposing a "View Access Period" to show UG the code and information Juice built for UG's website to ensure UG understood what existed and was thus subject to transfer.  Id. at ¶ 53.  On January 27, 2022, UG responded, representing Juice's procedure as agreeable.  Id. at ¶ 54.

In the period from January 19 to February 3, 2022, Juice provided UG with access to view "all existing materials, including source code, with no exceptions or reservations."  Id. at ¶ 55.  UG's counsel verbally represented that the Transfer Agreement "was meant to resolve the entire matter"; the View Access encompassed the universe of materials that would be transferred under the agreement; and the Transfer Agreement was meant to "resolve the entire matter."  Id. at ¶ 56.

    4. Termination Agreement Dispute

The parties signed the Transfer Agreement on March 8, 2022.  See id. at ¶ 48.  The Agreement acknowledges that the View Access period took place and that materials provided therein included "all computer code and information in Juice's possession that is used to operate the UG website in its most up-to-date form . . . ."  Id. at ¶ 58; see also Pl.'s Amended Ex. D, Transfer Agreement, at 1.  Section I defines in detail the deliverables provided during the View Access period, including items identified

in Appendix I to the August 10, 2021 draft of the Initial SOW and UG Inventory and Mechanics of Transfer List, provided, respectively, as Exhibits A and B to the Transfer Agreement.  Pl.'s Amended Ex. D (Doc. No. 34) at 2.  However, Section I also explicitly provides for the transfer of materials that are necessary or convenient to UG alone to operate UG's website.  Id. at ¶¶ 59, 61; see also Pl.'s Amended Ex. D, Transfer Agreement, at 2, § 1(c).

Juice transferred possession of Section 1 materials as well as the generic, i.e., non-UG specific, materials "as to which the Transfer Agreement did not assign ownership rights from Juice to UG."  Id. at ¶ 61.  On March 11, 2022, Juice completed the transfer pursuant to the four-day procedure outlined in the Transfer Agreement.  Id. at ¶ 62.  Five or so hours after Juice completed the transfer, UG's counsel emailed, noting that UG was not in possession of all the deliverables because UG did not receive, inter alia, any code for the Four Features.  Id. at ¶ 64.  In response, Juice declared that no code for the Four Features existed because UG had halted their development.  Id. at ¶ 65.  Further, Juice resent UG the files and information relating to the Four Features that it had previously transferred at the October 1, 2021 meeting.  Id. at ¶ 66.

Through the end of March and beginning of April 2022, UG maintained its position that Juice had breached the Transfer Agreement while Juice believed that their relationship had terminated pursuant to complete performance of the Transfer Agreement.  See id. at ¶ 67.  On April 19, 2022, Juice wrote to UG, stating that it believed the matter resolved but did not receive a reply from UG for four months.  Id.

On August 4, 2022, UG's counsel emailed Juice an attached draft complaint alleging Juice breached the Transfer Agreement. Id. at ¶ 68. UG's counsel stated that he would file the complaint unless Juice "complete[d] its performance" under the Transfer Agreement, or "remit[ted] a refund of $200,000 for the undelivered items." Id. at ¶ 68 (alterations in original). Together, the email and draft complaint allege that Juice invoiced UG for the development of the Four Features and "implicit[ly] den[y] that the MSA . . . is a valid and binding agreement of the parties." Id. at ¶ 69.

On August 22, 2022, Juice's counsel sent UG's counsel a Cease-and-Desist Letter to which UG never responded. Id. at ¶¶ 70-71. Since then, UG has added new features and taken certain features live, which required altering the source code Juice created. Id. at ¶ 71.

    B.    Procedural Background

On September 8, 2022, UG filed suit against Juice in Connecticut Superior Court, Judicial District for Norwalk and Stamford, alleging breach of contract, fraud, violation of CT Unfair Trade Practices Act, breach of implied covenant of good faith and fair dealing, and unjust enrichment. See Mem., Ex. 1, UG's State Complaint (Doc. No 31-1).

The plaintiff initiated the instant suit on September 16, 2022. See Compl. In Count One, Juice alleges that it owns the copyright of the material at issue and that UG obtained possession of the copyrighted material through fraudulent means. In Count Two, Juice claims that UG falsely represented that it intended to terminate its relationship with Juice through the Transfer Agreement in order to induce Juice into entering the contract and subsequently turning over copyrights. Count Three asserts breach of the Master Services Agreement. In Count Four, Juice claims UG breached the implied covenant of good faith and fair dealing under the Transfer Agreement.

Count Five alleges UG was unjustly enriched by material to which UG otherwise would have no rights in.  In Count Six, Juice brings a claim for equitable remedy under the theory of quantum meruit for providing UG with the copyrighted materials.  In Count Seven, Juice asserts it is entitled to declaratory judgment that Juice has not breached the Transfer Agreement.  UG moved to dismiss Counts One through Six of the plaintiff's Complaint on December 1, 2022.  See Mot. to Dismiss.

For the reasons set forth below, the court grants the Motion to Dismiss as to Count One and otherwise declines to exercise supplemental jurisdiction over the state claims.

### III.   STANDARD OF REVIEW

#### A.   Motion to Dismiss

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

B.  Supplemental Jurisdiction

Section 1367 of title 28 provides that a federal court "may decline to exercise supplemental jurisdiction . . . if (1) the claim raises a novel or complex issue of State law, (2) the [state law] claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).

In deciding whether to exercise supplemental jurisdiction, the court "should consider and weigh in each case, and every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  Thus, the dismissal of federal claims does not always weigh in favor of declining to exercise supplemental jurisdiction over state law claims.  See, e.g., Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003) (approving exercise of supplemental jurisdiction when, despite dismissal of federal claims, discovery was complete, the case was ready for trial, and the state law claims did not involve novel legal questions (discussing Raucci v. Town of Rotterdam, 902 F.2d 1050 (2d Cir. 1990))).  However, where the federal claims have been dismissed before trial, the factors generally weigh in favor against exercising supplemental jurisdiction.  Delaney v. Bank of Am. Corp., 766 F.3d 163, 170 (2d Cir. 2014); Lundy v. Catholic Health Sys. of Long Island inc., 711 F.3d 106, 117 (2d Cir. 2013); see also Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006) ("A district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage.").

**IV.   DISCUSSION**

    A.   <u>Copyright Infringement</u>

In support of its Motion to Dismiss, UG argues that Juice cannot assert a copyright infringement claim because the Transfer Agreement transferred ownership to UG. Mem. at 7-8. In response, Juice argues that the Transfer Agreement is void because it was procured through fraudulent misrepresentations; thus, its copyright infringement claim is not barred. Opp. at 9-10. UG counters that the Transfer Agreement is still operative because it has not been rescinded as a matter of law. <u>See</u> Reply at 2-4.

"To prove a claim of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." <u>Urbont v. Sony Music Ent.</u>, 831 F.3d 80, 88 (2d Cir. 2016). Copyright ownership can be transferred by "assignment, mortgage, exclusive license, or any other conveyance." <u>U.S. Naval Inst. v. Charter Commc'ns, Inc.</u>, 936 F.2d 692, 695 (2d Cir. 1991) (quoting 17 U.S.C. § 101). Once a contract for transfer of exclusive rights is executed, the grantee is not liable for copyright infringement. <u>U.S. Naval Inst.</u>, 936 F.2d at 695; <u>TVT Records v. Island Def Jam Music Grp.</u>, 412 F.3d 82, 93 (2d Cir. 2005).

However, problems with the formation or execution of the contract may prevent the legal transfer of rights over the copyrighted material, in which case, a copyright law claim by the transferor is not precluded. <u>Cf.</u> <u>Graham v. James</u>, 144 F.3d 229, 237-38 (2d Cir. 1998). For instance, if the intended grantee fails to satisfy a condition precedent to the transfer of rights over the copyrighted material, then the grantor retains ownership rights and can sue the intended grantee under copyright law for any unauthorized use, albeit the existence of a contract between the parties. <u>See id.</u> at 237.

10

Additionally, a party's conduct may render a contract voidable, the recission of which would mean that copyright law governed use during the time the contract was intended to be in effect. See id. at 237-38. However, "[f]ailing such rescission, . . . the grant continues in place, thus precluding infringement liability until such time as the copyright owner exercises his entitlement to rescind." TVT Records, 412 F.3d at 93 (quoting 3 Nimmer on Copyright § 10.15 [A] (6th ed. 1978)); see also Rano v. Sipa Press, Inc., 987 F.2d 580, 586 (9th Cir. 1993).

Accordingly, UG is only liable for copyright infringement if the Transfer Agreement is subject to recission.

1. Recission

Under its Second Cause of Action, Juice contends that the contract was void as a result of UG's alleged fraudulent inducement, see Opp. at 9, which, if true, would entitle Juice to seek recission as a remedy. See Leisure Resort Tech., Inc. v. Trading Cove Assocs., 277 Conn. 21, 32 (2006); Harold Cohn & Co. v. Harco Int'l, LLC, 72 Conn. App. 43, 49 (2002). However, rescission is not automatic. Keyes v. Brown, 155 Conn. 469, 476 (1967); Harold Cohn & Co., 72 Conn. App. at 49-50. A contract procured through fraudulent inducement is voidable, allowing a plaintiff to either seek rescission or affirm the contract and recover damages. Leisure Resort Tech., 277 Conn. at 32. Critically, however, although a fraudulently induced plaintiff is entitled to seek recission, it does not have a right to rescission unless it satisfies the condition precedent of returning or offering to return the contractually conferred benefit, such that "the other party is restored to his former condition . . . ." Keyes, 155 Conn. at 476; see also Leisure Resort Tech., 277 Conn. at 41 (quoting Mandeville v. Jacobson, 122 Conn. 429, 433 (1937)); Hernandez v. Saybrook Buick GMC, Inc., 505 F. Supp. 3d 93, 110 (D.

11

Conn. 2020).[1] However, the "rule requiring restoration is, of course, inapplicable if the rescinding party has received nothing, and the same is held to be true if he has received nothing of value." See Metcalfe v. Talarski, 213 Conn. 145, 154 (1989) (quoting 17 Am. Jur. 2d., Contracts § 513); Isola v. MacKenzie, No. CV920307875, 1997 WL 309578, at *10 (Conn. Sup. Ct. May 30, 1997).

Furthermore, although recission is a form of relief and not a cause of action, Connecticut law requires that the condition precedent be pled and proven separately from the underlying substantive claims of unenforceability. Keyes, 155 Conn. at 476; Duksa v. City of Middletown, 192 Conn. 191, 197 (1984); R&R Pool & Home, Inc. v. Fong, No. FSTCV176032853S, 2023 WL 4539854, at * 4 (Conn. Sup. Ct. July 3, 2023); Isola, 1997 WL 309578, at *8 (noting that a claim for recission must be specially pled).

---

[1] The court notes the that the "benefit conferred" or "value" under the rule requiring restoration ("restoration rule") is not strictly confined to the value constituting consideration under the contract. See, e.g., Metcalfe v. Talarski, 213 Conn. 145, 154 (1989). For example, in the context of a contract for the sale of property, the Metcalfe Court specifically defined the benefit conferred as the extent to which the plaintiff profited by looking at the law of restitution of property, which pronounces that "the liability of the innocent occupier . . . depend[s] on whether he has in fact been enriched by its use. See id. (citation omitted) (emphasis in original). Thus, there, rescission required that the plaintiff return the property as well as the rent he had collected from a tenant. Id. at 154-55.
In Isola, relying on Metcalfe, the court held that an offer of restoration was unnecessary because the defendants—the parties seeking recission—"received nothing of value from the plaintiff". Isola v. MacKenzie, No. CV920307875, 1997 WL 309578, at *10 (Conn. Sup. Ct. May 30, 1997) (noting that plaintiff's $20,000 was "worthless" because he "had borrowed the money from [one of the defendants] by providing worthless collateral and had defaulted on the promissory note prior to the defendants' renunciation of the agreement"). Thus, the "rule requiring restoration is . . . inapplicable if the rescinding party has received nothing, and the same is held to be true if he has received nothing of value." See Metcalfe, 213 Conn. at 154 (quoting 17 Am. Jur. 2d., Contracts § 513); Isola, 1997 WL 309578, at *10.
Here, under the Transfer Agreement, Juice required $23,462 from UG in satisfaction of prior billings that Juice claimed to be due and owing. Pl.'s Amended Ex. D, Transfer Agreement (Doc. No. 34) at 4, § IV. In exchange, Juice agreed this payment was in "full and final satisfaction" of any money owed by UG to Juice. Id. It could be argued—but was not by Juice—that this payment is not a "benefit conferred" for the transfer of copyrights because it was UG's prior outstanding obligation to pay Juice for its services. However, in the court's view, such an argument lacks merit. The settlement of money owed by UG to Juice for work done is part of the same agreement in which Juice transferred its copyrights. Thus, the court views that sum as "benefit conferred" or "value" as used in Metcalfe.

a. <u>Condition Precedent</u>

Whether an offer satisfies the condition precedent requires examining the steps a plaintiff took to return any benefit conferred. <u>See, e.g.</u>, <u>Burt's Spirit Shop, Inc. v. Ridgway</u>, 215 Conn. 355, 360 (1990) (finding that a discussion regarding rescission with the opposing party's attorney, without more, does not constitute an offer to restore opposing party to its former position); <u>Chamberlain v. BobMatick Chevrolet, Inc.</u>, 4 Conn. Cir. Ct. 685, 696 (1967) (holding plaintiff's letter offering to return the car she purchased from the defendant upon return of the purchase price merely constituted an invitation for the defendant to accomplish the transfer and noting, in particular, that following the decision of the trial court in favor of the defendant, plaintiff kept the car for nearly a year and then sold it).

UG has raised the sufficiency of pleadings regarding Juice's claim for recission in its Motion to Dismiss, arguing that Juice failed to make any effort to return benefits received under the contract and did not allege that it had done so. <u>See</u> Mem. at 13. <u>Isola</u>, 1997 WL 309578, at *8-9 (holding that "the requirement that the defense of recission be specially pleaded is deemed waived" because it was not timely raised).

The only allegation relating to recission is service of Juice's Cease-and Desist Letter. <u>See</u>, <u>supra</u>, at 7. The parties specifically dispute whether Juice's Cease-and-Desist Letter contained an offer to return the payment rendered by UG according to the terms of the Transfer Agreement. <u>See</u> Opp. at 12 (citing to Compl. at ¶¶ 70-71); Reply at 3. As UG notes, Juice does not allege or contend that the August 22, 2022 Letter mentions rescission or an offer to return UG's tendered payments. Reply at 3. There are no allegations in the Complaint that plausibly allege that Juice returned the value it received; thus, Juice has failed to state a claim for recission. <u>See</u> <u>Kavarco v. T.J.E.</u>,

13

Inc., 2 Conn. App. 294, 299 n.5 (1984) (finding that, "[a]lthough better practice would be to plead the condition precedent," the plaintiffs' attempts to return the property served as evidence that they "had attempted to comply with the condition"), overruled on other grounds by Kaczynski v. Kaczynski, 294 Conn. 121 (2009).

Accordingly, Juice, having failed to sufficiently allege that it satisfied the requisite condition precedent, does not presently have a right to recission. Absent the plaintiff satisfying the requisite predicate, the contract remains in force, and UG's liability, if any, is a matter of contract law. Without recission of the Transfer Agreement, Juice may not sue for a copyright claim. See, supra, at 10-11.

Therefore, the court grants UG's Motion to Dismiss as to Juice's copyright infringement claim, without prejudice to repleading,[2] consistent with this Ruling.

B.     Remaining Claims

In addition to asserting a copyright infringement claim against UG, Juice alleges fraud in the inducement, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, and entitlement to a declaratory judgment that Juice has not breached its contract obligations. UG argues for dismissal of claims relating to the Transfer Agreement on the ground that Juice failed to

---

[2] In granting the plaintiff leave to replead, it bears emphasizing that recission is an extraordinary remedy resulting in the undoing of a contract, "plac[ing] the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." Kavarco, 2 Conn. App. at 299; see also Metcalfe, 213 Conn. at 15. It "is not warranted merely for a failure exactly to perform but only for an unjustified default to perform the basic terms of a contract." Collins v. Sears, Roebuck & Co., 164 Conn. 369, 382 (1973) (internal citation omitted). Thus, "[a] court of equity is always reluctant to rescind, unless the parties can be put back in statu [sic] quo. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it." Milford Yacht, 136 Conn. at 549 (quoting Grymes v. Sanders, 93 U.S. 55, 62 (1876)).

Juice's allegation that UG has altered the source code Juice transferred pursuant to the Transfer Agreement, see Compl. at ¶ 71, raises the question of whether the parties can be restored to their status quo. See, e.g., Milford Yacht, 136 Conn. at 549 (noting that the plaintiff did not take "speedy, affirmative action to keep or place the defendant in statu [sic] quo . . . [o]n the contrary, it remained silent for well over a year and during this time the defendant was making substantial improvements to the property").

14

adequately plead the claims, see Mem. at 14, 31, and dismissal of claims relating to the prior contract, the MSA, are preempted by the Transfer Agreement, see id. at 29, 37. However, the court need not address UG's Motion to Dismiss as to Counts Two to Six because the court, sua sponte, dismisses all remaining claims, including Count Seven, on jurisdictional grounds.

Having dismissed the copyright infringement claim, the court is left only with state law contract claims. Although the parties are in the middle of discovery, the relevant factors weigh against exercising supplemental jurisdiction. See, e.g., Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306-08 (2d Cir. 2003) (holding that, although most of the pretrial discovery had been completed, the district court's exercise of supplemental jurisdiction was an abuse of discretion). Moreover, UG represents that it has filed suit against Juice in Connecticut Superior Court, alleging breach of contract, fraud, violation of Conn. Gen. Stat. § 42-110a et seq. ("Connecticut Unfair Trade Practices Act"), breach of implied covenant of good faith and fair dealing, and unjust enrichment. See Mem. Ex. 1, UG's State Complaint. Thus, many of the issues raised in in Juice's Complaint are also before the State's Superior Court, and Juice is free to seek to raise defenses and counterclaims similar to the ones raised in the instant case. Moreover, Juice appears to be within the statute of limitations for asserting contract claims and tort claims, see Conn. Gen. Stat. §§ 52-576, 52-577, and is thus also free to file a separate action in state court if the state court does not permit the addition of counterclaims to the pending state lawsuit. Consequently, comity, efficient case management, and minimizing expenditure of resources weigh in favor of declining supplemental jurisdiction.

Accordingly, the court declines to exercise supplemental jurisdiction over Counts Two to Seven.[3]

## V.   CONCLUSION

For the reasons stated herein, UncommonGood's Motion to Dismiss (Doc. No. 30) is granted as to Count One, without prejudice to repleading.  The court declines to exercise supplemental jurisdiction over the remaining state law claims in Counts Two to Seven.  Thus, the remainder of the Motion to Dismiss is terminated as moot.

**SO ORDERED.**

Dated at New Haven, Connecticut this 15th day of December 2023.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[3] The court views Count Seven as arising under state law as Juice does not rely on the federal Declaratory Judgment Act, 28 U.S.C. § 2201.  See Compl. at ¶¶ 122-25.  Furthermore, Juice does not otherwise invoke the Declaratory Judgment Act by resting federal jurisdiction upon that statute.  See Compl. at ¶¶ 11-12.  Rather, Juice contends this court has jurisdiction under 28 U.S.C. §§ 1331 and 1338 due to its assertion of a claim under the Copyright Act of 1976 and supplemental jurisdiction under 28 U.S.C. § 1367 over its additional claims.  See id.