**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| JUICE CREATIVE GROUP, LLC, | : | CIVIL CASE NO. |
| Plaintiff | : | 3:22-CV-01175 (JCH) |
| | : | |
| v. | : | |
| | : | |
| UNCOMMONGOOD, INC., | : | SEPTEMBER 25, 2024 |
| Defendant. | : | |
| | : | |

**RULING ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 175)**

**I.    INTRODUCTION**

Plaintiff Juice Creative Group, LLC ("Juice") brings this action against

UncommonGood, Inc. ("UG"), alleging copyright infringement under 17 U.S.C. § 101, et

seq., fraud in the inducement, breach of contract, breach of implied covenant of good

faith and fair dealing, unjust enrichment, quantum meruit, and entitlement to a

declaratory judgment that Juice has not breached its contract obligations.  See Am.

Compl. (Doc. No. 174).  UG moves to dismiss all of Juice's claims.  See Mot. to Dismiss

(Doc. No. 175); see Memorandum of Law in Support of Motion to Dismiss ("Def.'s

Mem.") (Doc. No. 176); see Defendants' Reply  Memorandum ("Def.'s Reply") (Doc. No.

178).  Juice opposes this Motion.  See Memorandum of Law in Opposition to Motion to

Dismiss ("Pl.'s Opp.") (Doc. No. 177).

For the reasons discussed below, the Motion is denied.

## II.    BACKGROUND

### A.    Factual Background[1]

Juice is a "full-service digital agency and business consultant" operating in Norwalk, Connecticut that offers services such as "web design, branding, and other advertising and marketing".  Am. Compl. at ¶¶ 9, 15.  UG is based in Greenwich, Connecticut, and describes itself as a financial technology company that facilitates internet-based funding and promotes awareness for non-profit organizations.  See id. at ¶ 10.

In March 2020, UG solicited Juice's services to, among other things, build a website and help develop a suite of digital products.  See id. at ¶ 17.  The parties began working together without a signed contract.  See id. at ¶ 18.  In or around August 2021, UG asked Juice to add new features to UG's web application.  See id. at ¶ 20.  UG and Juice entered into a Master Services Agreement ("MSA") to govern the execution of this work.  See id. at ¶¶ 2, 21.  Effective August 10, 2021, the MSA called "for Juice to design, code and build out a series of robust web-based features for the basic UG web application that Juice had already created for use by UG."  Id.

Importantly, the MSA states that Juice is the owner of all intellectual property rights to works created and developed by Juice.  Id. at ¶ 24.  Beginning in February 2022, Juice filed for copyrights to "six features it built for UG's web application: (1) Non-profit Sweepstakes Tool; (2) Non-Profit CRM; (3) Non-Profit Fundraiser Tool; (4) Non-

---

[1] As it must, the court draws the facts in this section from the well-plead allegations in Juice's Amended Complaint.  See Am. Compl. (Doc. No. 174.)  As this is the second Motion to Dismiss before the court, the court provides only an abbreviated version of prior allegations and includes new allegations in the Amended Complaint.

Profit Media Library Tool; (5) Non-Profit Donation Tools; and (6) Non-Profit Email.  <u>See</u> <u>id.</u> at ¶ 29.  Juice successfully obtained copyright registrations for these features.  <u>Id.</u>

On September 28, 2021, Carolyn Driscoll, President of UG and signatory of the MSA on behalf of UG, sent a message to Carter Grotta, Managing Partner and Creative Director of Juice, via Slack, informing Mr. Grotta that she wanted Juice to halt work on certain features, focus on the features that were currently in development, and allow for user testing.  <u>See</u> <u>id.</u> at ¶ 31.  Juice alleges that this message took the following four features out of scope: (1) Stories, (2) Chat, (3) Auctions, and (4) Analytics (collectively, "Four Features").  <u>See</u> <u>id.</u> at ¶ 30.  After September 28, 2021, Juice did not continue development on these Four Features.  <u>See</u> <u>id.</u> at ¶ 39.  In an October 1, 2021 meeting between the parties, Ms. Driscoll again reiterated the instruction to stop work on the Four Features, and at no point after was Juice instructed to restart its work on them. <u>See</u> <u>id.</u> at ¶¶ 33, 42.

After UG raised a large capital investment in or about October 2021, UG began trying to wind down its relationship with Juice.  <u>See</u> <u>id.</u> at ¶ 48.  UG representatives expressed that they wanted to take into their exclusive control all aspects of the UG website, including underlying source code.  <u>See</u> <u>id.</u> at ¶ 49.  However, UG allegedly refused to pay Juice anything for it.  <u>See</u> <u>id.</u> at ¶ 50.  Beginning December 2021, the parties began negotiating the contract that would govern the termination of their working relationship, which culminated in the execution of the Transfer Agreement on March 7, 2022.  <u>See</u> <u>id.</u> at ¶ 49.  In exchange for the transfer of ownership of the "website and web-based application, underlying source code, software, and all other functionality" as well the "means to access and operate the website and application", Juice "sought

payment of outstanding invoices and fair terms for the transfer of ownership and possession of the source code".  Id. ¶¶ 47, 49.  Under the Transfer Agreement, UG agreed to pay 50 percent of these invoices as "full and final satisfaction of any and all outstanding payments owed to [Juice] . . . ."  Id. ¶ 53; Pl.'s Ex. D, Transfer Agreement (Doc. No. 174-4) at 4, § 4.

To avoid future disputes, prior to executing the Transfer Agreement, the parties followed a series of procedures meant to ensure UG understood exactly what would be transferred.  See Am. Compl. at ¶ 54.  Juice allowed a "View Access Period," in which it provided access for UG representatives to view "all existing materials, including source code, with no exceptions or reservations."  Id. at ¶ 56.  On a February 2022 telephone call, UG's counsel verbally represented that what they saw in the View Access Period was precisely what would be transferred, and that the language of the Transfer Agreement states that UG would accept it "as is."  See id. at ¶ 57.

The parties signed the Transfer Agreement on March 7, 2022.  See id. at ¶ 3.  The Agreement acknowledges that the View Access period took place and that materials provided therein included "all computer code and information in Juice's possession that is used to operate the UG website in its most up-to-date form . . . ."  Id. at ¶ 59; see also Transfer Agreement at 1.

Juice transferred possession of all existing computer code, files, and information to UG.  See id. at ¶ 61.  However, five or so hours after Juice completed the transfer, and, allegedly before UG would have had time to inspect what Juice delivered, UG's counsel emailed Juice to protest that UG did not receive, inter alia, any code for the

Four Features.  See id. at ¶ 65-66.  In response, Juice declared that no code for the Four Features existed because UG had halted their development.  See id. at ¶ 70.

Through the end of March and beginning of April 2022, UG made various "threats and spurious claims" against Juice.  Id. at ¶ 72.  On April 19, 2022, Juice wrote to UG, stating that it believed the matter resolved but did not receive a reply from UG for four months.  See id.

On August 4, 2022, UG's counsel emailed Juice an attached draft complaint alleging Juice breached the Transfer Agreement.  See id. at ¶ 73.  UG's counsel stated that he would file the complaint unless Juice "complete[d] its performance" under the Transfer Agreement, or "remit[ted] a refund of $200,000 for the undelivered items."  Id. at ¶ 73.  Together, the email and draft complaint allege that Juice invoiced UG for the development of the Four Features and "implicit[ly] den[y] that the MSA . . . is a valid and binding agreement of the parties."  Id. at ¶ 74. Juice alleges this demand was made in bad faith, that UG never planned to honor the Transfer Agreement, and that UG always planned to demand more money or code from Juice after the Transfer Agreement was executed.  See id. at ¶¶ 66, 68, 75.

On August 22, 2022, Juice's counsel sent UG's counsel a Cease-and-Desist Letter to which UG never responded.  See dd. at ¶ 76; see Ex. E to Am. Compl. ("Cease and Desist Letter") (Doc. No. 174-5).  The Cease and Desist Letter alleges that UG fraudulently induced Juice to enter the Transfer Agreement, and that the Transfer Agreement was therefore voidable at Juice's option.  Cease-and-Desist Letter at 5.  The letter contains the following passages:

"Because UG fraudulently induced Juice to enter into the Transfer
Agreement, the Transfer Agreement is voidable at Juice's option, which it

hereby exercises. *Harold Cohn & Co. v. Harco Int'l, LLC*, 804 A.D.2d 218, 223 (Conn. App. Ct. 2002) ("A defrauded party has the option of seeking rescission or enforcement of the contract and damages."). Without the Transfer Agreement, UG has no basis to use, replicate, further develop, modify, upload, download, or create any derivative works from the source code to the above Existing Materials."

"Juice therefore demands that UG cease and desist any and all use of the [deliverables] by no later than September 2, 2022 and provide to Juice a sworn certification that all such source code has been permanently destroyed or returned to Juice.  Juice will maintain the $23,462 received pursuant to the Transfer Agreement in escrow and will return the funds to UG upon receipt of proof that the infringement has ceased. The parties will return to their positions immediately preceding execution of the Transfer Agreement."

Cease-and-Desist Letter at 5, 1-2.  UG did not respond, but instead filed suit against Juice in Connecticut state court.  See Am. Compl. at ¶ 78.  In the time since UG took possession of Juice's code, it has "manipulated Juice's copyrighted source code to add several new features to the Web-Based Application" and made "improvements and additions" to it.  Id. at ¶¶ 79-80.

B.     Procedural Background

On September 8, 2022, UG filed suit against Juice in Connecticut Superior Court, Judicial District for Norwalk and Stamford, alleging breach of contract, fraud, violation of CT Unfair Trade Practices Act, breach of implied covenant of good faith and fair dealing, and unjust enrichment.  See Def.'s Mem., Ex. 1, UG's State Complaint (Doc. No 31-1).

The plaintiff initiated the instant suit on September 16, 2022.  See Complaint (Doc. No. 1).  In Count One of the original Complaint, Juice alleges that it owns the copyright of the material at issue and that UG obtained possession of the copyrighted material through fraudulent means.  See Compl. at ¶¶ 72-83.  In Count Two, Juice claims that UG falsely represented that it intended to terminate its relationship with

Juice through the Transfer Agreement in order to induce Juice into entering the contract and subsequently turning over copyrights.  See id. at ¶¶ 84-94.  Count Three asserts breach of the Master Services Agreement.  See id. at ¶¶ 95-102.  In Count Four, Juice claims UG breached the implied covenant of good faith and fair dealing under the Transfer Agreement.  See id. at ¶¶ 103-106.  Count Five alleges UG was unjustly enriched by material to which UG otherwise would have no rights in.  See id. at ¶¶ 107-113.  In Count Six, Juice brings a claim for equitable remedy under the theory of quantum meruit for providing UG with the copyrighted materials.  See id. at ¶¶ 114-121. In Count Seven, Juice asserts it is entitled to declaratory judgment that Juice has not breached the Transfer Agreement.  See id. at ¶¶ 122-125.  On December 1, 2022, UG moved to dismiss Counts One through Six of the plaintiff's Complaint.  See First Motion to Dismiss, ("First Mot. to Dismiss") (Doc. No. 30).  Juice opposed the Motion.  See Plaintiff's Memorandum of Law in Opposition (Doc. No. 35).

On December 15, 2023, the court issued its Ruling on the Motion.  See Ruling on Defendants' Partial Motion to Dismiss ("Ruling") (Doc. No. 172).  The Ruling granted the Motion with respect to Juice's copyright claim in Count One without prejudice, giving Juice a right to replead.  Ruling at 10-14.  For Juice's remaining claims, which Juice brought under Connecticut state law[2], the court declined to exercise supplemental jurisdiction sua sponte.  Ruling at 14-16.

---

[2] As the court expressed in its prior Ruling, the court sees Count Seven as arising under state law because Juice does not rely on the federal Declaratory Judgment Act, 28 U.S.C. § 2201, as a basis for its declaratory judgment claim.  See Am. Compl. at ¶¶136-138.  Juice has contended, and continues to contend, that this court has jurisdiction under sections 1331 and 1338 of title 28 of the U.S. Code because Juice has asserted a claim under the Copyright Act of 1976, and that the court has supplemental jurisdiction with respect to Juice's other claims.  See id. at ¶¶ 11-12.

On January 5, 2024, Juice filed its Amended Complaint.  <u>See</u> Am. Compl.  On January 19, 224, UG filed its second Motion to Dismiss.  <u>See</u> Mot. to Dismiss; <u>see</u> Def.'s Mem.  On February 9, 2024, Juice filed its opposition.  <u>See</u> Pl.'s Opp.  On February 23, 2024, UG filed its response.  <u>See</u> Def.'s Reply.

## III.   STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor.  <u>See</u> <u>La Liberte v. Reid</u>, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  <u>Iqbal</u>, 556 U.S. at 678.  In deciding a motion to dismiss under Rule 12(b)(6), a complaint is deemed to include writings and documents attached to the complaint, referenced in the complaint, or integral to the complaint.  <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002).

## IV.   DISCUSSION

UG moves to dismiss Juice's copyright claim in Count One and argues that the court should again decline to exercise supplemental jurisdiction over Juice's remaining claims.  <u>See</u> Mot. to Dismiss.  In the alternative, UG Moves to Dismiss all seven Counts of the Amended Complaint.  <u>Id.</u>

A.    Copyright Infringement

In its previous Ruling, the court held that Juice had failed to plead copyright infringement on the grounds that Juice had transferred ownership of the copyrights as issue to UG.  See Ruling at 10-14.  Critically, the court held that Juice had not adequately pled its entitlement to the rescission of the Transfer Agreement, because it had not alleged that it offered to return the benefit UG conferred to it.  See id.  In the present Motion to Dismiss, UG argues that Juice has again failed to allege their entitlement to rescission; Juice argues that they have adequately pled it.  See Def.'s Mem. at 4-19, Pl.'s Opp. at 13-15.

"To prove a claim of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original."  Urbont v. Sony Music Ent., 831 F.3d 80, 88 (2d Cir. 2016).  Copyright ownership can be transferred by "assignment, mortgage, exclusive license, or any other conveyance."  U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 695 (2d Cir. 1991) (quoting 17 U.S.C. § 101).  Once a contract for transfer of exclusive rights is executed, the grantee is not liable for copyright infringement.  See id. at 695; TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 93 (2d Cir. 2005).

However, problems with the formation or execution of the contract may prevent the legal transfer of rights over the copyrighted material, in which case, a copyright law claim by the transferor is not precluded.  Cf. Graham v. James, 144 F.3d 229, 237-38 (2d Cir. 1998).  For instance, if the intended grantee fails to satisfy a condition precedent to the transfer of rights over the copyrighted material, then the grantor retains ownership rights and can sue the intended grantee under copyright law for any

unauthorized use, albeit the existence of a contract between the parties.  See id. at 237.

Additionally, a party's conduct may render a contract voidable, the rescission of which

would mean that copyright law governed use during the time the contract was intended

to be in effect.  See id. at 237-38.  However, "[f]ailing such rescission, . . . the grant

continues in place, thus precluding infringement liability until such time as the copyright

owner exercises his entitlement to rescind."  TVT Records, 412 F.3d at 93 (quoting 3

Nimmer on Copyright § 10.15 [A] (6th ed. 1978)); see also Rano v. Sipa Press, Inc., 987

F.2d 580, 586 (9th Cir. 1993).

Thus, as this court previously held, UG can only be liable for copyright

infringement if the Transfer Agreement is subject to rescission.  However, rescission is

not automatic.  "As a condition precedent to a rescission," Juice is "required to allege . .

. that they had restored or offered to restore [the other party] to its former condition as

nearly as possible."  Keyes v. Brown, 155 Conn. 469, 476, 232 A.2d 486, 490 (1967).

In its previous Ruling, the court found that the only allegation in the original

Complaint relating to Juice seeking rescission was the alleged service of Juice's Cease

and Desist Letter.  Ruling at 13.  The parties sharply disputed whether the letter

contained an offer to return the UG's payment under the Transfer Agreement.  Id.

However, the letter was not attached to the original Complaint as an exhibit, and the

Complaint did not otherwise allege Juice offered to return UG to its former condition.  Id.

Accordingly, Juice failed to plead an entitlement to rescission, so the court dismissed

Juice's copyright claim.

When it refiled its Amended Complaint, Juice attached the Cease-and-Desist

Letter as an exhibit.[3]  See Ex. E to Am. Compl. ("Cease and Desist Letter") (Doc. No.

174-5).  The Cease and Desist Letter contains the following passages:

> "Juice therefore demands that UG cease and desist any and all use of the
> [deliverables] by no later than September 2, 2022 and provide to Juice a
> sworn certification that all such source code has been permanently
> destroyed or returned to Juice.  Juice will maintain the $23,462 received
> pursuant to the Transfer Agreement in escrow and will return the funds to
> UG upon receipt of proof that the infringement has ceased.  The parties
> will return to their positions immediately preceding execution of the
> Transfer Agreement."

> "Because UG fraudulently induced Juice to enter into the Transfer
> Agreement, the Transfer Agreement is voidable at Juice's option, which it
> hereby exercises.  Harold Cohn & Co. v. Harco Int'l, LLC, 804 A.D.2d 218,
> 223 (Conn. App. Ct. 2002) ("A defrauded party has the option of seeking
> rescission or enforcement of the contract and damages.").  Without the
> Transfer Agreement, UG has no basis to use, replicate, further develop,
> modify, upload, download, or create any derivative works from the source
> code to the above Existing Materials."

Cease and Desist Letter at 1-2, 5.  In the court's view, Juice's offer to "return the

funds to UG upon receipt of proof that the infringement has ceased" is, on its

face, an offer to return the benefit Juice received under the Transfer Agreement.

See Petrucelli v. Palmer, 596 F. Supp. 2d 347, 368 (D. Conn. 2009) (holding a

"condition precedent to rescission is the offer to restore the other party to its

former condition as nearly as possible").

UG makes several arguments why the language in the Cease-and-Desist

Letter is insufficient, none of which is persuasive to the court. First, UG argues

that because Juice demanded "proof that the infringement has ceased," Juice

was demanding an additional concession beyond the scope of an offer of

---

[3] In deciding a motion to dismiss under Rule 12(b)(6), the complaint is deemed to include writings and documents attached to the complaint.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).  Therefore, the Cease-and-Desist Letter is appropriately considered by the court.

rescission.  Def.'s Mem. at 1-2.  However, drawing inferences in Juice's favor, the court views this as a request for verification that UG was no longer using its code, not as a demand for anything further.

UG also argues that Juice was not offering to restore it to its previous position, because Juice was demanding that UG stop using its code entirely, rather than that the parties return to status quo under the MSA, where UG could use the features Juice created.  Drawing all inferences in the plaintiff's favor, however, it is not clear from the face of the Complaint or Cease-and-Desist letter that Juice was not seeking a return to the status quo, particularly as the letter states: "the parties will return to their positions immediately preceding execution of the Transfer Agreement."  Cease-and-Desist Letter at 2.

Third, UG argues that Juice unreasonably delayed in seeking rescission, citing the delay between UG's early demands in March and April 2022 and the Cease-and-Desist Letter in August.  Def.'s Mem. at 13.  Juice responds that it believed the matter resolved after April, and it was not until UG "reemerged with its draft lawsuit in August" that Juice needed to promptly demand rescission.  Pl.'s Opp. at 19.  Indeed, "[i]t is well established that '[w]here a party desires to rescind upon the ground of . . . fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it . . . . He is not permitted to play fast and loose."  Cont'l Cas. Co. v. Marshall Granger & Co., LLP, 6 F. Supp. 3d 380, 393 (S.D.N.Y. 2014), aff'd sub nom. Cont'l Cas. Co. v. Boughton, 695 F. App'x 596 (2d Cir. 2017), quoting Grymes v. Sanders, 93 U.S. 55, 62 (1876).  Drawing all inferences, as it must, in the plaintiff's favor, the court does not conclude that

a several week delay – during which Juice found legal counsel – was an unreasonable delay in seeking rescission.  In addition, "[o]rdinarily, the question of what is a reasonable time for rescission is a question of fact."  Arthur Properties, S.A. v. ABA Gallery, Inc., No. 11 CIV. 4409 LAK, 2012 WL 2886685, at *3 (S.D.N.Y. July 16, 2012).  Thus, in the court's view, it would be inappropriate at the motion to dismiss stage to deny rescission based on unreasonable delay.

Finally, UG argues the improvements UG has made to Juice's code render it impossible to put the parties back into their prior positions, making rescission inappropriate.  Def.'s Mot. at 17-19.  And indeed, the Amended Complaint alleges that following the execution of the Transfer Agreement, UG "manipulated Juice's copyrighted source code to add several new features."  Am. Compl. ¶ 79.

"A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo.* If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it."  Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 240 (2d Cir. 2006), quoting Grymes v. Sanders, 93 U.S. 55, 62 (1876).  In its previous Ruling, the court expressed concern over this issue in granting Juice the right to replead.  See Ruling at 14, fn. 2.  However, after reviewing the parties briefs, the court is reluctant to decide this issue on the face of the pleadings.  In the court's view, whether the parties can be restored to the status quo involves questions of fact that cannot be resolved at this stage.  See Lipsky v. Commonwealth United Corp., 551 F.2d 887, 898 (2d Cir. 1976) (holding that a decision to dismiss a complaint seeking rescission was "premature" and "whether the status quo could be achieved is a question

of fact and could not be decided solely on the pleadings").  While UG's changes to the Juice's software and code may pose difficulties in restoring the parties to their previous positions, the court is not persuaded from the face of the Amended Complaint that it would be impossible and therefore prohibited.  Accordingly, the court will not dismiss Count One on this ground.

The Motion to Dismiss with respect to Count One of the Amended Complaint is denied.

### B.   Supplemental Jurisdiction

Because the Motion with respect to Juice's copyright claim is denied, and Juice's copyright claim is brought under federal law, a claim now remains over which this court has original jurisdiction.  28 U.S.C. § 1331.  Accordingly, the court no longer sees a basis under section 1367(c) of title 28 of the U.S. Code for declining supplemental jurisdiction.  The court will therefore exercise its supplemental jurisdiction over Juice's remaining claims.

However, the court makes this determination for the purposes of the present motion only, and may revisit whether to exercise supplemental jurisdiction if Count One is dismissed at a later stage.  The court remains mindful of comity and the need to avoid conflicting judgments, and many of the same issues were before the Connecticut state court in UG's action against Juice.  Accordingly, UG is not prejudiced from raising arguments at a later stage about the appropriateness of this court deciding Juice's state law claims.

C.     Fraud in the Inducement

Count Two of the Amended Complaint is a state law claim of fraudulent inducement. Juice alleges that UG fraudulently induced Juice to execute the Transfer Agreement in order to obtain Juice's source code and induce Juice to forgo half the value of its outstanding invoices while UG had no intention of walking away.  Am. Compl .at ¶¶ 95-108.  UG argues that Count Two should be dismissed, because Juice has failed to allege the required elements of fraudulent inducement.  Def.'s Mem. at 25-31.

The elements of fraudulent inducement in Connecticut are that "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury . . . . Under a fraud claim of this type, the party to whom the false representation was made claims to have relied on that representation and to have suffered harm as a result of the reliance." Sturm v. Harb Dev., LLC, 298 Conn. 124, 142 (2010).

UG first argues that Juice fails to allege any false representation.  Def.'s Mem. at 26-27.   However, drawing all reasonable inferences in the plaintiff's favor, the court infers that UG's alleged representation that it would accept Juice's code "as is" was a knowingly false statement.  See Am. Compl. at ¶ 57.  Juice has plausibly alleged that UG knew the Four Features were incomplete; indeed, UG instructed Juice not to finish them.  See Am. Compl.at ¶¶ 31-33.  UG was also given a "View Access Period" prior to the execution of the Transfer Agreement in which it could inspect the code and features as they existed.  See id. at ¶¶ 54-56.  There was no code for the Four Features shown in the View Access Period, indeed, no code for the Four Features ever existed.  See id.

at ¶ 70.  These allegations give rise to the inference that UG knew it would not be receiving the Four Features.  Thus, UG's near immediate demand that Juice hand over the Four Features following the execution of the Transfer Agreement gives rise to the inference that UG's commitment to accept the code "as is" was a false representation.  UG represented that it would accept the code "as is", allegedly knowing that it would not.  See Paiva v. Vanech Heights Const. Co., 159 Conn. 512, 515 (1970) ("a promise to do an act in the future, when coupled with a present intent not to fulfil the promise, is a false representation").  In the court's view, at the present stage, that is sufficient to satisfy the elements that UG made "(1) a false representation was made as a statement of fact" and that "(2) it was untrue and known to be untrue by the party making it".  Sturm, 298 Conn. at 142.

Additionally, UG's representation that it would accept code "as is" was made for the purpose of inducing Juice to execute the Transfer Agreement, transfer its code and intellectual property to UG, and accept a discount on its outstanding invoices.  See Am. Compl. ¶¶ 64-71.  Accordingly, UG made it to "to induce the other party to act upon it; and . . . the other party did so act upon that false representation to his injury".  Sturm, 298 Conn. at 142.  Thus, in the court's view, Juice has adequately pled the elements of fraudulent inducement.

UG also argues that Juice fails to abide by the heightened pleading standards for allegations of fraud set forth by Federal Rule of Civil Procedure 9(b), which states that "in alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  See Fed. R. Civ. P. 9(b); Def.'s Mem. at 26.  In interpreting 9(b), the Second Circuit has stated that, to plead fraud with the required particularity, a party

must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). In the court's view, the Amended Complaint meets this standard.

Take, for example, Juice's allegation that UG falsely represented it would accept Juice's code "as is", which the court finds is plausibly alleged as a knowingly false statement. See, supra, at 15. In this example, Juice alleges specifically that, on February 22, 2022, UG's counsel told Juice Board member Rhonda Brown that "he left the words 'as is' in the Transfer Agreement" and "told UG's CEO . . . that what they saw in the View Access was precisely what would be transferred under the Transfer Agreement." Am. Compl. at ¶ 57. The Amended Complaint goes on to allege that this was one of several statements that were misrepresentations, because "UG . . . never intended to abide by the Transfer Agreement or allow the Transfer Agreement to end the parties' relationship as promised." Am. Compl. ¶ 64. In this example, the Amended Complaint (1) identifies specific statements as misrepresentations, (2) identifies the speaker, (3) states exactly when the statements were made, and (4) explains why the statements are misrepresentations. Thus, it meets the heightened pleading standards of Rule 9(b).

Because the Amended Complaint pleads the elements of fraudulent inducement in a manner compliant with Rule 9(b), UG's Motion to Dismiss with respect to Count Two is denied.

D.   <u>Breach of Contract</u>

Having alleged that it rescinded the Transfer Agreement, Juice also alleges that UG is in breach of its obligations under the MSA, which the now-rescinded Transfer Agreement superseded.  <u>See</u> Am. Compl. at ¶¶ 109-116.  Specifically, the Transfer Agreement settled the amounts UG allegedly owed to Juice under its prior invoices.  <u>Id.</u> Because it rescinded the Transfer Agreement, Juice alleges, UG is in breach of the MSA for failing to pay the outstanding balance.  <u>See</u> <u>id.</u>

In support of its original Motion to Dismiss, UG argued that Count Three should be dismissed because the Transfer Agreement is a settlement that resolved existing claims under the MSA.[4]  <u>See</u> Defendant's Memorandum of Law in Support of [Prior] Motion to Dismiss ("Def.'s Prior Mem.") (Doc. No. 37) at 29.  To the extent that the Transfer Agreement was a settlement meant to discourage future litigation, it has, to put it mildly, not succeeded.  However, the court need not reach the issue of whether the Transfer Agreement waives claims, because such a waiver clause would be undone by any rescission of the Transfer Agreement.  Because the court has already held that Juice adequately pled a right to rescission, <u>see,</u> <u>supra,</u> at 13, the court cannot conclude now that any release is binding on Juice.

Because rescission "places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract", <u>see</u> <u>Winchester v.</u>

---

[4] Throughout its Memorandum, UG refers to arguments it briefed more fully in support of its prior Motion to Dismiss.  <u>See, e.g.,</u> Def.'s Mem. at 32.  Juice argues that this is inappropriate, and that UG is not entitled to arguments not briefed for the present Motion.  However, as the court previously declined supplemental jurisdiction over these claims and these arguments would now be substantially identical, the court will consider them, although it does not view UG's approach as appropriate.

UG objects that Juice should not have been permitted to amend Counts Two through Seven, and the court should ignore the amended allegations.  Def.'s Memo at 20-25.  UG is correct.  <u>See</u> Ruling at 16 ("granted <u>as the Count One,</u> without prejudice to repleading (emphasis added)").  However, the court will allow it and decide the pending Motion to Dismiss on the Amended Complaint.

McCue, 91 Conn. App. 721, 732, 882 A.2d 143, 150 (2005), rescission would return the parties to the state where UG allegedly owed money on outstanding invoices under a contract.  Accordingly, Juice has plausibly alleged breach of contract under the MSA and he Motion to Dismiss with respect to Count Three is denied.

> E.   Implied Covenant of Good Faith and Fair Dealing

Count Four of the Amended Complaint is an alleged breach of the implied covenant of good faith and fair dealing.  "[I]t is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. (Internal quotation marks omitted.)"  M&T Bank v. Lewis, 349 Conn. 9, 34, 312 A.3d 1040, 1056 (2024).

Juice argues that, by demanding the Four Features and threatening litigation hours after receiving Juice's code, UG acted in bad faith and deprived Juice of a benefit it could reasonably expect to receive under the Transfer Agreement.  Am. Compl. at ¶¶ 117-120.  UG argues that Juice has failed to identify an actual term of the Transfer Agreement that UG breached.  At the Motion to Dismiss stage, Juice's allegation that UG represented the Transfer Agreement would fully terminate the parties' relationship, see Am. Compl. at ¶ 53, suffices to show that UG's subsequent actions deprived Juice of a benefit it could reasonably expect under the contract.  Additionally, the court also finds that the same allegations that the court found sufficient to state a claim for fraudulent inducement are sufficient to support alleged bad faith.  See Habetz v.

Condon, 224 Conn. 231, 237 (1992) ("Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another. . . .").  Thus, because Juice has plausibly alleged that UG, in bad faith, deprived it of a benefit it could reasonably expect under the Transfer Agreement, it has plausibly alleged a violation of the implied covenant of good faith and fair dealing.[5]  The Motion to Dismiss with respect to Count Four is denied.

### F.    Unjust Enrichment and Quantum Meruit[6]

Counts Five and Six of the Amended Complaint are claims for unjust enrichment and quantum meruit, respectively.  Am. Compl. at ¶¶ 121-135.  Both allege that, because of the rescission of the Transfer Agreement, UG has been unjustly enriched and has failed to adequately compensate Juice for providing UG with its underlying source code and other products.  Id.

"Quantum meruit and unjust enrichment are common-law doctrines that provide restitution, or the payment of money, when justice so requires."  United Coastal Indus., Inc. v. Clearheart Const. Co., 71 Conn. App. 506, 511–12 (2002); see Walpole Woodworkers, Inc. v. Manning, 307 Conn. 582, f.n. 9 (2012) ("We recognize that this court has often used quantum meruit and unjust enrichment interchangeably, or as equivalent terms for recovery in restitution.").

---

[5] Juice should be aware, however, that while it is allowed to plead in the alternative, the court may not award both rescission of the Transfer Agreement, and damages for noncompliance with the Transfer Agreement.  See Duksa v. City of Middletown, 192 Conn. 191, 197, 472 A.2d 1, 4 (1984). ("A definite election to rescind a contract is final and operates as a waiver of any claim for damages for any breach of the contract."); see Petrucelli v. Palmer, 596 F. Supp. 2d 347, 368 (D. Conn. 2009) ("Usually, a judgment cannot stand if both damages and rescission are awarded.")
The court will not reach the issue here.

[6] The court will discuss these causes of action together, as Connecticut courts frequently do.  See Pollansky v. Pollansky, 162 Conn. App. 635, 656 (2016) ("Because unjust enrichment and quantum meruit are related causes of action, we consider them together.")

In Connecticut, plaintiffs seeking to recover for unjust enrichment must show "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573 (2006). Likewise, quantum meruit "arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement. . . . Centered on the prevention of injustice, quantum meruit strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services." Pollansky v. Pollansky, 162 Conn. App. 635, 656 (2016) (citations omitted).

Juice alleges that it provided UG with valuable source code that benefitted UG, and for which UG has not paid fair value. Am. Compl .at ¶¶ 121-125. In the court's view, this is sufficient to overcome a Motion to Dismiss. UG argues that Juice cannot sustain a claim for unjust enrichment because UG paid for what it received under the Transfer Agreement. Def.'s Mem. at 34-35. However, the payment it provided is under an agreement that Juice plausibly alleges it has rescinded; therefore, Juice may still seek recovery for unjust enrichment. See Courchevel 1850 LLC v. Wisdom Equities LLC, 846 F. App'x 33, 36 (2d Cir. 2021). "[W]here rescission of a contract is warranted, a party may timely rescind and seek recovery on the theory of quasi contract." Id. (applying New York Law).

UG raises two more arguments why Juice's unjust enrichment and quantum meruit claims should be dismissed. First, UG argues that in the event the Transfer Agreement is rescinded, the MSA would govern the parties' relationship. See Def.'s

Mem. at 34.  UG argues that the MSA, as an express contract, precludes an unjust enrichment claim.  Id.

"[U]njust enrichment is not available as a remedy when there is a valid contract between the parties and that contract addresses the matter at issue in the unjust enrichment action."  Gleason v. Durden, 211 Conn. App. 416, 428, 272 A.3d 1129, 1138, cert. denied, 343 Conn. 921, 275 A.3d 211 (2022).  Nevertheless, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice."  Town of New Hartford v. Connecticut Res. Recovery Auth., 291 Conn. 433, 455, 970 A.2d 592, 612 (2009).  In addition, it is permissible to allege unjust enrichment in the alternative to breach of an express contract.  Standard Petroleum Co. v. Faugno Acquisition, LLC, 330 Conn. 40, 56, 191 A.3d 147, 161 (2018).

At this stage, it is not clear from the face of the Amended Complaint that the MSA precludes Counts Five and Six. These Counts allege that UG unjustly benefitted from material that Juice did not provide under the MSA, if the Transfer Agreement is rescinded, the counts appear to address a transfer of property not governed by the MSA or any other express contract.  Additionally, Juice is permitted to plead unjust enrichment and quantum meruit as alternative grounds to recovery under express contracts, so the court will not dismiss them at this stage.

Second, UG argues that unjust enrichment and quantum meruit claims are preempted by federal copyright law.  Def.'s Mem. at 34.  Indeed, the Second Circuit has held that "[t]he Copyright Act exclusively governs a claim when (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright

Act . . . and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law . . . ." Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 48 (2d Cir. 2019). However, the Amended Complaint is clear in its allegations that Juice transferred, and UG benefitted from, more than just Juice's copyrights.  See Am. Compl. at ¶ 62 (alleging copyrights were in addition to website technical deliverables).  Accordingly, while the Copyright Act may preempt these claims to the extent they seek to recover for copyright infringement, the court will not at this stage dismiss these two claims on the basis of copyright preemption.

Because Juice alleges that UG has unjustly benefitted from Juice's deliverables without paying fair value for them, the Motion to Dismiss Counts Five and Six is denied.

G.    Declaratory Judgment

Finally, Juice seeks a declaratory judgment from this court that it has fulfilled its obligations under the Transfer Agreement.  See Am. Compl. at ¶¶ 136-139.  "The purpose of a declaratory judgment action, as authorized by [Connecticut law], is to secure an adjudication of rights [when] there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties."  New London Cnty. Mut. Ins. Co. v. Nantes, 303 Conn. 737, 747, 36 A.3d 224, 232 (2012).  A declaratory judgment action can be maintained "where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof."  Milford Power Co., LLC v. Alstom Power, Inc., 263 Conn. 616, 626 (2003).

Here, Count Seven meets the prerequisites: Juice has an interest in resolving whether it fulfilled its obligations under the Transfer Agreement, the question is unsettled between the parties, and both Juice and UG are parties to the present action.. On that basis the Motion to Dismiss with respect to Count Seven is denied.

## V.    CONCLUSION

For the reasons stated herein, UncommonGood's Motion to Dismiss (Doc. No. 175) is denied.  In light of the age of the case, and that the deadline for discovery expired before the court's Ruling on the first Motion to Dismiss, see Order (Doc. No. 135), the court sets the deadline for dispositive motions at 30 days from the date of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of September 2024.


    /s/ Janet C. Hall
Janet C. Hall
United States District Judge