UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUICE CREATIVE GROUP, LLC, | : | |
| Plaintiff/Counterclaim Defendant, | : | Civil No. 3:22-cv-01175-JCH |
| v. | : | |
| UNCOMMONGOOD, INC., | : | |
| Defendant/Counterclaim Plaintiff. | : | April 30, 2025 |

**LOCAL RULE 56(a)(2) PLAINTIFF'S RESPONSES
TO DEFENDANT'S ADDITIONAL MATERIAL FACTS**

1. On December 12, 2021, as Juice began negotiating the Transfer Agreement with UG, Juice's Managing Partner, Carter Grotta, exchanged Slack messages with Juice's Chief Technical Officer, commenting on Juice's leverage over UG by reason of its ownership of the IP in UG's website. He said that UG would have to pay Juice "a lot more money," because Driscoll "could not sell her company" without control over the IP. (UG Ex. 1). At deposition, Grotta elaborated on this exchange, testifying that Juice had been "screwed" by UG and that he had intended to transfer ownership of the IP only if Juice received "the money that we deserved for the work that we did." (UG Ex. 4 at 290:25-291:3, 291:24-292:14, 293:22-294:9).

**RESPONSE:** Undisputed that UG Ex. 1[1] is a December 12, 2021 slack message that contains those words, but dispute the characterization created by cherry-picking. In response to Attorney Dreier's question "I'd like to know what you mean by that" in UG Ex. 4, Grotta testified:

---

[1] For the purpose of clarity, citations to Defendant UG's numbered Exhibits (submitted with its Opposition Papers as opposed to the alphabetically titled exhibits UG submitted with its moving papers) are referenced "UG Ex. __", while Plaintiff Juice's numbered Exhibits will continue to be referenced as "Ex. __".

1

"If -- if we own the code, which we do, and we own the code and we own the right to the work that we did because there no agreement in place saying that Uncommon -- we had – JUICE had transferred those rights to UncommonGood. There are two ways this gets done. You know, and we have done -- we have partners who done it with Fortune 500 companies. Agencies build platforms all the time. The bigger company doesn't own it. They pay for a license and they pay for it to get built and they pay for a license. And so in this situation, there a bunch of different paths we could have gone down. The one that we most likely would have done, if Carolyn had been reasonable, if UncommonGood had acted in good faith, is we would have figured out a license or a transfer of ownership at a point where we had the money that we deserved for the work that we did. We had a closeout agreement that protected both sides and we figured out how do that correctly." (UG Ex. 4 at 291:12-292:8)

2.  During the negotiations of the TA, Rhonda Brown, on behalf of Juice, sent UG's counsel drafts of the proposed agreement, all of which included its promise to transfer to UG ownership of the IP in the source code for the features of UG's website free and clear of all claims and encumbrances. (UG Ex.9 at UG1921, UG1370, UG1338).

**RESPONSE:** Undisputed that UG Ex. 9 are drafts of the Transfer Agreement, but they are irrelevant because the State Court has already interpreted Juice's obligations to deliver the Website Technical Deliverables – which as UG admits includes the copyrights – as a matter of law, holding that Juice has "borne its burden of proving that it has delivered the Website Technical Deliverables it was required to deliver under the Transfer Agreement". (Ex. 42 at 12.)

3.  On January 24, 2022, Juice sent UG an email assuring UG that the TA would provide for "a complete transfer of the code … and will clarify that ownership rests with UG." (UG Ex. 10).

**RESPONSE:** Undisputed, but UG Ex. 10 also makes clear that the parties have a dispute about the ownership of the intellectual property in the UG Website, in part because UG has disavowed the MSA. That dispute is one of the disputes that UG promised it would forgo if the Transfer Agreement were signed, and yet the Transfer Agreement was signed and UG still raised disputes regarding the validity of the MSA and the status of the pre-Transfer Agreement ownership, including in its State Action. (Brown Decl. ¶ 11; Exs. 33, 37, 38.)

4. UG's CEO, Carolyn Driscoll, relied on the foregoing representations in entering into the TA. (Driscoll Dec. paras. 12-13). She directed UG's counsel in the negotiations of the TA and was apprised of all developments. (Driscoll. Dec. para. 11).

**RESPONSE:** Disputed. UG Ex. 10 is an email between Ms. Brown and Ms. Driscoll and no record evidence supports Ms. Driscoll's statement that she saw or relied on any statements therein. UG's privilege log does not reflect that the email in UG Ex. 10 was sent to her and UG has claimed privilege on all communications between Ms. Driscoll and Attorney Dreier. (Ex. 66.)

5. In late February 2022, Grotta, with Ms. Brown's advice, applied for and, on February 28, obtained copyright registrations in his name (through application files each styled "secret pdf") for the code in at least four of the features for UG's website that were to be transferred to UG. These included the features Non-Profit Fundraiser Tool, Non-Profit Media Library Tool, Non-Profit Sweepstakes Tool and Non-Profit Donation Tools. (UG Ex. 2).

**RESPONSE:** Disputed. This AMF ¶ 5 is identical to UG SUF ¶ 20 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 at ¶ 20.

6. Juice did not disclose to UG, either before or during the negotiations of the TA, upon entering the TA or during the Transfer Period that it or Grotta had intended to file for these registrations, that either of them had done so or that either of them had obtained the registrations. (UG Ex. 4 at 411:12-17; UG Ex. 5 at 353:9-21; UG Ex. 4 at 412:12-19).

**RESPONSE:** Undisputed, although repeat that no registration had been "obtained" by the time of the Transfer Period. *See* ECF 244-1 ¶ 21. (Grotta Opp. Decl. ¶ 11.)

7. In Article II of the TA, Juice promised to transfer to UG all of the UG Website Technical Deliverables during the Transfer Period. Article I, Section 1(b) provided that the Deliverables

3

included all the IP and, in particular, all of the copyrights, in the items listed in Section 1(a), which included all of the code and software for UG's website. (ECF 233-6 at 16500-16501).

**RESPONSE:** Undisputed.

8. In Article III of the TA, (a) Juice represented that it "hereby irrevocably transfers, conveys, and assigns to UG any and all rights, titles and interest in and to … the UG Website Technical Deliverables … free and clear of any and all actual, known, or threatened liens claims, or other encumbrances…," and (b) Juice agreed to "execute all documents reasonably necessary to record [those] assignments and transfers." (*Id*. at 16502).

**RESPONSE:** Undisputed.

9. Article VIII, Section 6 of the TA sets out an Integration Clause.  (*Id*. at 16505-16506).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 at ¶ 23.

10. There is no General Release in the TA. (Id).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 at ¶ 23.

11. On March 11, 2022, UG was able to determine preliminarily that it appeared Juice had not delivered any code for the features Stories, Chat, Auctions or Analytics (the "Four Features"). UG was able to make this preliminary determination, because the delivery and UG's review of the delivery had already been proceeding for three days, and Juice had prioritized locating the Four Features, inasmuch as they were among the items UG had not already seen and was most eager to see.  (Driscoll Dec. para. 19).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 25 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 25.

12. Upon that determination, Ms. Driscoll instructed UG's counsel to so inform Juice, believing it was better to notify Juice sooner rather than later (even if UG was still uncertain),

so that Juice could promptly correct (or explain) the error and UG could not be accused of delay. The Four Features were not the only items that UG notified Juice were missing at that time, but, as it turns out, UG was mistaken as to a number of those other items. (Driscoll Dec. para. 20).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 57 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 57.

13. On March 11, 2022, per Ms. Driscoll's instruction, UG's counsel notified Juice's counsel that it appeared Juice had failed to deliver any code for the Four Features. (Driscoll Dec. para. 20; ECF 233-38 at 1845-1846). Juice determined at that time that it had been fraudulently induced to enter into the TA. (Ex. 5 at 334:23-335:8).

**RESPONSE:** Undisputed Attorney Dreier sent an email on March 11 2022, but dispute (1) that Attorney Dreier's email was qualified by what it did or did not "appear." (Juice Ex. 33 at UG 1845 ("as of close of business today, UG is still not in possession of all the UG Website Technical Deliverables as you suggest. Specifically… [lists code for the Four Features]")); and (2) Juice has no knowledge of whether Attorney Dreier's email was at Ms. Driscoll's direction, but there is no privileged communication from Ms. Driscoll to Attorney Dreier on March 11, 2022. (Ex. 66.) Moreover, this AMF is nearly identical to UG's SUF ¶ 25 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 25.

14. By same-day reply, Juice denied that it was obligated to deliver the Four Features, and UG, in turn, threatened litigation if the code were not delivered within a 30-day cure period. (ECF 233-38 at 1845-46).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 26.

15. After various further correspondence on the matter (ECF 233-38 at 1841-1844,) by email on April 19, Juice maintained that it had no obligation to deliver the Four Features and

considered the matter closed. (ECF 174 para. 72; ECF 233-43, 44). When Juice received no reply, it concluded that was the end of their dispute. (ECF 174. para. 72; UG Ex. 5 at 359:12-360:7, 363:18-364:8, 365:14-21, 367:14-17; ECF 233-43). Juice thought "the transfer was a success" and the relationship had been fully terminated. (UG Ex. 4 at 278:6-9). Juice repeatedly informed UG that Juice had fully performed all of its obligations under the TA. (UG Ex. 18)

**RESPONSE:** Undisputed.

16. Nevertheless, over the course of the next five months, Juice still did not notify UG about any of the copyright registrations and still did not take any measures to record any assignment of the registrations to UG. (UG Ex. 5 at 369:23-370:11; UG Ex. 4 at 412:12-19).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 28.

17. Instead, in correspondence with the Copyright Office in April and May 2022, Mr. Grotta informed the Copyright Examiner that he was assigning the registrations to Juice. (UG Ex. 2 at 26199-26200, 26161-26162). The Copyright Examiner specifically asked Grotta, in June 2022, how copyright ownership had been obtained and whether there was any "written agreement." He asked for "an appropriate transfer statement explaining how you, the copyright claimant, legally [acquired] ownership of the copyright." (*Id*. at Juice 26160-26161). Instead of acknowledging the assignment of the copyrights to UG under the TA, Grotta ignored the inquiry until August and then informed the Copyright Examiner that "Juice Creative Group has obtained all copyrights by written agreement." (*Id.* at 26160).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 29 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 29.

18. As a result of the foregoing, after several refilings by Juice and Mr. Grotta, six copyrights (now including the features "NonProfit Email Integration"and "NonProfit CRM," collectively, the

"Six Copyrights"), were all registered in Juice's name. (ECF 233-48). Juice never took any measures to record the assignment to UG or to correct the misinformation provided to the Copyright Office. (UG Ex. 11 at 11, Request No. 23).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 30.

19. By letter to UG's counsel dated August 22, 2022 (the "cease and desist letter"), Juice's counsel, Emily Kirsch, accused UG of fraudulently inducing Juice to enter into the TA. She declared the TA to be void and claimed that any use of the Website Technical Deliverables by UG constituted an infringement of Juice's copyrights therein. (ECF 233-45).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 31.

20. Until receiving the "cease and deist letter," UG had not known that Juice was contesting UG's ownership to any of the copyrights. (Driscoll Dec. para. 25).

**RESPONSE:** Disputed as drafted because until the cease and desist letter, Juice ***was not*** contesting UG's ownership to any of the copyrights. (Brown Decl. ¶¶ 39, 40.)

21. In her "cease and desist" letter, Attorney Kirsch informed UG that "Juice will maintain the $23,462 received [from UG] pursuant to the Transfer Agreement in escrow and will return the funds to UG upon receipt of proof that the infringement has ceased." (ECF 233-45).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 36.

22. UG construed the "offer" of rescission, with that condition, as one that would require an admission and expose it to greater liability. (Driscoll Dec. para. 24).

**RESPONSE:** Juice has no knowledge of how UG construed the rescission, but UG's construction is inconsistent with the plain language of the Cease and Desist Letter. *See* ECF 244-1 ¶ 36.

23. None of the funds were ever escrowed or returned. (UG Ex.4 at 237:4-23, 383:24-384:8).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 36.

24. Prior to entering into the TA, Juice had viewed UG as a licensee of the software that was utilized in UG's website, and UG was using the software. [ECF 174. para. 76]. In its "cease and desist" letter Juice did not offer to restore UG's status as a licensee or allow it to continue to use the software. (ECF 233-45). Instead, Juice demanded that "UG cease and desist any and all use of the Website Technical Deliverables and Website Technical Deliverables," which included the software. (*Id.*).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 37 submitted with its moving papers. Please see Juices response thereto at ECF 244-1 ¶ 37.

25. Juice did not inform UG in the cease and desist letter that it had filed for or obtained any copyright registrations. (ECF 233-45).

**RESPONSE:** Undisputed.

26. As of the time UG entered into the TA, it had paid Juice approximately $600,000, primarily its work on the website. Thereafter, as of the time it received the receiving the "cease and desist letter," UG had invested hundreds of thousands of dollars more in the code and had made its website — and thereby its business — fully dependent on its use and adaptation of the code. (Driscoll Dec. para. 27). Juice did not make any offer to compensate UG for any of that investment. UG did not make a profit from its [sic] use of the code. (*Id.*).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶¶ 33 and 39 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶¶ 33 and 39.

27. In the time it delivered the code to UG in March 2022 and sent its "cease and desist" letter in August 2022, Juice knew that UG was building its business based on the source code it had obtained from Juice and was modifying the code. (ECF 174 para. 86).

**RESPONSE:** Undisputed in part, disputed in part. *See* ECF 244-1 ¶ 40.

28. Juice never notified UG of any of its copyright registrations until September 2022, when it sued UG for infringement of the copyrights it had assigned to UG in the TA. (UG Ex. 5 at 369:23 – 370:11; Driscoll Dec. para. 28).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 32.

29. UG made all payments due to Juice under the TA. (UG Ex. 11 at 5, Request No. 4).

**RESPONSE:** Undisputed. *See* ECF 244-1 ¶ 35.

30. According to Juice, (a) it determined on March 11, 2022, when it received UG's demand for the Four Features, that it had been fraudulently induced to enter into the TA (UG Ex. 5 at 334:23 – 335:12; ECF 233-45 at 4), and (b) it would not have entered into the TA if it had known that UG would make an immediate demand for the Four Features. (ECF 174 para. 102).

**RESPONSE:** Disputed. This AMF is identical to UG's SUF ¶ 38 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 38.

31. In an email to UG's counsel on October 4, 2022, Juice's counsel, Emily Kirsch, demanded that UG pay Juice another $450,000 if it wanted "uncontestable rights to the source code." (UG Ex. 3). She said that would make up for the deeply discounted prices Juice had charged.

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 41 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 41, including Juice's objection that this is an impermissible use of a settlement communication.

32. The Four Features — including the coding for Stories. Chat and Analytics, and the design and technical documentation for Auctions — were listed on the SOW that Juice sent to UG in August. (UG Exh. 5 at 203:7-17; ECF 233-12 at 13642-13644; Driscoll Dec. paras. 4,7). Though the SOW was not signed until October, Juice worked on the items on the unsigned SOW in August

9

and September. (Driscoll Dec. paras. 4,6; UG Ex. 12 at 305:13-306:7).

**RESPONSE:** Undisputed in part and disputed in part. This AMF is substantially identical to UG's SUF ¶¶ 42 and 43 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶¶ 42 and 43.

33. On September 28, 2021, Grotta sent a Slack message to Driscoll complaining about being overworked and understaffed. (UG Ex. 13 at UG 296-297; Driscoll Dec. para. 5). By reply that day, Driscoll suggested that Juice "hit the pause button" on certain of the work (UG Ex. 13 at UG 297), which Juice construed as including the Four Features. (UG Ex. 12 at 348:22-349:9).

**RESPONSE:** Undisputed. *See* ECF 244-1 ¶ 44.

34. On October 6, 2021, after meeting with Juice on October 1 and getting assurances on the completion of the work, Driscoll executed the SOW prepared by Juice, which included the Four Features, and sent it to Grotta, who then countersigned the same, thereby directing and authorizing the completion of the work on the SOW. (Driscoll Dec. para. 6; UG Ex. 12 at 211: 12- 212:4).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 45 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 45.

35. Grotta informed Driscoll that the UG website was in "rapid development" (UG Ex. 13 at UG296; Driscoll Dec. para. 7). Juice defines "development" as writing code; development of a feature is coding the feature. (UG Ex. 6 at 39:6-7). Juice defines "rapid development" of a feature as Juice working overtime and weekends on the feature to go as fast as humanly possible without cutting corners. (UG Ex. 4 at 438:8-440:6). Juice had plenty of time to complete the code on the Four Features before the Deliverables were due the following March. (Driscoll Dec. para. 18).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 45 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 45.

36. On October 13, 2021, Mr. Grotta sent to Ms. Driscoll a proposed revised SOW, which did not include the Four Features (UG Ex. 14; Exh. 5 at 203:7-22, 206:25-207:8). She refused to sign it. (UG Ex. 4 at 309:11-23; Driscoll Dec. 8). The SOW signed 8/6/21 is the only one. (Driscoll Dec. para. 8).

**RESPONSE:** Undisputed, as clarified. This AMF is nearly identical to UG's SUF ¶ 46 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 46.

37. There were no Dev Reports after early December. (ECF 233-25 thru 233-31).

**RESPONSE:** Undisputed.

38. Juice did not accept the proposal in Attorney Dreier's letter of December 3, 2021, and instead responded with its own proposal in Attorney DiRusso's letter of December 8, 2021, which, in turn, was rejected by UG. (UG Ex.15; Driscoll Dec. para. 14).

**RESPONSE:** Disputed as characterized. Attorney Dreier's letter of December 3, 2021 was not a proposal but rather an ultimatum.

39. The copy of the SOW posted by Ms. Driscoll in early December was annotated to show the status of the work, to the best of UG's knowledge, as of October. (Driscoll Dec. para. 14; ECF 233-32 at UG1388).

**RESPONSE:** Disputed. The copy of the SOW posted by Ms. Driscoll was annotated to show the status of work as of December 9, the date it was posted. (Ex. 17.)

40. The SOW was attached as Exhibit A to the TA. (ECF 233-6 at Juice 23314-23317).

**RESPONSE:** Undisputed. *See* ECF 244-1 ¶ 47.

41. Exhibit A was specified in Section 1(a) of Article I of the TA as one of the six categories of Deliverables under the TA. (*Id*. at Juice 16500-16501). Exhibit A identifies the Four Features as Deliverables, including, in particular, the coding for Stories, Chat and Analytics and the design

11

and technical documentation for Auctions. (*Id*. at Juice 23316-23317). Ms. Brown concedes that Exhibit A was "a list of what had been partially or fully completed and existed at the time of the Transfer Agreement." (UG Ex. 5 at 92:1-9). Juice understood that UG could reasonably expect Juice to deliver anything that appeared on Exhibit A. (UG Ex. 5 at 237:19-239:9).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 47.

42. UG understood from the definition of the Deliverables in the TA (ECF 233-6 at 16500 16501) that (a) the coding for the Stories, Chat and Analytics features (which were listed on Exhibit A) existed, in at least partially completed form, and would therefore be delivered in that form, and (b) the design and technical documentation for the Auctions feature existed, in at least partially completed form, and t would therefore be delivered in that form. (Driscoll Dec. paras. 17-18).

**RESPONSE:** Disputed. This position has already been presented to the State Court and the State Court Decision held that such a belief was unreasonable as a matter of law, that no reasonable person could have interpreted Juice as making that representation and such a parsing of the language made no sense. (Ex. 42.) This position is also contrary to its position in March 2022, when it insisted that it was entitled to the Four Features based solely on their inclusion on Exhibit A of the Transfer Agreement. (Ex. 33.)

43. The disclaimer in the TA was drafted by Juice (UG Ex.5 at 173:24-174:3 ):

> JUICE DOES NOT MAKE ANY, AND SPECIFICALLY DISCLAIMS ALL, EXPRESS OR IMPLIED WARRANTIES OR GUARANTEES REGARDING SERVICES PROVIDED BY JUICE TO UG OR THE CONDITION OF THE UG WEBSITE TECHNICAL DELIVERABLES AND THE UG WEBSITE CONTENT DELIVERABLES AND PROVIDES SUCH TO UG "AS IS." (ECF 233-6 at Juice 16503-16504).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 48 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 48.

44. Brown asked that the "as is" language be included in the TA but never discussed with UG

12

what it meant. (UG Ex. 5 at 172:24-173:6). However, the parties understood it to mean that certain of the Deliverables might only be partially completed. (*Id.* at 174:4-9). UG was prepared to accept the code for the Four Features in less than completed or functional form, but that did not mean the code might not exist at all and might not be delivered at all. (Driscoll Dec. para. 18).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 49 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 49. Further, Juice disputes this AMF as precluded by the doctrines of res judicata and collateral estoppel, as Juice informed UG in November 2024. (Ex. 67.)

45. Juice understood the TA was intended to resolve all disputes then existing between the parties (UG Ex. 12 at 157-58) but that if either party believed the other breached the TA itself, it could sue the other party to enforce the TA. Juice entered into the TA despite actually expecting that UG would do that, because Juice was eager to finalize the transition. (UG Ex. 4 at 197:1-5).

**RESPONSE:** Undisputed. *See* ECF 244-1 ¶ 50.

46. Juice gave UG for 12 business days from January 18, 2022 (the "Term"), read only, or "view access" to the computer code in its possession that was being used or might be used during the Term to operate the UG Website. (UG Ex.16). There was no written list of what items were included in the View Access. (Driscoll Dec. 15). Juice has acknowledged in its testimony that by the end of the negotiations it understood that the View Access would *not* include all of the items that Juice was going to deliver to UG as part of the transition. (UG Ex. 5 at 85:3-8, 105:24-106:2, 107:1-7, 191:13 – 192:7, 303:1-18, 306:4-7).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 53.

47. The items shown in the View Access comprised just one of the six categories of items listed in Article I, Section 1(a) that were to be transferred to UG. (ECF 233-6 at 16500-16501).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 54.

48. A prefatory "Whereas" clause to the TA states that the View Access was comprised of all computer code and information in Juice's possession that was used at that time to operate the UG website. (*Id*. at 16500). The Four Features were not yet being used to operate the website during the View Access Period or when the TA was entered into. (Driscoll Dec. para. 15).

**RESPONSE:** Undisputed, as clarified. *See* ECF 244-1 ¶ 55.

49. When Juice made its delivery pursuant to the TA in March, everyone at UG fully expected that the Four Features, would be there to some extent. (ECF 233-41 at 11:14-22).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 58 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 58. Further, Juice disputes this AMF as precluded by the doctrines of res judicata and collateral estoppel, as Juice informed UG in November 2024. (Ex. 67.)

50. Exhibit B to the TA comprised just one of the six categories of items listed in Article I, Section 1(a) that were to be transferred to UG. It details the *process* by which the Deliverables were to be transferred. (ECF 233-6 at 16501, 23325; UG Ex.5 at 244:20-247:1).

**RESPONSE:** Disputed. This AMF is identical to UG's SUF ¶ 59 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 59.

51. After Juice commenced this action, UG had increasing difficulty raising capital under the cloud of contested ownership in its IP. When the Court dismissed Juice's complaint, with leave to replead, in December 2023, UG was able to draw more investor interest, including a loan in March 2024 by UG's principal investor looking to protect his investment — but other investors were still unwilling to come forward in the context of uncertainty. Accordingly, UG was forced to discontinue its business in May 2024, pending the prospect of resuming if the

dispute with Juice could be quickly resolved. When the Court then reinstated Juice's Amended Complaint in September 2024, UG determined to close permanently. (Driscoll Dec. para. 29); (Berger Dec. paras. 6-9).

**RESPONSE:** Disputed. The Declaration of James Berger is entitled to zero evidentiary weight because (i) it is not based on personal knowledge and contains hearsay statements; (ii) Berger was never disclosed as a witness with any knowledge relevant to this case either in UG's Rule 26(f) disclosures or in response to any interrogatory thereafter; (iii) Berger is not proffered as an expert so statements relating to "his experience" are of no value; (iv) the Court did not "reinstate" Juice's complaint in September 2024 but rather denied UG's Motion to Dismiss the Amended Complaint, which Amended Complaint had been properly on file and operative since January 5, 2024. Further, UG's reference to a "cloud" over UG's intellectual property is incomprehensible. As of August 22, 2022, all of UG's rights in the source code to the UG Website had been rescinded and UG clearly had no rights in the source code whatsoever. (Ex. 40.) Finally, Juice's Amended Complaint was properly on file as of January 5, 2024. (ECF 174.) UG's reference to this Court's "reinstating" Juice's Amended Complaint is incomprehensible.

52. The Complaint in the State Action did not address Juice's obligations under the TA with respect to the copyrights (UG Ex. 17); nor did the State Court Decision. (ECF 233-47). The State Court Decision did not determine that UG defrauded Juice or that, upon entering into the TA, UG knew that the code for the Stories, Chat and Analytics features and the design and technical documentation for the Auctions feature were not at least partially completed. (ECF 233-47).

**RESPONSE:** Disputed. This AMF is nearly identical to UG's SUF ¶ 61 submitted with its moving papers. Please see Juice's response thereto at ECF 244-1 ¶ 61. In addition, the Amended State Court Complaint filed on July 28, 2023 (Ex. 68), specifically seeks redress for

15

alleged non-delivery of certain Website Technical Deliverables, which includes *by its definition,* "any and all intellectual property interests and rights … including … all rights of … copyright …." (Ex. 1 at Article I.)

Dated:  April 30, 2025

                                              KIRSCH & NIEHAUS PLLC

                                              By:  */s/ Emily B. Kirsch*
                                              (admitted pro hac vice)
                                              Emily B. Kirsch
                                              Craig S. Tarasoff
                                              950 Third Avenue, Suite 1900
                                              New York, New York 10022
                                              (646) 415-7530
                                              emily.kirsch@kirschniehaus.com
                                              craig.tarasoff@kirschniehaus.com

                                              -and-

                                              McCARTER & ENGLISH, LLP
                                              Joseph J. Cherico
                                              One Canterbury Green
                                              201 Broad Street
                                              Stamford, CT 06901
                                              Tel.: (203) 399-5900
                                              Fax: (203) 399-5800
                                              E-mail:  jcherico@mccarter.com

                                              *Attorneys for Plaintiff/Counterclaim Defendant Juice Creative Group, LLC*