**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUICE CREATIVE GROUP, LLC, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:22-cv-01175-JCH |
| | : | |
| | : | |
| v. | : | |
| | : | |
| UNCOMMON GOOD, INC., | : | AUGUST 25, 2025 |
| Defendant. | : | |

**RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 232)
AND DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON ITS
COUNTERCLAIMS AND SUMMARY JUDGMENT ON THE AMENDED COMPLAINT
(DOC. NOS. 236, 237)**

## I.    INTRODUCTION

Juice Creative Group, LLC ("Juice") brings this action against Uncommon Good,

Inc., ("UG"), alleging copyright infringement under 17 U.S.C. § 101, et seq., fraud in the

inducement, breach of contract, breach of the implied covenant of good faith and fair

dealing, unjust enrichment, quantum meruit, and entitlement to a declaratory judgment

that Juice has not breached its contractual obligations.  See Am. Compl. (Doc. No. 174).

Also pending are five Counterclaims brought by UG against Juice: breach of contract,

fraud, unjust enrichment, breach of the implied covenant of good faith and fair dealing,

and a prayer for declaratory judgment.  See Defendant's Answer and Counterclaims

(Doc. No. 190).

Before the court are dueling motions for summary judgment. See Plaintiff's

Motion for Summary Judgment[1] ("Juice's Mot.") (Doc. No. 232); Defendant's Motion for

Partial Summary Judgment on its Counterclaims ("UG's Partial Mot.") (Doc. No. 236)

---

[1] Though styled as a Motion for Summary Judgment, Juice's Motion is a Partial Motion for Summary Judgment on the Amended Complaint and the Counterclaims, seeking summary judgment on two of the claims in the Amended Complaint and all five Counterclaims.

and Defendant's Motion for Summary Judgment on the Amended Complaint ("UG's Mot.") (Doc. No. 237) (together, "UG's Motions").  The parties oppose the Motions, respectively.  Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("UG's Opp.") (Doc. No. 245); Plaintiff's Memorandum of Law in Opposition to Defendant's Motions for Summary Judgment ("Juice's Opp.") (Doc. No. 244).

For the reasons set forth below, Juice's Motion is granted in part and denied in part and UG's Motions are granted in part and denied in part.

## II.   BACKGROUND

### a.  Factual Background: Juice's Motion for Summary Judgment

The parties' relationship began in March 2020.  UG, a startup focused on providing online tools for nonprofits, retained Juice, a digital design agency, to design and develop the UG Website and web-based application (together, the "Website").  Defendant's Local Rule 56(a)(2) Statement of Facts in Opposition to Plaintiff's Motion for Summary Judgment ("UG's 56(a)(2) Statement") (Doc. No. 245-1) at ¶ 1.  On August 10, 2021, Carter Grotta (Managing Partner and Creative Director of Juice) sent Carolyn Driscoll (UG Founder and CEO) a draft Master Services Agreement ("MSA") and initial Statement of Work ("SOW") which governed the parties' rights and obligations concerning the development of the Website.  Id. at ¶ 4.  Ms. Driscoll signed the MSA and SOW and returned them to Mr. Grotta.  Mr. Grotta countersigned both documents.  Id. at ¶¶ 5-6.  Over the next 18-months, the parties worked together on development of the Website.

By Fall 2021, the relationship between the two parties deteriorated. The parties began to negotiate the termination of the relationship, culminating in the execution of the Transfer Agreement in March 2022.  Id. at ¶ 51.  Pursuant to the Transfer Agreement, Juice agreed to transfer ownership and control of materials it had built to UG in exchange for payment of portions of outstanding invoices owed to Juice.  See generally Juice's Ex. 1.

The parties negotiated and agreed to a process by which UG could understand the universe of materials to be transferred under the Transfer Agreement.  Id. at ¶ 32. The parties agreed to a "View Access" period during which Juice would allow UG read-only access to the UG Website for 12 business days from January 18 to February 3, 2022.  Id. at ¶ 33.  UG represented that, if Juice complied with transferring the code viewed during the View Access period and other existing materials agreed upon by the parties, UG would forgo litigating the claims of non-delivery it had threatened previously. Id. at ¶ 44.[2]  Attorney Dreier, on behalf of UG, told Juice that, if Juice transferred the

---

[2] UG's 56(a)(2) Statement ¶ 44 rebuts the following: "Attorney Dreier assured Ms. Brown that by transferring the code viewed during the View Access Period, and the other existing materials agreed upon by the parties, UG would forego litigating claims of non-delivery that it had threatened up to that point," by stating "UG repeats and incorporates by reference its Objection to Juice's use of Ms. Brown's testimony to evidence these facts for the reasons set forth above in response to Statement of Fact No. 42. **Subject to the foregoing, UG admits**."

The objection in question is: "UG objects to Juice offering Ms. Brown's testimony of what was said in this phone call as its support for this 'undisputed' fact, while refusing to produce Ms. Brown's notes of the phone call.  She has testified that she has such notes but has withheld them on the basis of attorney-client privilege, because she has sent them to counsel.  The notes do not gain privileged status merely because they were subsequently shared with counsel.  UG submits that Juice has waived the admission of this testimony, at least for present purpose, by withholding the notes."  Id.  ¶ 42.

UG raises this objection multiple times in its 56(a)(2) Statement.  See, e.g., id. ¶¶ 43, 44, 45, 46, 47.  The court declines to reach the merits of UG's objection but at the time uses the above statement only to sketch the basic factual background, acknowledging too that UG admits the Statement as undisputed.

Website materials in its possession, UG would forgo any claims against Juice.  Id. at 42. It was also around this time that Juice applied for, and received, copyright registrations for six of the features subject to the Transfer Agreement. Id. ¶ 78.[3]  On March 8, 2022, the parties entered into the Transfer Agreement.  Id. ¶ 51.

In the four days following execution of the Transfer Agreement, Juice transferred all existing code along with all other existing materials as required by the Transfer Agreement's Inventory and Mechanics of Transfer List.  Id. ¶ 52.  Almost immediately thereafter, conflict ensued. On March 11, 2022, the final day of the transfer, at 10:20 PM, UG emailed Juice:

> As of close of business today, UG is still not in possession of all the UG Website Technical Deliverables as you suggest.  Specifically, UG does not have in its possession those expressly listed and included by Exhibit A  - i.e., (i) the full code related to (a) email integration (see Phase II: September at p. 3) and (b) the media library (see Phase III: October at p. 4); (ii) any code whatsoever related to (a) stories (see Phase I: September at p. 3), (b) chat (See Phase III: October at p. 4), (c) auctions (id) and (d) analytics (id); (iii) any design documentation for 9 additional features (Summary see p. 1); and (iv) any technical documentation for 8 additional features (Summary see p. 1).  If we are mistaken and such has been transferred, please direct us to the files where these items reside; otherwise, please transfer these items immediately, and let us know the method by which you will do so.

See Juice's Mot. Ex. 33.  Juice responded that it had completely performed under the Transfer Agreement.  Id. ¶ 56.  Juice and UG continued to exchange emails on March 12, 2022, concerning Juice's delivery or non-delivery of what are known in this matter as the "Four Features" (Stories, Chat, Auctions, and Analytics). Id. ¶ 58.  On March 13, March 16, and April 10, Juice maintained that it had performed fully under the Transfer

---

[3] The parties dispute the name in which the registrations were filed: Juice Creative Group, LLC or Carter Grotta, but the timing in which these registrations occurred is not in dispute.

Agreement.  Id. ¶¶ 59, 60.  UG responded that it expected Juice to transfer "all of the outstanding items listed in Exhibit A," or else UG would resort to litigation.  Id. ¶ 61.

In a letter dated August 22, 2022, Juice informed UG that it believed the Transfer Agreement was procured by fraud, thereby attempting to rescind the Transfer Agreement.  Id. ¶ 66.  In this letter, Juice offered to hold the $23,462 that UG paid per the Transfer Agreement in escrow.  Id. ¶ 67.

On September 8, 2022, UG filed a lawsuit in Connecticut Superior Court ("the Superior Court") asserting five causes of action: breach, fraud, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  Id. at ¶ 68. On March 26, 2024, the Superior Court granted summary judgment in Juice's favor as to all counts of UG's Complaint.  Id. at ¶ 69.  The Superior Court held that Juice "has borne its burden of proving that it delivered the 'Website Technical Deliverables' it was required to deliver under the Transfer Agreement.'" Id. at ¶ 73.  UG appealed the Superior Court's decision which appeal was withdrawn shortly thereafter.  See Uncommongood, Inc. v. Juice Creative Grp., LLC., No. FST CV 22-6058173 S, 2024 WL 1068963 (Conn. Super. Ct. Mar. 6, 2024), Withdrawal of Appeal (Doc. No. 163). The copyrights at issue in the instant matter are included in the definition of "Website Technical Deliverables" set forth in the Transfer Agreement.  Id. at ¶ 74.  How and if those copyrights were duly transferred is the primary question involved in Juice's Motion.

> b. Factual Background: UG's Motions for Summary Judgment

The undisputed facts animating UG's Motions are largely identical to those related to Juice's Motion. See supra Part I.A.  However, for purposes of clarity and

comprehensiveness, the court provides a recitation of the pertinent facts here based on the undisputed facts reflected in the Local Rule 56(a) statements connected to these Motions.

In March 2020, UG engaged Juice as a consultant to provide website building services in connection with the development of UG's first-generation website (i.e., the "Website").  Local Rule 56(a)(2) Plaintiff's Statement of Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Juice's 56(a)(2) Statement") (Doc. No. 244) ¶ 1.  On August 10, 2021, Juice presented UG with a proposed Statement of Work and Master Services Agreement (the "SOW" and "MSA" respectively) which would govern the rights and obligations of the parties as part of this relationship.  Id. ¶ 3.  The MSA provided Juice would own the IP associated with Juice's work product and that UG would be a licensee.  Id. ¶ 8. These documents were ultimately executed by the parties.  Id. ¶¶ 9 ("Undisputed that UG returned executed copies of the MSA and SOW"), 14 ("Undisputed that Juice had been operating under and would continue to operate under the fully and duly executed MSA").

By Fall of 2021 the relationship between the two parties began to deteriorate and UG informed Juice that it was terminating the consultancy and engaging an attorney to prepare a separation agreement ultimately entitled Transfer Agreement.  Id. at ¶ 15.  In February 2022, during the pendency of negotiations surrounding the Transfer Agreement, Juice sought copyright registrations for six of the features ultimately subject to the Transfer Agreement, i.e., the Six Copyrights.  Id. at ¶ 20; UG's Exhibit N.  Juice did not disclose to UG that it had intended to file for these registrations, that it had filed for these registrations, or that it obtained these registrations.  Juice's 56(a)(2) Statement

¶ 21.  Under the Transfer Agreement, Juice agreed to transfer ownership and control of materials it had built to UG in exchange for payment of portions of outstanding invoices owed to Juice.  UG's Exhibit P; see, also, supra Part I.A.  On March 8, 2022, Juice and UG entered into the Transfer Agreement.  Juice's (56)(a)(2) Statement ¶ 22.

The Transfer Agreement delineated a Transfer Period by which Juice would transfer the materials to UG in the four days following execution of the Transfer Agreement.  Id. ¶ 23.  On the final day of the Transfer Period, UG notified Juice that it had not delivered four features UG understood to be subject to the Transfer Agreement: Stories, Chat, Auctions, and Analytics, otherwise known as the "Four Features."  UG's Exhibit Q.  By same day reply, Juice denied that it was obligated to deliver the Four Features.  Juice's (56)(a)(2) Statement ¶ 26.  The parties continued to dispute their respective expectations related to the Four Features that day, and later again on April 10 and April 19.  Id. ¶ 27.

By letter dated August 22, 2022, Juice told UG that it believed UG induced Juice to enter into the Transfer Agreement by fraud.  UG's Exhibit CC.  The letter "demand[ed] that UG cease and desist any and all use of the Website Technical Deliverables and Website Content Deliverables by no later than September 2, 2022, and provide to Juice a sworn certification that all such source code has been permanently destroyed or returned to Juice."  Id. The letter went on to state that "Juice will maintain the $23,462 received pursuant to the Transfer Agreement in escrow and will return the funds to UG upon receipt of proof that the infringement has ceased.  The parties will return to their positions immediately preceding execution of the Transfer Agreement."  Id.

Shortly thereafter, on September 8, 2022, UG sued Juice in Connecticut Superior court alleging five causes of action: breach, fraud, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  See, generally, Uncommongood, Inc., No. FST CV 22-6058173 S Amended Complaint ("State Complaint").  On March 26, 2024, the Superior Court granted summary judgment in Juice's favor as to all counts in UG's operative Complaint. Uncommongood, Inc., No. FST CV 22-6058173 S, 2024 WL 1068963.  The Superior Court held that Juice "has borne its burden of proving that it delivered the 'Website Technical Deliverables' it was required to deliver under the Transfer Agreement.'" Id.  The Transfer Agreement's definition of "Website Technical Deliverables" includes the copyrights involved in UG's Motion.  UG's Exhibit P.

    c.  Procedural Background

On January 5, 2024, Juice filed an Amended Complaint against UG, alleging, inter alia, that UG unlawfully infringed upon source code created and owned by Juice. See generally Amended Complaint (Doc. No. 174).  On October 28, 2024, Juice filed its Answer to the Amended Complaint, asserting five Counterclaims: (1) Breach of Contract; (2) Fraud; (3) Unjust Enrichment; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; and (5) Declaratory Judgment.  Defendant's Answer and Counterclaims ("Counterclaims") (Doc. No. 190).  Cumulatively across all three Motions at issue, the parties seek summary judgment on each claim and counterclaim.  The court addresses each in turn.

### III.    LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Com. Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016). Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

### IV.    DISCUSSION

Both parties move for summary judgment and, in doing so, raise various arguments as to the status of the Transfer Agreement and the ownership of copyrights transferred thereunder.  Before addressing these arguments, the court notes that it has not yet ruled on whether the Transfer Agreement has been rescinded.  Given that many of Juice's claims and UG's counterclaims rest on how that question is resolved, the court cannot reach certain issues upon which the parties' arguments necessarily turn,

as will become more apparent in this Ruling.  With this in mind, the court turns to the parties' summary judgment motions, beginning with Juice's Motion.

A.  <u>Juice's Motion for Summary Judgment</u>

Juice moves for summary judgment on each of UG's five counterclaims and the first two causes of action in Juice's Amended Complaint: (1) copyright infringement and (2) fraud in the inducement.  <u>See</u> <u>generally</u> Juice's Mot.  With respect to UG's counterclaims, Juice argues that UG's counterclaims are barred in their entirety by the doctrine of res judicata or collateral estoppel because the Superior Court dismissed the entirety of UG's claims against Juice at the summary judgment stage.  Juice's Mot. at 7; <u>see</u> <u>also</u>, <u>UncommonGood, Inc. v. Juice Creative Group, LLC</u>, Docket No. FST-CV22-6058173-S (Conn. Super. Ct.).  In the alternative, Juice argues that each of the Counterclaims fail to survive summary judgment on their merits because UG has not raised a genuine issue of material fact that, <u>inter</u> <u>alia</u>, Juice failed to satisfy its obligations under the Transfer Agreement by delivering uncontested ownership of the Website Deliverables.  <u>See</u> <u>generally</u>, Juice's Mot. at 11-26.

As for Juice's own two claims, Juice argues that there is no issue of material fact that Juice owns the copyright of the Website Deliverables and that "UG's ongoing, unauthorized, and conceded use of those Copyrights" amounts to infringement as a matter of law.  Juice's Mot. at 26.  Juice argues that, while the Transfer Agreement putatively transferred copyright ownership to UG, this assignment was rescinded due to UG's fraudulent conduct.  Juice's Mot. at 27.

1. Whether Res Judicata or Collateral Estoppel Extinguishes UG's
   Counterclaims (UG's Counterclaims One Through Five)

The doctrine of "res judicata evokes the common law principles of judicial economy and comity. It provides that a final judgment on the merits bars a subsequent action between the same parties over the same cause of action." Channer v. Dep't of Homeland Sec., 527 F.3d 275, 279 (2d Cir. 2008). The doctrine bars re-litigation of an issue where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 55 (2d Cir. 2018).[4]

When determining whether an action could have been brought in a prior proceeding, the Second Circuit considers "whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 499 (2d Cir. 2014). The Supreme Court of Connecticut has held that "the rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it." Powell v. Infinity Ins. Co.,

---

[4] The closely related "doctrine of collateral estoppel precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a prior proceeding." Boguslavsky v. Kaplan, 159 F.3d 715, 719–20 (2d Cir. 1998). "Under federal law, a party is collaterally estopped from relitigating an issue if a four-part test is met: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Id. Because the dispute concerns whether certain claims could have been brought in the Superior Court action rather than whether the Superior Court action already disposed of certain issues of fact or law, it is res judicata, not collateral estoppel, that is relevant here.

282 Conn. 594, 607, 922 A.2d 1073, 1082 (2007). "If a party sues for a breach of

contract, res judicata will preclude the party's subsequent suit for any claim of breach

[of that contract] that had occurred prior to the first suit." TechnoMarine SA, 758 F.3d at

501.

UG's operative Complaint in the Superior Court asserted five causes of action

which largely mirror the Counterclaims raised here.  The key distinction between the

Superior Court action and the Counterclaims is that UG's Superior Court claims turn on

whether Juice properly delivered certain "missing" pieces of code, known colloquially as

the "Four Features." The Counterclaims, on the other hand, allege that Juice failed to

properly deliver copyright ownership of the material which Juice did turn over.  The court

holds that, while this distinction is not, as Juice describes, "cosmetic," see Juice's Reply

at 2, fn 2, the Counterclaims arise from the same transaction and therefore could have

been brought in the Superior Court action.  Moreover, UG knew or could have known

the basis underlying their federal claims during the pendency of the Superior Court

action or, indeed, even before.  For those reasons, res judicata bars UG from litigating

the Counterclaims.

In the Superior Court action, UG alleged that "Defendant Juice has substantially

failed to perform its material obligations under the Transfer Agreement by failing to

transfer all of the UG Website Technical Deliverables, as required by the Transfer

Agreement's Section 1 and particularly Section I(1)(a)(iv)."   See DOCKET NO. FST-

CV22-6058173-S Amended Complaint ("State Complaint") at ¶ 39.  It is from this

purported breach that the four subsequent state claims flowed: that Juice falsely

represented that it would transfer the putative missing features, that this false

representation amounted to a violation of the Connecticut Unfair Trade Practices Act and the implied covenant of Good Faith and Fair Dealing, and that this false representation and breach resulted in unjust enrichment.  State Compl. at ¶¶ 43, 44, 51, 53, 59, 63, 64.  The Superior Court held that the relevant provision of the Transfer Agreement, Article I Section 1(a), "clear[ly] and unambiguous[ly]" required Juice only to deliver existing items in its possession, not a coded and completed complement of the Four Features.  See generally, UncommonGood, Inc, Docket No. FST-CV22-6058173-S.  The Superior Court entered summary judgment on all of UG's claims in Juice's favor.

The Counterclaims before this court likewise turn on breach of the Transfer Agreement, albeit of a different provision.  UG alleged that "Juice has substantially failed to meet its obligations under the TA by failing to effectuate the registrations in the Six Copyrights to UG, which ownership rights in their subject materials were confirmed by the TA as vested in UG, and instead continuing to assert its ownership over the same."  Counterclaims ¶ 20.  UG further alleged that, "as a direct result of the foregoing breach of contract UG has been denied clear and free ownership of the intellectual property indispensable to its website and thereby indispensable to its business."  Counterclaims ¶ 22.  As with the Superior Court action, it is from this purported breach that all other Counterclaims flow: that Juice misrepresented to UG that it would transfer "sole and irrevocable possession and control" over the Website Deliverables, that its supposed failure to effectuate transfer of the copyrights amounted to a breach of good

faith and fair dealing, and that this resulted in unjust enrichment to Juice.[5]
Counterclaims ¶¶ 24, 26, 27, 29, 45, 52.

Though the Counterclaims turn on a different provision of the Transfer Agreement not contemplated by the Superior Court, they are claims which could have been brought in the Superior Court action.  UG's failure to raise them in the Superior Court action is fatal.  As mentioned, the doctrine of res judicata applies where (1) the previous action involved an adjudication on the merits; (2) the previous action involved the same parties or those in privity with them, and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.  There is no question that the Superior Court action involved the same parties and the same agreement.  Summary judgment is an adjudication on the merits for purposes of res judicata.  Centra Mortg. Holdings. Ltd. v. Mannix, 18 F. Supp. 2d 162, 168 (D. Conn. 1998).  "It is clear that a grant of summary judgment is a final judgment on the merits entitled to full res judicata effect."  Id.  What remains, and what is contested by the parties, is whether the Counterclaims could have been brought in the Superior Court action.

 Further, UG's allegation that Juice breached the Transfer Agreement by encumbering the Website Deliverables with the Six Copyrights concerns a course of conduct which predates UG's initiation of the Superior Court action.[6]  Indeed, UG's

---

[5] The Counterclaims in the instant matter do not include an analogue to UG's CUTPA claim brought in the Superior Court action.  In addition, the Counterclaims include a prayer for declaratory judgment not included in the Superior Court action.  Counterclaims ¶¶ 62, 63.

[6] UG also alleges a further breach that Juice "failed and refused to execute the documents necessary to record UG's right, title and interest in and to the Deliverables."  Defendant's Answer and Counterclaims (Doc. No. 190) at ¶ 15; "[B]ut even more telling is the fact that in the months that followed, **instead of taking any measures to record the assignment to UG, as required by the TA,** Mr. Grotta took all necessary measures to assign the copyrights to Juice and expressly concealed from the Copyright Office the prior assignment to UG."  UG's Opp. at 23 (emphasis added).

theory of breach underlying its Counterclaims concerns conduct which occurred in early

2022.  UG, in its own words, understood Juice's August 2022 letter to mean that Juice

was contesting UG's ownership of the copyrights.  See UG's 56(a)(2) Statement:

Additional Material Facts ¶ 20 ("Until receiving the 'cease and desist letter,' UG had not

known that Juice was contesting UG's ownership to any of the copyrights.")  UG

commenced its state lawsuit in September 2022 and it was not until July 28, 2023,

nearly one year later, that UG filed its Amended Complaint in the Superior Court action.

UG's argument that it did not learn of the copyright registrations until Juice initiated the

instant action is unavailing as a matter of law.  L-Tec Elecs. Corp. v. Cougar Elecs. Org.,

Inc., 198 F.3d 85, 88 (2d Cir. 1999) (affirming dismissal on res judicata grounds where

the operative "facts and events themselves arose prior to the filing of the original

complaint. . . [it is] only [plaintiff's] awareness of the facts that came later.").  Moreover,

copyright registrations by their nature are a matter of public record and could have been

discovered by UG prior to initiation of the Superior Court action.  See, generally, Hesse

v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) (noting that

federal copyright registrations are a matter of public record amenable to judicial notice).

Not only could the Counterclaims have been brought in the Superior Court action

because the conduct at issue predates the Superior Court action's operative Complaint:

they should have been brought because the Counterclaims form a convenient trial unit

---

This argument is unavailing for purposes of res judicata because this supposed failure of recordation is again a course of conduct predating the Superior Court action and therefore could have been argued in the Superior Court action.  Moreover, the Transfer Agreement requires only that "Juice agrees to execute all documents reasonably necessary to record the assignments and transfers contemplated by this Agreement." Transfer Agreement Part III ¶ 2.  In other words, the Transfer Agreement does not require that Juice record the copyright transfer itself.  The court is not persuaded by UG's theory of breach that Juice abdicated recordation requirements that extended beyond executing the Transfer Agreement itself.

with the Superior Court action claims.  The Counterclaims and Superior Court action

claims present two different bases of breach of the same contract: that Juice breached

the Transfer Agreement because they did not deliver the Four Features or that Juice

breached the Transfer Agreement because it encumbered the ownership of the material

it did deliver, i.e., the Six Copyrights.  The Superior Court could have disposed of the

copyright ownership question relying on the same rules of contract interpretation that

allowed it to rule on the question of the Four Features, just as this court would have,

had this court reached the merits of the Counterclaims.  This is not lost on UG.  UG

itself argued in its Opposition Memorandum to Juice's Motion for Summary Judgment in

the Superior Court action that:

> "Juice has also admitted that it promised to deliver to UG, within the Transfer
> Period, 'all intellectual property interest,' including 'all rights of. . . copyright' for
> the UG Website Technical Deliverables and that it would execute all documents
> reasonably necessary to record those assignments – even though, again, it
> actually did not intend to do so (and still has not done so) but instead
> purposefully concealed its copyright filings from UG."

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary

Judgment ("State Opp.") at 34.  In doing so, UG recognizes that the two theories of

breach interrelate.

Because the court finds that res judicata bars the Counterclaims from being

litigated in the case, the court does not reach Juice's arguments as to the merits of each

individual Counterclaim.[7]

---

[7] UG's Fifth Counterclaim in the instant action is a prayer for declaratory judgment "that Juice was
not excused from performing its obligations under the TA and that it breached the TA by failing to effectuate
the assignment and transfer of the Six Copyrights to UG."  See Defendant's Answer and Counterclaims (Doc.
No. 190) at ¶¶ 61-63.  As stated in footnote 5, no analogue exists in the Superior Court action.  However, for
the reasons described herein, that claim too is extinguished by res judicata because it turns on the same
theory of breach as its other Counterclaims, i.e., that Juice failed to transfer the Six Copyrights
unencumbered.  All the Counterclaims could have been brought in the Superior Court action because they

2.  Whether Juice has Established Rescission as a Matter of Law (Juice's Count
    One)

Juice argues that the undisputed record shows it duly rescinded the Transfer Agreement and therefore copyright ownership rests with Juice, such that UG's continued use of the transferred material amounts to copyright infringement as Juice alleges in Count One.  Juice's Mot. at 26.  However, Juice's copyright infringement claim rests on an a priori assumption that it has proven rescission.  The court holds that there are issues of material fact as to the question of rescission.  The court therefore denies summary judgment on Juice's copyright infringement claim.

Rescission is an equitable remedy often sought in claims sounding in breach of contract.  Petrucelli v. Palmer, 596 F. Supp. 2d 347, 367 (D. Conn. 2009).  "As to the relief requested, Connecticut law clearly allows and even encourages rescission as a remedy for a complaint that sounds in breach of contract."  Id.  It is also often sought in actions sounding in fraud.  Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 298 (1984), overruled on other grounds by Kaczynski v. Kaczynski, 294 Conn. 121, 981 A.2d 1068 (2009).  "Recission of a contract is an appropriate remedy if there has been a material misrepresentation of fact upon which a party relied and which caused it to enter the contract."  Id.  However, rescission is not automatic.  Keyes v. Brown, 155 Conn. 469, 476 (1967); Harold Cohn & Co., 72 Conn. App. at 49-50; ECF 172 at 11.

The party seeking rescission must return to the defendant any gains from the contract in which rescission is sought.  See Heaphy v. Lesko, No. 3:05-CV-1593 (WWE), 2009 WL 1138727, at *2 (D. Conn. Apr. 27, 2009), adhered to on

---

sound in a different theory of breach of the same transaction.  For that reason, the declaratory judgment claim is extinguished.

reconsideration, No. 3:05-CV-1593(WWE), 2009 WL 1795036 (D. Conn. June 24, 2009) (citing Restatement (Second) of Contracts, § 384, cmt. b, illus. 2 (1981));  Petrucelli v. Palmer, 596 F. Supp. 2d 347, 368 (D. Conn. 2009) (holding a "condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible").  In addition, the party seeking rescission must act without unreasonable delay.  Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 239-240 (2d Cir. 2006).

The parties vigorously dispute whether Juice tendered a valid offer to restore UG to its position prior to execution of the Transfer Agreement and whether Juice did so timely.  Both involve questions of fact not appropriate at the summary judgment stage. As this court stated in its Ruling on Defendant's Motion to Dismiss (Doc. No. 181), "[a] court of equity is always reluctant to rescind, unless the parties can be put back in statu quo. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it." (internal citations omitted).  This court explained in that Ruling that both whether status quo ante is practicable and what constitutes unreasonable delay are often questions of fact.  Id.

Juice posits that its August 2022 letter is a valid offer to restore UG to its position prior to execution of the Transfer Agreement.  Juice's Mot. at 27-28.  Juice argues that, in this letter, it "set forth its basis for rescission, grounded in UG's fraudulent misrepresentations, and exercised its right to rescind the Transfer Agreement and return the $23,462 to UG upon confirmation that UG was no longer infringing Juice's copyrights."  Id.  UG argues that no offer could restore UG to its prior position as nearly as possible given post-Agreement modifications UG made to the Website Deliverables.

UG's Opp. at 37.  These arguments turn primarily on a short excerpt in the August 2022 letter which reads:

> "Juice will maintain the $23,462 received pursuant to the Transfer Agreement in escrow and will return the funds to UG upon receipt of proof that the infringement has ceased. The parties will return to their positions immediately preceding execution of the Transfer Agreement."

See Juice's Ex. 40 at 2.  Whether holding the $23,462 in escrow is enough to restore UG to status quo ante, given post-Agreement modifications to the Website Deliverables, is a determination of fact that is best suited for the fact finder.  Indeed, the court cannot assess from the face of the August 2022 letter alone whether the escrowed funds, without more, is enough to account for any post-Agreement modifications, or whether any offer could account for those modifications.  For that reason alone, summary judgment is not proper.

The same is true of timeliness.  The parties dispute whether the rescission itself was unreasonably delayed.  Juice argues that it acted promptly in issuing the August 2022 letter: within three weeks of UG threatening litigation for alleged breach of the Transfer Agreement.  Juice's Mot. at 29.  UG argues that Juice first learned of the alleged fraud animating its rescission demand during the Transfer Period in March 2022 when UG first inquired about the missing code.  UG's Opp. at 38-39.  The question of rescission timeliness is ordinarily one of fact.  Arthur Properties, S.A. v. ABA Gallery, Inc., No. 11 CIV. 4409 LAK, 2012 WL 2886685, at *3 (S.D.N.Y. July 16, 2012).  It is inappropriate at the summary judgment stage for the court to determine when Juice first learned of UG's alleged fraudulent intent and how the timing of that discovery comports with the August 2022 letter.  Discovery of the purported fraud remains an issue of material fact making summary judgment improper.

3.  Whether UG Fraudulently Induced Juice to Enter into the Transfer Agreement
     (Juice's Count Two)

Finally, Juice seeks summary judgment on its fraudulent inducement claim.  Juice

claims that UG made fraudulent representations both in negotiating the Transfer

Agreement and through the Transfer Agreement's language itself.  Juice's Mot. at 31.

To show fraudulent inducement, a party must show "(1) a false representation was

made as a statement of fact; (2) the statement was untrue and known to be so by its

maker; (3) the statement was made with the intent of inducing reliance thereon; and (4)

the other party relied on the statement to his detriment."  Antilla v. L.J. Altfest & Co., Inc.,

2012 WL 3580477, at *15 (D. Conn. Aug. 17, 2012).  "[A] promise to do an act in the

future, when coupled with a present intent not to fulfill the promise, is a false

representation."  Paiva v. Vanech Heights Constr. Co., 159 Conn. 516, 515 (1970).  For

the reasons stated herein, the court denies summary judgment as to the fraudulent

inducement claim.

With respect to the fraudulent statements, Juice cites to several alleged

misstatements, including, inter alia, that on January 17, 2022, UG's counsel confirmed

to Juice that the View Access Period procedure was "agreeable."  Juice's Mot. at 32;

Juice's Ex. 31.  Juice understood this representation to mean "that the source code

during the View Access Period would constitute the entire universe of built code

required to be transferred to UG."  Juice's Mot. at 32.  On January 25, 2022, UG

represented to Juice that UG would accept all features "as is."  Id. at 34.  Juice

understood that these representations meant that UG had confirmed that the files and materials to be transferred were sufficient.  Id.  at 33.[8]

Juice argues UG knew what the universe of existing materials were and promised that it would accept this population set in exchange for settlement of existing disputes and a sum of money representing partial satisfaction of outstanding invoices. Id. at 35.  Despite this purported understanding, a few hours after transfer was complete, UG emailed Juice asserting that certain Website Deliverables were missing. Juice's Ex. 8 at 024368-9.  Juice posits that "[t]his timing only makes sense if UG knew that it was not prepared to accept what it had already told Juice that it would accept." Juice's Mot. at 36.  Juice further argued that UG knew that code did and did not exist in the months leading up to the Transfer Agreement from correspondence related to status updates on various workstreams.  Id. at 36-37.  In sum, "UG knowingly misrepresented to Juice what it would be willing to accept in exchange for a release and total separation of the parties."  Id. at 37.  Juice argued that UG intended for Juice to rely on these misrepresentations and Juice's reliance thereof was reasonable and to its detriment.  Id. at 37-39.

UG's alleged fraudulent intent, that is, that UG knew that certain code did not exist and would not form part of the Website Deliverables, turns on an issue of fact not yet resolved at this stage.  Namely, to what extent the timing of UG's correspondence

---

[8] Juice also alleges that another fraudulent statement occurred during a call between Juice and Attorney Dreier during which Dreier represented that "the Transfer Agreement was meant to resolve the entire matter."  Juice's Mot. at 33.  The court does not rely on this statement.  As stated supra, Footnote 2, "UG objects to Juice offering Ms. Brown's testimony of what was said in this phone call as its support for this 'undisputed' fact, while refusing to produce Ms. Brown's notes of the phone call.  She has testified that she has such notes but has withheld them on the basis of attorney-client privilege, because she then sent them to counsel."  UG's 56(a)(2) Statement at ¶ 42.

related to the missing code on the evening of the transfer raises the inference of fraudulent intent.  A reasonable jury might find that, while the expectation of receiving the missing code was unreasonable,[9] it does not rise to the level of fraud that UG, in eager anticipation of the code, would prioritize locating it upon transfer of the Website Deliverables and fail to locate it shortly after delivery.  See UG's Opp. at 34-35.  The court is not prepared, as a matter of law, to assess what constitutes a reasonable amount of time to sift through software coding and identify gaps thereto.  Such an exercise is best suited for the fact finder.

The court notes that the Superior Court action disposed of the issue of whether it was reasonable for UG to expect delivery of certain ultimately-uncoded material in connection with a breach of contract action.  What remains, and what is best suited for the fact finder, is whether this unreasonableness rises to the level of fraudulent intent to form the basis of a fraudulent intent claim.  For that reason, summary judgment is improper.

---

[9] The Superior Court held it was indeed unreasonable.

  "The Court does not find that Article 1, Section 1 (a) of the Transfer Agreement to be ambiguous as it relates to items related to the four features at issue. The clear and unambiguous import of the language, based on a fair and reasonable construction of the words using their common meaning in the sentence read as a whole, is that defendant agreed to deliver 'existing' items, 'including' those items related to the features identified in Exhibit A, 'whether or not entirely or partly completed'. The reference to 'all items identified' in Exhibit A, which was the list of all features in the original statement of work appendix, could not reasonably be understood to mean the entire scope of work was completed and coded. **No reasonable construction of the language would indicate defendant agreed in the Transfer Agreement to deliver the four features coded and completed or that defendant represented that the four features had been coded and completed. Nor is there any reason to interpret the existing work to be delivered to be referring to coding as differentiated from other phases of pre-code development (i.e. designs, technical documentation) if any such existed for the four features. The parsing of the language proposed by [UG] makes no sense in terms of the plain meaning of the language used, particularly in the context of a transfer agreement for deliverables on an incomplete project.**" Uncommongood, Inc. v. Juice Creative Grp., LLC., No. FST CV 22-6058173 S, 2024 WL 1068963, at *4 (Conn. Super. Ct. Mar. 6, 2024) (emphasis added).

22

B.  UG's Motions for Summary Judgment

　　a.  UG's Motion for Partial Summary Judgment on its Counterclaims

UG moves for summary judgment as to its first two Counterclaims: breach of contract and fraud.  In essence, UG argues that (1) Juice breached the Transfer Agreement by failing to transfer the IP of the Website Deliverables and that (2) Juice never intended to transfer the IP free and clear, thereby fraudulently inducing UG to enter into the Transfer Agreement.  See generally UG's Mot.

As with the rest of UG's Counterclaims, both its breach claim and its fraud claim are extinguished by the doctrine of res judicata as explained in, supra, Part IV.A.1.  UG could have, and indeed should have, brought these claims in its Superior Court action and its failure to do so is fatal at the summary judgment stage.  The court denies UG's Motion for Partial Summary Judgment.

　　b.  UG's Motion for Summary Judgment on the Amended Complaint

UG also moves for summary judgment as to each of the seven counts in Juice's Amended Complaint: (1) copyright infringement; (2) fraudulent inducement; (3) breach of the MSA; (4) breach of the implied covenant of good faith and fair dealing; (5) unjust enrichment; (6) quantum meruit; and (7) declaratory judgment.  The court discusses each in turn.

　　i.  Copyright Infringement (Juice's Count One)

Juice's first cause of action in its Amended Complaint is copyright infringement. Amended Complaint ¶¶ 81-94.  Juice alleges that it is the rightful owner of the Six Copyrights and that UG obtained possession of this copyrighted code through fraudulent inducement into the Transfer Agreement.  Id. at ¶¶ 85, 86.  Juice asserts that

it has duly rescinded the Transfer Agreement because of this purported fraudulent inducement.  Id. at ¶ 87.  However, UG contends that Juice's infringement claim must fail because (i) Juice transferred the copyright to UG through the Transfer Agreement, (ii) Juice cannot show that it effectively rescinded the Transfer Agreement, and (iii) Juice's infringement claim is barred by the illegality of its copyright registrations.  UG's Mot. 4-17.

The court denies summary judgment on this count for the same reason it denies summary judgment as to Juice's Motion on the same: material issues of fact exist as to whether Juice duly rescinded the Transfer Agreement.  See, supra, Part IV.A.2.

To establish a copyright infringement claim, "a plaintiff must show both ownership of a copyright and unauthorized copying by the defendant."  Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999).  A certificate of copyright registration is prima facie evidence of ownership of a copyright.  Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003).  Copyright ownership may be transferred by operation of contractual assignment. U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 695 (2d Cir. 1991).  The parties do not dispute that the Transfer Agreement intended to transfer copyright ownership of the Website Deliverables to UG.

However, issues with the formation or execution of a contract may frustrate copyright assignment such that a transferor's copyright claim is not precluded.  See Graham v. James, 144 F.3d 229, 237-38 (2d Cir. 1998).  A party's conduct may render a contract voidable and subject to rescission.  Id.  To establish rescission, the party seeking rescission must: (i) return to the defendant any benefit earned from the contract the party seeks to rescind and (ii) act without unreasonable delay.  See, supra, Part

IV.A.2.  As it were, the parties contest both whether Juice made an adequate offer to restore the status quo ante and whether it did so timely.  Material issues of fact exist as to both.

In its August 22, 2022 letter, Juice offered to "maintain the $23,462 received pursuant to the Transfer Agreement in escrow and will return the funds to UG upon receipt of proof that the infringement has ceased."  UG's Exhibit CC.  UG argues, inter alia, that this offer to maintain the funds paid to Juice in escrow would not "restore UG to its prior position as nearly as possible."  UG's Mot. at 7.

> "Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract.  A condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible."

Metcalfe v. Talarski, 213 Conn. 145, 153 (1989) (quoting Kavarco v. T.J.E., Inc., 2 Conn.App. 294, 299, 478 A.2d 257 (1984)) (emphasis added).  Indeed, the restoration rule is not strictly confined to conferring the value constituting consideration under the contract.  Id. at 154.  The parties dispute whether the letter's offer to escrow the $23,462, absent more, constitutes a full offer to restore status quo ante.

This court previously held that, drawing all inferences in Juice's favor, the August 2022 letter could have been viewed as Juice seeking a return to the status quo, particularly given the language that "the parties will return to their positions immediately preceding execution of the Transfer Agreement."  Ruling on Defendant's Motion to Dismiss at 12.  (Doc. No. 181).  However, while that language was sufficient to survive the pleading stage, the court cannot conclude that the offer to escrow the $23,462, without more, is sufficient as a matter of law.  There exists an issue of fact as to whether

an offer to restore the <u>status quo ante</u> must necessarily contemplate both UG's status as a licensee prior to the Transfer Agreement, Juice's 56(a)(2) Statement ¶ 8, or post-Agreement modifications UG made to the Website Deliverables.  UG's Mot. at 8.  Indeed, the restoration rule is not a rigid one and may necessitate looking at conditions beyond the Transfer Agreement's consideration.  <u>Metcalfe</u>, 213 Conn. at 154.

The same is true of timeliness.  The parties dispute whether Juice's letter purporting to rescind the Transfer Agreement was timely.  "Rescission claims must be instituted promptly after discovery of the fraud."  <u>Ballow Brasted O'Brien & Rusin P.C. v. Logan</u>, 435 F.3d 235, 239 (2d Cir. 2006) (quoting <u>Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank</u>, 850 F.Supp. 1199, 1211 (S.D.N.Y.1994)).  Juice alleges that "Juice believed, but did not have confirmation, that UG had made misrepresentations in negotiating the Transfer Agreement as of March 11, 2022, when UG immediately claimed breach of the Transfer Agreement."  Juice's Opp. at 10.  Juice argues that it was not until August of that year, when UG threatened litigation with the Superior Court action, that Juice had the confirmation it needed to proceed with rescission.  <u>Id</u>. at 11.  UG argues the opposite—that it was in March 2022 when Juice had its basis to accuse UG of potential fraud.  UG's Mot. at 11.

Whether a rescission was timely is a fact-specific inquiry and may implicate questions of actual or constructive knowledge of the purported material misrepresentation.  <u>United States Liab. Ins. Co. v. WW Trading Co.</u>, 813 F. App'x 636, 639 (2d Cir. 2020).  The question of what information was sufficient to put Juice on actual or constructive notice that UG may have fraudulently induced Juice into the Transfer Agreement cannot be resolved at the summary judgment stage.  A reasonable

jury could find, or not find, that Juice had the information it needed to pursue rescission as of March 2022.

Because the court cannot resolve the question of rescission on summary judgment, the court cannot reach the question of copyright ownership because whether the Six Copyrights vest in Juice turns on whether the Transfer Agreement has been rescinded or not.

ii.  Fraudulent Inducement (Juice's Count Two)

Juice's second cause of action is fraudulent inducement.  Juice alleges that it entered into the Transfer Agreement based on UG's knowingly false representations as to the operation of the Transfer Agreement in terminating the relationship and the universe of materials Juice was obligated to transfer to UG under the Transfer Agreement.  Amended Compl. ¶ ¶ 95-108.  The court denies summary judgment on this count for the same reason it denies summary judgment as to Juice's Motion on the same: material issues of fact exist as to whether UG evinced requisite fraudulent intent. See, supra, § IV.A.3.

To prove fraudulent inducement, a party must show "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment."  Antilla, 2012 WL 3580477, at *15 (D. Conn. Aug. 17, 2012).  "[A] promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."  Paiva, 159 Conn. at 515 (1970).  Though the parties dispute multiple elements of fraudulent

inducement, the court focuses its decision on the second element: that the statement was known to be untrue by its maker.

As in its own Motion for Summary Judgment, Juice contends in opposition that "the clearest evidence of UG's intent" with respect to at least one of the material misstatements in question is the time frame following the Transfer Period during which UG demanded receipt of the Four Features.  Juice's Opp. at 19.  Juice argues that UG must have necessarily always intended to pursue the completion and delivery of the Four Features because it demanded delivery "a mere five hours" after the Transfer Period was complete.  Id.

As discussed, see, infra, Part IV.A.3. that UG knew certain code did not exist and would not constitute part of the Website Deliverables remains an issue of fact at this stage.  More specifically, that whether UG's knowledge that this code did not exist may be reasonably inferred by the timing in which it demanded the missing code from Juice is something better suited for the fact finder.  A reasonable jury may find that UG had an unreasonable, but not otherwise knowingly false, belief that it could expect the code, and its anticipation of the Four Features allowed for the short time lapse between delivery and the demand by Attorney Dreier.  For that reason alone, the court denies as to UG summary judgment on Juice's second cause of action.

### iii.   Breach of the MSA (Juice's Count Three)

In its third cause of action, Juice alleges that UG breached the MSA by failing to pay all the invoices for work performed pursuant to the MSA.  Specifically, Juice alleges that there is "$23,463.95 due and owing," and that "Juice has made repeated demands for payment [from UG], to no avail."  Amended Compl. ¶¶ 109-116.  UG asserts that,

according to the terms of the Transfer Agreement, "nothing was left owing to Juice under the MSA—if the TA is enforceable."  UG's Mot. at 34.  The threshold inquiry is whether the TA is operative and enforceable.

The Transfer Agreement by its terms superseded the MSA and would, if the Transfer Agreement were operative, extinguish amounts due and owing under the MSA.[10]  As with Juice's copyright infringement claim, the question remains as to whether Juice effectively rescinded the Transfer Agreement.

Because material issues of fact exist with respect to the sufficiency of Juice's offer to restore UG to the status quo ante and Juice's timeliness in doing so, the court cannot reach the question of breach of the MSA.  For that reason, the court denies summary judgment on Juice's Count Three.

iv.  Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Four)

Juice's fourth cause of action is breach of the implied covenant of good faith and fair dealing.  Juice alleges that, in "demanding the Four Features and threatening litigation mere hours after receiving ownership of the documents and source code from Juice, UG has evaded the spirit of the Transfer Agreement."  Amended Compl. ¶ 118. Indeed, Juice asserts that, by "doing so, UG has deprived Juice of the benefits of the bargain, that is, a full and complete termination of the relationship between the parties." Id. at ¶ 119.  UG argues that Juice cannot point to any express term in the Transfer

---

[10] The Transfer Agreement states in relevant part, "UG shall remit to Juice a final payment in the amount of $23,462 (the 'Payment') for any and all outstanding payments Juice claims to be due and owing by UG to Juice with respect to Juice's assistance with the UG Website Technical Deliverables and UG Website content Deliverables, and Juice shall deem such payment full and final satisfaction of any and all outstanding payment owed to it by UG and acknowledges that no additional monies are owed by UG to Juice on any accounts whatsoever."  Article IV of the Transfer Agreement (Def.'s Ex. P).

Agreement that UG has allegedly breached and, therefore, Juice cannot show a breach of good faith and fair dealing.  UG's Mot. at 36.

Connecticut law implies in every contract the covenant of good faith and fair dealing.  Thomas v. Vigilant Ins. Co., 594 F. Supp. 3d 499, 505 (D. Conn. 2022).  "In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  Courteau v. Tchrs. Ins. Co., 243 F. Supp. 3d 215, 219 (D. Conn. 2017).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive."  Id. In addition, "Connecticut courts have adopted the view that a claim for breach of the implied covenant of good faith and fair dealing must be tied to an alleged breach of an express contract term."  Nwachukwu v. Liberty Bank, 257 F. Supp. 3d 280, 296 (D. Conn. 2017).

Here, Juice alleges that the "heart" of the Transfer Agreement for Juice "was to fully resolve the parties' disputes concerning Juice's development of the UG Website and terminate the parties' relationship," Juice's Opp. at 31, and that Juice was deprived of that benefit.  However, in neither the Amended Complaint nor Juice's Opposition does Juice point to a specific contract term that UG has allegedly breached.[11]  While the court recognizes that the Transfer Agreement's overall aim might have been to put to rest myriad disputes arising out of a souring consultancy relationship, that these

---

[11] While plausible that the Transfer Agreement was drafted to bury the proverbial hatchet amidst a souring professional relationship between the two parties, there is not an explicit contract provision to that effect.  Even the preamble of the Transfer Agreement itself is silent as to the reconciliation point.  Therefore, the court cannot find a breach of the covenant as a matter of law.

disagreements continued post-Agreement does not, without more, indicate a bad faith breach.  Absent any evidence of a provision setting forth that purpose, Juice has failed to adequately show a breach of the covenant of good faith and fair dealing.  For that reason, the court grants UG summary judgment on Juice's Count Four.

> v.  Unjust Enrichment & Quantum Meruit (Juice's Counts Five & Six)

Juice's fifth and six causes of action are unjust enrichment and quantum meruit. With respect to unjust enrichment, Juice alleges that it "provided UG with valuable source code and other information, to which UG otherwise would have no ownership rights," that Juice has unjustly received no benefit or compensation for that code and, therefore, UG has been enriched by utilizing the source code for its benefit.  Amended Compl. ¶¶ 121-127.  Similarly, for its quantum meruit claim, Juice alleges that it conferred a benefit upon UG by providing it with valuable source code, Juice received no benefit or compensation for the source code, and that UG has been enriched by utilizing the source code for its benefit while failing to pay Juice.  Id. ¶¶ 128-135.

UG argues, inter alia, that these two claims fail in part because equitable relief is not available where there is a contract governing the subject matter.  UG's Mot. 36-37. Prayers for relief which sound in quasi-contract are unavailable where an enforceable contract exists.  For instance, "proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." Patrick Baker & Sons Inc. v. St. Killian Candle Co., No. 3:17-CV-0664 (RAR), 2023 WL 1505598, at *22 (D. Conn. Feb. 3, 2023). Juice, for its part, contends that there is no operative contract on the subject matter of the source code because the Transfer Agreement has been duly rescinded.  Juice's Opp. 31-32.

As is true of other causes of actions in Juice's Amended Complaint, the threshold inquiry here is whether the Transfer Agreement has been rescinded.  The issues related to whether the Transfer Agreement has been duly rescinded, i.e., the sufficiency and timeliness of the offer to restore the status quo ante, bear on these quasi-contract claims.  Whether these claims for equitable relief are available to Juice require an a priori determination that the Transfer Agreement is no longer operative, i.e., is rescinded.  Because the court has not reached the question of rescission, it cannot reach the question of the two quasi-contract claims.  For that reason, the court denies summary judgment on the fifth and sixth counts.

vi.  Declaratory Judgment (Count Seven)

Finally, in its Count Seven, Juice seeks a declaratory judgment that "it has not breached the Transfer Agreement."  Amended Compl. ¶¶ 136-139.  UG asserts that Juice is not entitled to a declaratory judgment because it unduly encumbered the copyrights associated with the Website Deliverables Juice ultimately transferred under the Transfer Agreement.  UG's Mot. at 39-40.  Juice contends that it was not obligated to inform UG of the copyright registrations at issue and that Juice transferred the copyrights by operation of execution of the Transfer Agreement.  Juice's Opp. at 32.

A "transfer of copyright ownership is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect but not including a nonexclusive license." 17 U.S.C. § 101. "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the

owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

The Transfer Agreement was a written, executed assignment of the copyright ownership of the Website Deliverables.  The remaining inquiry then is twofold: (1) to what extent, if any, did the copyright registrations of which UG complains vitiate the transfer of ownership of the Website Deliverables and (2) did Juice have recordation obligations beyond execution of the Transfer Agreement.  Based on the plain language of the Transfer Agreement itself, the court finds that the answer to the second question is no.  Juice did not have recordation requirements beyond executing the Transfer Agreement.  As for the first question, the court declines to hold that, as a matter of law, the copyright registrations encumbered the copyright such that declaratory judgment is improper.  For that reason, summary judgment Count Seven is denied.

## V.    CONCLUSION

For the reasons discussed above, Juice's Motion for Summary Judgment (Doc. No. 232) is GRANTED in part and DENIED in part and UG's Motions for Partial Summary Judgment on its Counterclaims and Summary Judgment on the Amended Complaint (Doc. Nos. 236, 237) are GRANTED in part and DENIED in part.  Juice's Motion for Summary Judgment is GRANTED with respect to all five of UG's Counterclaims and DENIED with respect to Counts One and Two in Juice's Amended Complaint.  UG's Motion for Partial Summary Judgment on its Counterclaims is DENIED on both Counterclaims One and Two.  UG's Motion for Summary Judgment on the Amended Complaint is DENIED as to Counts One, Two, Three, Five, Six, and Seven and GRANTED as to Count Four.

The Pretrial Memorandum is due 30 days from entry of this Ruling.  <u>See</u>

Scheduling Order Regarding Case Management Plan (Doc. No. 25).

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of August 2025.

<u> /s/ Janet C. Hall        </u>
Janet C. Hall
United States District Judge